# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK
# ALBANY DIVISION

COUNTY OF ALBANY, NEW YORK,

     *Plaintiff,*

     v.

ELI LILLY AND COMPANY; NOVO
NORDISK INC.; SANOFI-AVENTIS U.S.
LLC; EVERNORTH HEALTH, INC.
(FORMERLY EXPRESS SCRIPTS
HOLDING COMPANY); EXPRESS
SCRIPTS, INC.; EXPRESS SCRIPTS
ADMINISTRATORS, LLC; MEDCO
HEALTH SOLUTIONS, INC.; ESI MAIL
PHARMACY SERVICES, INC.; EXPRESS
SCRIPTS PHARMACY, INC.; CVS
HEALTH CORPORATION; CVS
PHARMACY, INC; CAREMARK RX, LLC;
CAREMARK PCS HEALTH, LLC;
CAREMARK, LLC; UNITEDHEALTH
GROUP, INC.; OPTUM, INC.; OPTUMRX
INC.; OPTUMINSIGHT, INC.,

     *Defendants.*

Case No.   1:22-cv-00981 (DNH/CFH)

Jury Trial Demanded

# COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................ 1

II.     PARTIES ...................................................................... 10

        A.      Plaintiff ............................................................ 10

        B.      Manufacturer Defendants .............................................. 11

        C.      PBM Defendants ....................................................... 16

III.    JURISDICTION AND VENUE ...................................................... 44

        A.      Subject-Matter Jurisdiction .......................................... 44

        B.      Personal Jurisdiction ................................................ 45

        C.      Venue ................................................................ 45

IV.     ADDITIONAL FACTUAL ALLEGATIONS .............................................. 46

        A.      Diabetes and Insulin Therapy ......................................... 46

                •   Diabetes: A Growing Epidemic ..................................... 46

                •   Insulin: A Century-Old Drug ...................................... 47

                •   Current Insulin Landscape ........................................ 50

                •   Insulin Adjuncts: Type 2 Medications ............................. 52

        B.      The Dramatic Rise in the Price of Diabetes Medications ............... 55

                •   Defendant Manufacturers Have Increased Prices in Lockstep ........ 61

        C.      Pharmaceutical Payment and Supply Chain .............................. 66

        D.      PBMs' Role in the Pharmaceutical Payment Chain ....................... 67

                •   The Rise of the PBMs in the Pharmaceutical Supply Chain ........... 70

                •   Insular Nature of the Pharmaceutical Industry .................... 73

        E.      The Insulin Pricing Scheme ........................................... 77

        F.      Defendants Admit That They Have Engaged in the Insulin Pricing
                Scheme and That it Is Harming Diabetics .............................. 83

i

G.      Defendants Profit Off the Insulin Pricing Scheme ..................................... 88

PBMs Pocket a Majority of Manufacturers' Secret Payments .............................. 89

The Insulin Pricing Scheme Allows PBMs to Profit Off Pharmacies .................. 94

The Insulin Pricing Scheme Increases PBM Mail-Order Profits ......................... 95

H.      Plaintiff Purchases the At-Issue Drugs from Defendants ......................... 96

I.      Defendants Deceived Plaintiff ................................................................. 97

The Manufacturer Defendants Deceived Plaintiff ............................................... 97

•   PBM Defendants Deceived Plaintiff ................................................ 100

J.      The Insulin Pricing Scheme Has Damaged Plaintiff ................................ 110

K.      Defendants' Recent Efforts in Response to Rising Insulin Prices ........... 113

V.      TOLLING OF THE STATUTES OF LIMITATIONS .......................................... 115

A.      Discovery Rule Tolling ............................................................................ 116

B.      Fraudulent Concealment Tolling ............................................................. 116

C.      Estoppel .................................................................................................. 117

D.      Continuing Violations ............................................................................. 117

VI.     CLAIMS FOR RELIEF .................................................................................. 117

1.      Violations of the Racketeer Influenced and Corrupt Organizations
        Act ("RICO"), 18 U.S.C. § 1962(c) (against Defendants Eli Lilly,
        Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark) .................. 117

A.      Defendants are Culpable "Persons" Under RICO .................................... 118

B.      Manufacturer-PBM RICO Enterprises .................................................... 118

C.      Defendants' Use of the U.S. Mails and Interstate Wire Facilities ........... 124

D.      Conduct of the Manufacturer-PBM Enterprises' Affairs ........................ 126

E.      Defendants' Pattern of Racketeering Activity ......................................... 128

F.      Defendants' Motive ................................................................................. 129

G.      The Manufacturer-PBM Enterprises' Insulin Pricing Scheme
        Damaged Plaintiff .................................................................................. 130

2.  Violations of RICO, 18 U.S.C. § 1962(d)  By Conspiring to Violate 18 U.S.C. § 1962(c)  (against All Defendants) .................................................. 132

3.  Violation of New York General Business Law N.Y. Gen. Bus. Law § 349 (Against All Defendants)........................................................ 133

4.  Unjust Enrichment (Against All Defendants) ..........................................137

5.  Civil Conspiracy ...................................................................... 139

**VII.   MOTION FOR INJUNCTION**....................................................................**141**

**VIII.   PRAYER FOR RELIEF** .........................................................................**142**

**IX.   JURY DEMAND**..................................................................................**143**

# TABLE OF FIGURES

Figure 1: Price Increase of Insulin vs. Selected Consumer Goods from 1997-2018 .......... 6

Table 1: Diabetes medications at issue in this case ......................................................... 54

Figure 2: Rising reported prices of Humulin R (500U/mL) from 1997-2021 ................ 56

Figure 3: Rising reported prices of Humalog vials and pens from 1996-2021 ............... 57

Figure 4: Rising reported prices of Levemir from 2006-2021 ....................................... 58

Figure 5: Rising reported prices of Novolog vials and pens from 2002-2021 ................ 59

Figure 6: Rising reported prices of Lantus vials and pens from 2001-2021.................... 60

Figure 7: Rising reported prices of long-acting insulins ................................................. 62

Figure 8: Rising reported prices of rapid-acting insulins ............................................... 63

Figure 9: Rising reported price increases for human insulins ........................................ 64

Figure 10: Rising reported prices of Type 2 drugs......................................................... 65

Figure 11: Lockstep insulin price increases.................................................................... 66

Figure 12: Insulin distribution and payment chain ........................................................ 68

Figure 13: PBM consolidation ....................................................................................... 72

Plaintiff, County of Albany, New York ("Plaintiff" or "Albany County"), by and through the undersigned attorneys, brings this lawsuit against the above-named Defendants and alleges as follows:

## I.   INTRODUCTION

1.   Diabetes is an epidemic and a public-health crisis throughout the United States. The total estimated cost of diabetes in the U.S. in 2017 was $327 billion, including $237 billion in direct medical costs and $90 billion in reduced productivity.[1] One in four healthcare dollars is spent caring for people with diabetes.[2] In total, nearly 30 million people, 9.3% of the country, live with this disease.[3] Of this number, approximately six million people rely on daily insulin treatments to survive.[4]

2.   The economic impact of diabetes is staggering. Diabetes costs an estimated $15.1 billion per year in New York alone in direct medical expenses for diagnosed and undiagnosed diabetes, prediabetes, and gestational diabetes.[5] Another $6.1 billion is spent on indirect costs from lost productivity due to diabetes.[6]

3.   Approximately 1.7 million people in New York, or 10.7% of the adult population, have diabetes.[7] More than 5.2 million New Yorkers have prediabetes with blood glucose levels higher than normal but not yet high enough to be diagnosed as

---

[1] *See* AMERICAN DIABETES ASSOCIATION, *The Cost of Diabetes*, (Mar. 22, 2018), https://www.diabetes.org/resources/statistics/cost-diabetes.

[2] *Id.*

[3] *Id.*

[4] Carolyn Y. Johnson, *Why treating diabetes keeps getting more expensive*, WASH. POST (Oct. 31, 2016), https://washingtonpost.com/news/wonk/wp/2016/10/31/why-insulin-prices-have-kept-rising-for-95-years/.

[5] *See* AMERICAN DIABETES ASSOCIATION, *The Burden of Diabetes in New York* (Oct. 2021), https://diabetes.org/sites/default/files/2021-10/ADV_2021_State_Fact_sheets_New%20York.pdf (last visited Sept. 9, 2022).

[6] *Id.*

[7] *Id.*

diabetes.[8] In Albany County, approximately 21,000, or 7.8%, of adult residents are living with diabetes.[9]

4.    Diabetes is the leading cause of blindness, kidney failure, and lower limb amputations and is the sixth leading cause of death in New York despite the availability of effective treatment.[10]

5.    Diabetics in New York generally rely on daily insulin treatments or the use of oral medications, insulin or a combination of both to treat and control diabetes. As a result, hundreds of thousands of New York residents must rely on the companies that manufacture diabetes medications to stay alive and, thus, are at the mercy of these manufacturers.

6.    Defendants Eli Lilly, Novo Nordisk, and Sanofi (collectively, the "Manufacturer Defendants" or "Manufacturers") manufacture the vast majority of insulins and other diabetic medications available in the United States.

7.    Defendants CVS Caremark, Express Scripts, and OptumRx (collectively, the "PBM Defendants" or "PBMs") collectively influence the pricing for the at-issue drugs.[11] The PBM Defendants' dominance results from the reality that these three corporate actors

---

[8] *Id.*

[9] N.Y. St. Dep't of Health, *Percentage Of Adults With Diagnosed Diabetes, By County, N.Y. State, BRFSS 2018*, https://www.health.ny.gov/statistics/prevention/injury_prevention/information_for_a ction/docs/2021-01_ifa_report.pdf (last visited Sept. 8, 2022); U.S. CTR. FOR DISEASE CONTROL AND PREVENTION, *U.S. Diabetes Surveillance System, Albany County 2019*, https://gis.cdc.gov/grasp/diabetes/DiabetesAtlas.html# (last visited Sept. 9, 2022).

[10] N.Y. St. Dep't of Health, *New York State Leading Causes of Death: 2010-2019*, www.apps.health.ny.gov/public/tabvis/PHIG_Public/lcd/reports/#state (last updated Jan. 2022).

[11] In the context of this Complaint, the "at-issue drugs" are Humulin N, Humulin R, Humalog, Trulicity, Basaglar, Lantus, Toujeo, Apidra, Soliqua, Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

are, at once, (1) the largest pharmacy benefit managers in the United States and in New York (controlling approximately 80% of the PBM market)[12]; (2) the largest pharmacies in the United States and in New York (making up 3 of the top 5 dispensing pharmacies in the U.S.)[13]; and (3) housed within the same corporate families as three of the largest insurance companies in the United States—Aetna (CVS Caremark), Cigna (Express Scripts), and UnitedHealthcare (OptumRx). These Defendant corporate conglomerates sit at 4th (CVS Caremark), 5th (OptumRx), and 12th (Express Scripts) on the Fortune 500 list.[14]

8.     Through every facet of these three activities (insurance, pharmacy benefit managing, and pharmacy dispensing), the Defendants profit in myriad ways from driving up the prices for the at-issue drugs. In fact, a recent study published in the Journal of the American Medical Association found that—for transactions where the PBM Defendants control the insurer, the PBM, and the pharmacy (e.g., Aetna-Caremark-CVS Pharmacy)—the PBM Defendants capture an astonishing 50% of the money spent on each insulin prescription (up from only 25% in 2014), despite the fact that they do not contribute to the development, manufacture, innovation, or production of the drug.

9.     As part of this work, the PBM Defendants establish national formulary offerings (i.e., approved drug lists), which, among other things, set the baseline for which

---

[12] Adam J. Fein, *The Top Pharmacy Benefit Managers of 2021: The Big Get Even Bigger,* DRUG CHANNELS (Apr. 5, 2022), https://www.drugchannels.net/2022/04/the-top-pharmacy-benefit-managers-of.html#:~:text=We%20estimate%20that%20for%202021,OptumRx%20business%20of%20UnitedHealth%20Group.

[13] Adam J. Fein, *The Top 15 U.S. Pharmacies of 2021: Market Shares and Revenues at the Biggest Companies,* DRUG CHANNELS (Mar. 8, 2022), https://www.drugchannels.net/2022/03/the-top-15-us-pharmacies-of-2021-market.html#:~:text=The%20top%20seven%20dispensing%20pharmacies,prescription%20dispensing%20revenues%20in%202021.

[14] FORTUNE, *Fortune 500 List of Companies*, https://fortune.com/fortune500/2022/search/ (last visited Sept. 9, 2022).

diabetes medications are covered and which are not covered by nearly every payor in the United States, including in New York and, more specifically, Albany County.

10.     The PBM Defendants understand that their national formulary offerings drive drug utilization.

11.     The more accessible a drug is on the PBMs' national formulary, the more that drug will be used throughout the United States, including in Albany County.

12.      The Manufacturer Defendants likewise understand that the PBM Defendants' national formularies drive drug utilization throughout the country.

13.     Given the PBMs' market power and the crucial role their standard formularies play in the pharmaceutical pricing chain, both Defendant groups understand that the PBM Defendants wield enormous control over drug prices and purchasing behavior.

14.     The unfair and deceptive conspiracy at the root of this Complaint—the "Insulin Pricing Scheme"—was born from this mutual understanding.

15.     Over the course of the last fifteen years, and pursuant to the Insulin Pricing Scheme, the Manufacturer Defendants have sharply increased the reported prices of their respective diabetes drugs in lockstep, even though the cost to produce these drugs decreased during that period.

16.     Insulins, which today cost the Manufacturer Defendants less than $2 to produce and which were originally priced at $20 when released in the late 1990s, now range in price from $300 to $700.[15]

---

[15] *See* Dzintars Gotham, Melissa J. Barber, & Andrew Hill, *Production Costs and Potential Prices for Biosimilars Of Human Insulin and Insulin Analogues*, BMJ GLOBAL HEALTH (Sept. 25, 2018), https://gh.bmj.com/content/3/5/e000850; Table 1 of this Complaint.

17.     In the last decade alone, the Manufacturer Defendants have in tandem increased the prices of their insulins up to 1000%, taking the same increase down to the decimal point within a few days of one another. [16]

18.     Figure 1 illustrates the rate at which Defendant Eli Lilly raised the price of its analog insulin, Humalog, compared to the rate of inflation for other consumer goods and services from 1997-2018.

---

[16] *See* Irl B. Hirsch, MD, *Changing Cost of Insulin Therapy in the U.S.* (Mar. 6, 2016), http://professional.diabetes.org/files/media/Changing_Cost_Insulin.pdf; Figure 1 of this Complaint.

**Figure 1: Price Increase of Insulin vs. Selected Consumer Goods from 1997-2018**



19.     Remarkably, nothing about these medications has changed during that time; today's $350 insulin is the exact same product Defendants once sold for $20.[17]

20.     The current exorbitant price of insulin stands in stark contrast to its origins: the discoverers sold the original patent for $1 to ensure that the medication would remain affordable. Today, insulin has become the poster child for skyrocketing pharmaceutical prices.[18]

21.     Both the Manufacturer Defendants and the PBM Defendants play vital roles in, and profit immensely from, the Insulin Pricing Scheme.

22.     The Insulin Pricing Scheme works as follows: first, to gain formulary access from the PBM Defendants for their diabetic treatments, the Manufacturer Defendants artificially and willingly raise their prices, and then secretly pay a significant, yet undisclosed, portion of that false list price back to the PBMs. These Manufacturer Payments[19] are provided under a variety of labels—rebates, discounts, credits, inflation/price protection fees, administration fees, etc. However they are described, the

---

[17] Indianapolis Bus. J., *Lilly Insulin Prices Under Microscope*, REPUBLIC (Sept. 3, 2017), http://www.therepublic.com/2017/09/03/lilly_insulin_prices_under_microscope/#:~:targetText=Lilly%20launched%20Humalog%20in%201996,month's%20supply%20for%20many%20patients.&targetText=Instead%2C%20the%20company%20said%2C%20they,negotiate%20drug%20prices%20for%20insurers; *see also* Table 1 of this Complaint.

[18] Jerry Mitchell, *Life-Saving Hormone 'Belongs to the World,' Scientists Said. Insulin Pricing Challenges That Concept*, MISSISSIPPI TODAY (Oct. 13, 2021), https://mississippitoday.org/2021/10/13/mississippi-insulin-pricing-challenges-lawsuit/

[19] In the context of this Complaint, the term "Manufacturer Payments" is defined as all payments or financial benefits of any kind conferred by the Manufacturer Defendants to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on a PBM's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments includes rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees and any other form of consideration exchanged.

Manufacturer Payments, along with the inflated reported prices, are a *quid pro quo* for formulary inclusion in the PBMs' national offerings.

23.     The Manufacturers' list prices are so untethered from the net prices realized by the Manufacturers as to constitute a false price.

24.     Next, the PBMs grant national formulary status based upon the highest inflated price—which the PBMs know to be false—and upon which diabetes medications generate the largest profits for these PBMs.

25.     The Insulin Pricing Scheme creates a "best of both worlds" scenario for Defendants. The Manufacturer Defendants are able to buy preferred formulary position and increase their revenues, while the PBM Defendants receive these secret Manufacturer Payments.

26.     The PBM Defendants profit off the Insulin Pricing Scheme in numerous ways, including: (1) retaining a significant—yet undisclosed—percentage of the secret Manufacturer Payments, either directly or through rebate aggregators, (2) using the price produced by the Insulin Pricing Scheme to generate unearned and unwarranted profits from pharmacies, and (3) relying on those same artificial prices to drive up the PBMs' margins and fees related to their mail-order pharmacies.

27.     Thus, although the PBM Defendants represent both publicly and to their clients that they use their market power to drive down prices for diabetes medications, these representations are false and deceptive. Instead, the PBMs' "negotiations" intentionally drive up the price of the at-issue drugs and are directly responsible for the skyrocketing price of diabetes medications.

28.     Because the price of every at-issue diabetes medication is based upon the price generated by Defendants' unfair and deceptive scheme, every payor in the United

States that purchases these life-sustaining drugs, including Plaintiff, has been directly harmed by the Insulin Pricing Scheme.

29.     For diabetic New Yorkers, including the beneficiaries of Plaintiff's health plans, the physical, emotional, and financial tolls of paying excessive prices for diabetes medications is devastating. Unable to afford the drugs their doctors prescribe, many diabetics are forced to ration or under-dose their insulin, inject expired insulin, reuse needles, and starve themselves to control their blood sugars with as little insulin as possible. These behaviors are extremely dangerous and can lead to serious complications or even death.

30.     As a payor for and purchaser of the at-issue drugs, Plaintiff Albany County has been overcharged millions of dollars during the relevant time period as a direct result of the Insulin Pricing Scheme.

31.     Plaintiff Albany County seeks legal relief against the Defendants to protect its economic interests and to protect its Beneficiaries.

32.     Indeed, since 2013, Albany County has spent more than $5.4 million on the at-issue diabetes medications.

33.     A substantial portion of this $5.4 million is attributable to Defendants' inflated prices that did not arise from transparent or competitive market forces; rather, the artificially inflated costs can be attributed to undisclosed dealings between the Manufacturer Defendants and the PBM Defendants as further described herein.

34.     This action alleges that Defendants violated the Racketeer Influenced and Corrupt Organizations Act, various provisions of the New York General Business Laws, and New York common law by engaging in the Insulin Pricing Scheme. The Insulin Pricing Scheme directly and foreseeably caused and continues to cause harm to Plaintiff.

35.     This action seeks injunctive relief, restitution, disgorgement, actual damages, treble damages, punitive damages, and attorneys' fees and costs to address and abate the harm caused by the Insulin Pricing Scheme.

36.     The relevant period for damages alleged in this Complaint is from 2003 through the present.

## II.     PARTIES

### A.     Plaintiff

37.     **Plaintiff Albany County, New York**, is a body corporate and politic under the laws of the State of New York.

38.      Plaintiff, as a government entity, provides vital services to its nearly 375,000 residents including public safety, emergency management, and health services.

39.     Any increase in spending has a detrimental effect on Plaintiff's overall budget and, in turn, negatively impacts its ability to provide necessary services to the community.

40.     The Insulin Pricing Scheme has had such an effect.

41.     Additionally, as a government employer, Plaintiff provides health benefits to its employees, retirees, and their dependents ("Beneficiaries"). One of the benefits Plaintiff offers its Beneficiaries is paying a substantial portion of the purchase price of their pharmaceutical drugs, including the at-issue diabetes medications. Plaintiff also purchases the at-issue diabetes medications for use in county-run facilities.

42.     Plaintiff maintains a self-insured health plan for its Beneficiaries, with approximately 6,170 members.

43.     Exclusive of the costs associated with providing diabetes medications at county-run facilities, such as correctional facilities and nursing homes, Plaintiff Albany

County spends approximately $630,000 per year on the costs of providing diabetes medications for its health-plan members. Accordingly, over the course of the relevant time period, Plaintiff has expended millions of dollars in overcharges to the detriment of its Beneficiaries and taxpayers.

44.     Indeed, recognizing the costs associated with providing such benefits to its Beneficiaries, Plaintiff specified in its Requests for PBM Proposals that "the County has placed significant importance on the reimbursement rates paid by each proposer to pharmacies for covered medications." The County specifically requested that "all proposals be quoted utilizing a 'transparent pricing' model," meaning "that the chosen provider will not retain any money associated with prescription drug rebates or any money associated with the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies."

45.     Plaintiff seeks relief for the harm suffered by Defendants' misrepresentations and omissions regarding their illegal Insulin Pricing Scheme.

**B.     Manufacturer Defendants**

46.     **Defendant Eli Lilly and Company ("Eli Lilly")** is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

47.     Eli Lilly is registered to do business in the State of New York. Eli Lilly may be served through its registered agent: National Registered Agents, Inc., 28 Liberty Street, New York, New York 10005.

48.     Eli Lilly holds four active out-of-state wholesaler licenses (License Nos. 027026, 027029, 027030, 034464) in New York.

49.     In New York and nationally, Eli Lilly manufactures, promotes, and distributes several at-issue diabetes medications: Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

50.     Eli Lilly's global revenues in 2019 were $4.13 billion from Trulicity, $2.82 billion from Humalog, $1.29 billion from Humulin and $1.11 billion from Basaglar.[20]

51.     Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin and $801 million from Basaglar.[21]

52.     Eli Lilly transacts business in New York and in Albany County, targeting these markets for its products, including the at-issue diabetes medications.

53.     Eli Lilly employs sales representatives throughout New York, to promote and sell Humulin N, Humulin R, Humalog, Trulicity, and Basaglar.

54.     Eli Lilly also directs advertising and informational materials to New York and Albany County physicians and potential users of Eli Lilly's products.

55.     At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Eli Lilly published its prices for the at-issue diabetes medications throughout New York with the express knowledge that payment and reimbursement by Plaintiff would be based on those false list prices.

56.     During the relevant time period, Plaintiff purchased Eli Lilly's at-issue drugs at a price based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

---

[20] Eli Lilly, Annual Report (Form 10-K) (Dec. 31, 2019).
[21] Eli Lilly, Annual Report (Form 10-K) (Dec. 31, 2018).

57.     All of the Eli Lilly diabetes medications related to the at-issue transactions were paid for and/or reimbursed in New York based on the specific false and inflated prices Eli Lilly caused to be published in New York in furtherance of the Insulin Pricing Scheme.

58.     **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

59.     Sanofi may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

60.     Sanofi holds three active out-of-state wholesaler licenses (License Nos. 028243, 028467, 032896) in New York.

61.     Sanofi manufactures, promotes, and distributes pharmaceutical drugs both in New York and nationally, including several at-issue diabetes medications: Lantus, Toujeo, Soliqua, and Apidra.

62.     Sanofi's global revenues in 2019 were $3.50 billion from Lantus and $1.03 billion from Toujeo, $400 million from Apidra and $144 million from Soliqua.[22]

63.     Sanofi's global revenues in 2018 were $3.9 billion from Lantus, $923 million from Toujeo, $389 million from Apidra and $86 million from Soliqua.[23]

64.     Sanofi transacts business in New York and in Albany County, targeting these markets for its products, including the at-issue diabetes medications.

65.     Sanofi employs sales representatives throughout New York and in this District to promote and sell Lantus, Toujeo, Soliqua, and Apidra.

---

[22] Sanofi, Annual Report (Form 20-F) (Dec. 31, 2019).
[23] Sanofi, Annual Report (Form 20-F) (Dec. 31, 2018).

66.     Sanofi also directs advertising and informational materials to New York physicians and potential users of Sanofi's products for the specific purpose of selling the at-issue drugs in New York and Albany County and profiting from the Insulin Pricing Scheme.

67.     At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Sanofi published its prices of its at-issue diabetes medications throughout New York for the purpose of payment and reimbursement by payors, including Plaintiff.

68.     During the relevant time period, Plaintiff Albany County purchased Sanofi's at-issue drugs at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

69.     All of the Sanofi diabetes medications related to the at-issue transactions were paid for and/or reimbursed in New York and Albany County based on the specific false and inflated prices Sanofi caused to be published in New York in furtherance of the Insulin Pricing Scheme.

70.     **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

71.     Novo Nordisk is registered to do business in the State of New York. Novo Nordisk may be served through its registered agent: Novo Nordisk, Inc., 28 Liberty Street, New York, New York 10005.

72.     Novo Nordisk manufactures, promotes, and distributes pharmaceutical drugs both in New York and nationally, including at-issue diabetic medications: Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

73. Nordisk's global revenues in 2019 were $2.89 billion from Novolog, $973 million from Levemir, $968 million from Tresiba, $2.29 billion from Victoza and $1.17 billion from Ozempic.[24]

74. Novo Nordisk's global revenues in 2018 were $4.19 billion from Novolog, $1.66 billion from Levemir, $1.19 billion from Tresiba, $3.61 billion from Victoza and $185 million from Ozempic.[25]

75. Novo Nordisk transacts business in New York and in Albany County, targeting these markets for its products, including the at-issue diabetes medications.

76. Novo Nordisk employs sales representatives throughout New York and Albany County to promote and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic.

77. Novo Nordisk also directs advertising and informational materials to New York and Albany County physicians and potential users of Novo Nordisk's products.

78. At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Novo Nordisk published its prices of its at-issue diabetes medications throughout New York for the purpose of payment and reimbursement by Plaintiff.

79. During the relevant time period, Plaintiff purchased Novo Nordisk's at-issue diabetes medications at prices based on false list prices generated by the Insulin Pricing Scheme through its employee health plans and for use in county-run facilities.

80. All of the Novo Nordisk diabetes medications related to the at-issue transactions were paid for and/or reimbursed in New York based on the specific false and

---

[24] Novo Nordisk, Annual Report (Form 20-F) (Dec. 31, 2019).
[25] Novo Nordisk, Annual Report (Form 20-F) (Dec. 31, 2018).

inflated prices Novo Nordisk caused to be published in New York in furtherance of the Insulin Pricing Scheme.

81.     Collectively, Defendants Eli Lilly, Novo Nordisk, and Sanofi are referred to as the "Manufacturer Defendants" or the "Manufacturers."

**C.     PBM Defendants**

82.     **Defendant CVS Health Corporation ("CVS Health")** is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Health transacts business and has locations throughout the United States and New York.

83.     CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

84.     CVS Health—through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents, and Chief Communication Officers—is directly involved in creating and implementing the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs involved in the Insulin Pricing Scheme.

85.     CVS Health's conduct had a direct effect in New York and damaged Plaintiff Albany County as a payor and purchaser.

86.     On a regular basis, CVS Health executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

87.     In each annual report for at least the last decade, CVS Health (or its predecessor) has repeatedly and explicitly stated that *CVS Health*:[26]

- designs pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members;

- negotiates with pharmaceutical companies to obtain discounted acquisition costs for many of the products on CVS Health's drug lists, and these negotiated discounts enable CVS Health to offer reduced costs to clients;

- utilizes an independent panel of doctors, pharmacists, and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on its drug lists.

88.     CVS Health publicly represents that CVS Health constructs programs that lower the cost of the at-issue diabetes medications. For example, in 2016, CVS Health announced a new program to "reduce overall spending in diabetes" that is available in all states, including New York, stating:

> "*CVS Health* introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, *lower pharmacy costs [for diabetes medications]* through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3000 to $5000 per year for each member who successfully improves control of their diabetes" (emphasis supplied).[27]

89.     In 2017, CVS Health stated that "*CVS Health* pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year

---

[26] CVS Caremark/CVS Health, Annual Report (Form 10-K) (Dec. 31, 2009-2019).

[27] CVS HEALTH, *CVS Health Introduces New "Transform Diabetes Care" Program to Improve Health Outcomes and Lower Overall Health Care Costs* (Dec. 13, 2016), https://cvshealth.com/newsroom/press-releases/cvs-health-introduces-new-transform-diabetes-care-program-improve-health.

the lowest in five years. Despite manufacturer price increases of near 10 percent, *CVS Health* kept drug price growth at a minimal 0.2 percent."[28]

90.     In November 2018, CVS Health acquired Aetna for $69 billion and became the first combination of a major health insurer, PBM, and mail-order and retail pharmacy chain. As a result, CVS Health controls the health plan/insurer, the PBM and the pharmacies utilized by approximately 40 million Aetna members in the United States and in New York. CVS Health controls the entire drug pricing chain for these 40 million Americans.

91.     CVS Health is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout New York that dispensed and received payment for the at-issue diabetes medications throughout the relevant time period.[29]

92.     **Defendant CVS Pharmacy, Inc. ("CVS Pharmacy")** is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy is a wholly owned subsidiary of CVS Health.

93.     CVS Pharmacy is the immediate or indirect parent of many pharmacy subsidiaries that own and operate hundreds of pharmacies throughout New York and is directly involved in these pharmacies dispensing and payment policies related to the at-issue diabetes medications.[30]

---

[28] CVS HEALTH, *CVS Health Kept Drug Price Growth Nearly Flat and Improved Medication Adherence for PBM Clients in 2017* (Apr. 15, 2018), https://cvshealth.com/news-and-insights/press-releases/cvs-health-kept-drug-price-growth-nearly-flat-and-improved.
[29] CVS Caremark/CVS Health, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2019).
[30] CVS Caremark/CVS Health, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2019).

94.     CVS Pharmacy is also the immediate and direct parent of Defendant Caremark Rx, LLC.[31]

95.     CVS Pharmacy is registered to do business in New York and has been since at least 1997.[32]

96.     CVS Pharmacy may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

97.     CVS Pharmacy holds an active out-of-state pharmacy license (License No. 032367) in New York.

98.     During the relevant time period, CVS Pharmacy provided retail pharmacy services in New York that gave rise to the Insulin Pricing Scheme, which damaged Plaintiff.

99.     **Defendant Caremark Rx, LLC** is a Delaware limited liability company and an immediate or indirect parent of many subsidiaries, including pharmacy benefit management and mail order subsidiaries that engaged in the activities in New York that gave rise to this Complaint.[33]

100.    Caremark Rx, LLC is a wholly owned subsidiary of Defendant CVS Pharmacy and its principal place of business is at the same location as CVS Pharmacy and CVS Health.[34]

101.    Caremark Rx, LLC is registered to do business in New York and has been since at least October 18, 2010. Caremark Rx, LLC may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

---

[31] *Id.*

[32] Business Entities Online, *Business Name Search*, S.C SEC'Y STATE, https://businessfilings.sc.gov/BusinessFiling/Entity/Profile/a3420ef5-eaf0-4cfa-a561-48d86184e91c (last visited Sept. 9, 2022).

[33] CVS Caremark/CVS Health, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2019).

[34] CVS Caremark/CVS Health, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2019).

102.    During the relevant time period, Caremark Rx, LLC provided PBM and mail order pharmacy services in New York that gave rise to the Insulin Pricing Scheme and damaged payors in New York.

103.    **Defendant Caremark LLC** is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark, LLC is a wholly owned subsidiary of Caremark Rx, LLC

104.    Caremark, LLC is registered to do business in New York and has been since at least August 1, 2007. Caremark, LLC may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

105.    Caremark, LLC holds an active out-of-state wholesaler license (License No. 025623) and four active out-of-state pharmacy licenses (License Nos. 025624, 037566, 038098, 038254) in New York.

106.    During the relevant time period, Caremark, LLC provided PBM and mail order pharmacy services in New York and Albany County that gave rise to the Insulin Pricing Scheme, which damaged Plaintiff.

107.    **Defendant CaremarkPCS Health, LLC** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CVS Health is the direct or indirect parent company of CaremarkPCS Health LLC.

108.    CaremarkPCS Health, LLC, doing business as CVS Caremark, provides pharmacy benefit management services.

109.    CaremarkPCS Health, LLC is registered to do business in New York and has been since at least February 27, 2009. CaremarkPCS Health, LLC may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

20

110.    During the relevant time period, CaremarkPCS Health, LLC provided PBM services in the State of New York, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff Albany County.

111.    Defendants CaremarkPCS Health, LLC and Caremark, LLC are agents and/or alter egos of Caremark Rx, LLC, CVS Pharmacy, and CVS Health.

112.    As a result of numerous interlocking directorships and shared executives, Caremark Rx, LLC, CVS Pharmacy and CVS Health are directly involved in the conduct of and control CaremarkPCS Health, LLC and Caremark, LLC's operations, management and business decisions related to the at-issue formulary construction, Manufacturer Payments and mail order and retail pharmacy services to the ultimate detriment of Plaintiff. For example:

> a.    During the relevant time period, these parent and subsidiaries have had common officers and directors, including:
>
> - Thomas S. Moffatt, Vice President and Secretary of Caremark Rx, LLC, CaremarkPCS Health LLC, and Caremark, LLC, is also a Vice President, Assistant Secretary, and Senior Legal Counsel at CVS Health and the Vice President, Secretary and Senior Legal Counsel of CVS Pharmacy;[35]
>
> - Melanie K. Luker, Assistant Secretary of Caremark Rx, LLC, CaremarkPCS Health, LLC, and Caremark, LLC, is also a Manager of Corporate Services at CVS Health;[36]

---

[35] CVS HEALTH, *Thomas S. Moffatt,* https://investors.cvshealth.com/investors/corporate-governance/officers/person-details/default.aspx?ItemId=d69a2f14-70cb-47b3-9e3d-583e5408ddf3 (last visited Sept. 9, 2022); FLA. SEC'Y OF STATE ANNUAL REP., Divisions of Corporations Public Access System.

[36] FLA. SEC'Y OF STATE ANNUAL REP., Divisions of Corporations Public Access System.

- Carol A. Denale, Senior Vice President and Treasurer of Caremark Rx, LLC, is also Senior Vice President, Treasurer and Chief Risk Officer at CVS Health Corporation;[37]

- John M. Conroy has been Vice President of Finance at CVS Health since 2011, and was also President and Treasurer of Caremark, LLC and CaremarkPCS Health LLC in 2019;[38]

- Sheelagh Beaulieu has been the Senior Director of Income Tax at CVS Health while also acting as the Assistant Treasurer at CaremarkPCS Health LLC and Caremark LLC[39]

b.      CVS Health owns all the stock of CVS Pharmacy, which owns all the stock of Caremark Rx, LLC, which owns all the stock of Caremark LLC CVS Health also directly or indirectly owns all the stock of CaremarkPCS Health LLC.[40]

c.      CVS Health, as a corporate family, does not operate as separate entities. The public filings, documents and statements of CVS Health presents its subsidiaries, including CVS Pharmacy, CaremarkPCS Health, LLC, Caremark, LLC and Caremark Rx, LLC as divisions or departments of one unified "diversified health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." The day-to-day operations of this

---

[37] CVS HEALTH, *Carol A. DeNale,* https://investors.cvshealth.com/investors/corporate-governance/officers/person-details/default.aspx?ItemId=1deaad66-090c-4c73-b82d-8d0163f9ce29 (last visited Sept. 9, 2022); FLA. SEC'Y OF STATE ANNUAL REPORTS, Divisions of Corporations Public Access System.

[38] John Conroy, LINKEDIN, https://www.linkedin.com/in/john-conroy-53aa372 (last visited Sept. 9, 2022); FLA. SEC'Y OF STATE ANNUAL REP., Divisions of Corporations Public Access System.

[39] Sheelagh Beaulieu, LINKEDIN, https://www.linkedin.com/in/sheelaghbeaulieu (last visited Sept. 9, 2022);FLA. SEC'Y OF STATE ANNUAL REP , Divisions of Corporations Public Access System.

[40] CVS Caremark/CVS Health, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2019) (publicly available Current Organization Chart of CVS Health and its affiliates).

corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations discussed in this Complaint.[41]

d.      All executives of CaremarkPCS Health, LLC, Caremark, LLC, Caremark Rx, LLC, and CVS Pharmacy ultimately report to the executives at CVS Health, including the President and CEO of CVS Health.

e.      As stated above, CVS Health's CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, Senior Vice Presidents and Chief Communication Officers are directly involved in the policies and business decisions of CaremarkPCS Health, LLC and Caremark, LLC that gave rise to Plaintiff Albany County's claims in this Complaint.

113.    Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, LLC, Caremark, LLC and CaremarkPCS Health, LLC, including all predecessor and successor entities, are referred to as "CVS Caremark."

114.    CVS Caremark is named as a Defendant in its capacities as a PBM and pharmacy.

115.    In its capacity as a PBM, CVS Caremark coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on CVS Caremark's formularies.

---

[41] CVS Caremark/CVS Health, Annual Report (Form 10-K) (Dec. 31, 2009-2019); CVS Health, *Our Purpose,* https://cvshealth.com/about-cvs-health/our-purpose (last visited Sept. 9, 2022); CVS Health, *Quality of Care,* https://cvshealth.com/health-with-heart/improving-health-care/quality-of-care (last visited Sept. 9, 2022).

116.    CVS Caremark has the largest PBM market share based on total prescription claims managed, representing approximately 40% of the national market. CVS Caremark's pharmacy services segment generated $141.5 billion in total revenues last year.[42]

117.    At all times relevant hereto, CVS Caremark offered pharmacy benefit services nationwide and to New York payors, and derived substantial revenue therefrom, and, in doing so, made the at-issue misrepresentations (discussed below) and utilized the false prices generated by the Insulin Pricing Scheme to profit off payors.

118.    At all times relevant hereto, CVS Caremark offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in New York. During the relevant time period, those formularies included diabetes medications, including all of those at issue in this Complaint.

119.    CVS Caremark purchases drugs directly from manufacturers and through drug wholesalers for dispensing through its mail order pharmacy.

120.    During the relevant time period, CVS Caremark provided PBM services to Plaintiff and, in doing so, CVS Caremark set the price that Plaintiff paid for the at-issue drugs based on the false list prices generated by the Insulin Pricing Scheme and Plaintiff paid CVS Caremark for the at-issue drugs.

121.    In its capacity as a retail pharmacy, CVS Caremark further and knowingly profited from the false list prices produced by the Insulin Pricing Scheme by pocketing the

---

[42] CVS Caremark Annual Report (Form 10-K) (Dec. 31, 2018); National Community Pharmacists Association, PBM Resources, http://www.ncpanet.org/advocacy/thetools/pbm-resources; Ed Kaplan & Wendy Pongracz, *Negotiating and Drafting Pharmacy Benefit Manager  Contracts for Self-Insured Plans*, Strafford (June 21, 2016), http://media.straffordpub.com/products/negotiating-and-drafting-pharmacy-benefit-manager-contracts-for-self-funded-plans-2016-06-21/presentation.pdf.

spread between acquisition cost for the drugs at issue (an amount well below the list price generated by the Insulin Pricing Scheme), and the amounts it received from payors (which amounts were based on the false list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

122.   During the relevant time period, CVS Caremark provided mail order and retail pharmacy services to Plaintiff and, in doing so, Plaintiff paid CVS Caremark for the at-issue drugs at prices based on the false list prices generated by the Insulin Pricing Scheme.

123.   At all times relevant hereto, CVS Caremark dispensed the at-issue medications nationwide and directly Plaintiff through its mail order and retail pharmacies and derived substantial revenue from these activities in New York.

124.   At all times relevant hereto, CVS Caremark had express agreements with Defendants Novo Nordisk, Sanofi, and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to CVS Caremark, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail order pharmacies.

125.   **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.[43]

126.   Evernorth may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

---

[43] Until 2021, Evernorth Health, Inc. conducted business under the name Express Scripts Holding Company. For the purposes of this Complaint "Evernorth" refers to Evernorth Health, Inc and Express Scripts Holding Company.

127.    Evernorth, through its executives and employees, including its CEO and Vice Presidents, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme.

128.    Evernorth's conduct had a direct effect in New York and to Plaintiff Albany County.

129.    On a regular basis, Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

130.    Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout New York, which engaged in the activities that gave rise to this Complaint.[44]

131.    In December 2018, Evernorth merged with Cigna in a $67 billion deal to consolidate their businesses as a major health insurer, PBM, and mail-order pharmacy. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM, and the mail-order pharmacies utilized by approximately 15 million Cigna members in the United States and in New York. Evernorth controls the entire drug pricing chain for these 15 million Americans.

132.    In each annual report for at least the last decade, Evernorth has repeatedly and explicitly[45]:

- Acknowledged that it is directly involved in the company's PBM services, stating "[Evernorth is] the largest stand-alone PBM company in the United States."

- Stated that Evernorth: "provid[es] products and solutions that focus on improving patient outcomes and assist in controlling costs; evaluat[es] drugs

---

[44] Express Scripts Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2018).
[45] Express Scripts Annual Reports 2009-2019.

for efficacy, value and price to assist clients in selecting a cost-effective formulary; [and] offer[s] cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members."

133. **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

134. Express Scripts, Inc. is registered to do business in New York and has been since at least September 25, 2013. Express Scripts, Inc. may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

135. Express Scripts, Inc. holds eight active out-of-state pharmacy licenses (License Nos. 032610, 032611, 032612, 032617, 033102, 033212, 033218, 033219) in New York.

136. Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout New York that engaged in the conduct, which gave rise to this Complaint.[46]

137. During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail-order pharmacy services, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff.

138. Indeed, Express Scripts, Inc. provides pharmacy benefit services to Plaintiff Albany County, New York, based on Plaintiff's reliance upon Express Scripts, Inc.'s response to the County Request for Proposals.

139. **Defendant Express Scripts Administrators, LLC,** doing business as Express Scripts and formerly known as Medco Health, LLC, is a Delaware limited liability

---

[46] Express Scripts Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2018).

company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth.

140.    Express Scripts Administrators, LLC is registered to do business in New York and may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

141.    During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in New York discussed in this Complaint that gave rise to the Insulin Pricing Scheme that damaged Plaintiff.

142.    **Defendant Medco Health Solutions, Inc. ("Medco")** is a Delaware Corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey.

143.    Medco may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

144.    In 2012, Express Scripts acquired Medco for $29 billion.

145.    Prior to the merger, Express Scripts and Medco were two of the largest PBMs in the United States and in New York.

146.    Prior to the merger, Medco provided the at-issue PBM and mail order services in New York, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff.

147.    Following the merger, all of Medco's PBM and mail-order pharmacy functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's payor customers becoming Express Scripts' customers. The combined company covered over 155 million lives at the time of the merger.

28

148.    At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, then CEO of Medco, David B Snow, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater [Manufacturer Payments] from drug manufacturers and other suppliers."

149.    The then-CEO of Express Scripts, George Paz, during a Congressional subcommittee hearing in September 2011, echoed these sentiments: "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines."

150.    **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.[47]

151.    ESI Mail Pharmacy Service, Inc. is registered to do business in New York and has been since at least August 31, 2000. ESI Mail Pharmacy Service, Inc. may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

152.    ESI Mail Pharmacy Service, Inc. holds an active pharmacy license (License No. 024708) and two active out-of-state pharmacy licenses (License Nos. 025764, 025766) in New York.

153.    During the relevant time period, ESI Mail Pharmacy Services provided the mail-order pharmacy services in New York discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff.

---

[47] Express Scripts Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2018).

154.     **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

155.     Express Scripts Pharmacy, Inc. is registered to do business in New York and has been since at least September 25, 2013. Express Scripts Pharmacy, Inc. may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

156.     Express Scripts Pharmacy, Inc. holds eight active out-of-state pharmacy licenses (License Nos. 032610, 032611, 032612, 032617, 033102, 033212, 033218, 033219) in New York.

157.     During the relevant time period, Express Scripts Pharmacy, Inc. provided the mail order pharmacy services in New York discussed in this Complaint, which gave rise to the Insulin Pricing Scheme and damaged Plaintiff.

158.     As a result of numerous interlocking directorships and shared executives, Evernorth and Express Scripts, Inc. control Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., and Express Scripts Pharmacy, Inc's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail order pharmacy services to the ultimate detriment of Plaintiff. For example:

   a.     During the relevant time period, these parent and subsidiaries have had common officers and directors:

   - Officers and/or directors shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David

Queller, President; Jill Stadelman, Managing Counsel; and Scott Lambert, Treasury Manager Director;[48]

- Executives shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips, Chief Financial Officer; and Priscilla Duncan, Associate Senior Counsel;[49]

- Officers and/or directors shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer;[50] Priscilla Duncan, Associate Senior Counsel; and Joanne Hart, Treasury Director;[51] and

- Officers and/or directors shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Jill Stadelman, Managing Counsel; Scott Lambert, Treasury Manager Director; and Joanne Hart, Treasury Director.[52]

b.      Evernorth directly or indirectly owns all the stock of Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc.[53]

---

[48] Express Scripts, Inc., *2014-2020 Annual Report to the Missouri Secretary of State*, https://bsd.sos.mo.gov/e-commerce/company/search/315149; Division of Corporations, *ESI Mail Pharmacy Service, Inc., 2020 Annual Report to the Missouri Secretary of State*, FLA. DEP. OF STATE, http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=ESIMAILPHARMACYSERVICE%20F100000021060&aggregateId=forp-f10000002106-1619960a-48df-4220-9c69-965d62015743&searchTerm=esi%20mail&listNameOrder=ESIMAILPHARMACYSERVICE%20F100000021060 (last visited Sept. 9, 2022); Express Scripts Pharmacy, Inc., *2020 Annual Report to the Missouri Secretary of State*, https://bsd.sos.mo.gov/e-commerce/company/search/704432; Cigna Newsworthy, *Cigna Announces Leadership Updates to Support Continued Growth in Health Services,* CIGNA (Feb. 11, 2022), https://newsroom.cigna.com/2020-02-11-Cigna-Announces-Leadership-Updates-to-Support-Continued-Growth-in-Health-Services; David Queller, LINKEDIN, https://www.linkedin.com/in/davidqueller/ (last visited Sept. 9, 2022); EXPRESS SCRIPTS, *About Us*, https://www.express-scripts.com/corporate/index.php/experts/queller; Express Scripts Administrators, LLC, *2020 Annual Report to the Florida Secretary of State*.
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] Express Scripts Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2018).

c.      The Evernorth corporate family does not operate as separate entities. The public filings, documents and statements of Evernorth presents its subsidiaries, including Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people." The day-to-day operations of this corporate family reflect these public statements. All of these entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint.[54]

d.      All of the executives of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

e.      As stated above, Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. that gave rise to Plaintiff's claims in this Complaint.

159.    Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health

---

[54] Express Scripts Annual Reports; EVERNORTH, https://www.evernorth.com/ (last visited Sept. 9, 2022).

Solutions, Inc., and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts."

160.     Express Scripts is named as a Defendant in its capacities as a PBM and mail-order pharmacy.

161.     In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on Express Script's formularies.

162.     Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States.[55] During the relevant period of this Complaint, Express Scripts controlled 30% of the PBM market in the United States. Express Scripts has only grown larger since the Cigna merger.[56]

163.     In 2017, annual revenue for Express Scripts was over $100 billion.[57]

164.     As of December 31, 2018, more than 68,000 retail pharmacies, representing over 98% of all retail pharmacies in the nation, participated in one or more of Express Scripts' networks.[58]

165.     Express Scripts transacts business throughout the United States and New York.

166.     At all times relevant hereto, Express Scripts derived substantial revenue providing pharmacy benefits in New York.

---

[55] Express Scripts, Annual Report (Form 10-K) (Dec. 31, 2017).
[56] NATIONAL COMMUNITY PHARMACISTS ASSOCIATION, *PBM Resources*, http://www.ncpanet.org/advocacy/thetools/pbm-resources.
[57] Express Scripts, Annual Report (Form 10-K) (Dec. 31, 2018).
[58] *Id.*

167. At all times relevant hereto, and contrary to all of their express representations, Express Scripts knowingly insisted that its payor clients use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

168. At all times relevant hereto, Express Scripts has concealed its critical role in the generation of those false list prices.

169. At all times relevant hereto, Express Scripts maintained standard formularies that are used nationwide, including in the State of New York. During the relevant time period, those formularies included drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications.

170. During the relevant time period, Express Scripts provided PBM services to Plaintiff and, in doing so, Express Scripts set the price that Plaintiff paid for the at-issue drugs at prices based on the false list prices generated by the Insulin Pricing Scheme and Plaintiff paid Express Scripts for the at-issue drugs.

171. In its capacity as a mail-order pharmacy, Express Scripts received payments from New York payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Plaintiff.

172. At all times relevant hereto, Express Scripts offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in New York. During the relevant time period, those formularies included diabetes medications, including all of those at issue in this Complaint.

173. Express Scripts purchases drugs directly from manufacturers for dispensing through its mail-order pharmacy.

174.     At all times relevant hereto, Express Scripts dispensed the at-issue medications nationwide and directly to Plaintiff through its mail order pharmacies and derived substantial revenue from these activities in New York.

175.     During the relevant time period, in addition to its critical role in the Insulin Pricing Scheme, which detrimentally affected all payors and purchasers of the at-issue drugs, Express Scripts also provided PBM services directly to Plaintiff Albany County.

176.     Indeed, in requesting proposals for pharmacy benefit manager services for Albany County's self-insured prescription drugs program on behalf of its Beneficiaries, the County specified that "due to the costs associated with providing [pharmaceutical benefits for its Beneficiaries], the County has placed significant importance on the reimbursement rates paid by each proposer to pharmacies for covered medications." The County specifically requested that "all proposals be quoted utilizing a 'transparent pricing' model," meaning "that the chosen provider will not retain any money associated with prescription drug rebates or any money associated with the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies."

177.     During certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, Express Scripts worked directly with OptumRx to negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement. For example, in a February 2014 email released by the U.S. Senate in conjunction with its January 2021 report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug" ("January 2021 Senate Insulin Report"), Eli Lilly describes a "Russian nested doll situation" in which Express Scripts was

negotiating rebates on behalf of OptumRx related to the at-issue drugs for Cigna (who later would become part of Express Scripts).[59]

178.    At all times relevant hereto, Express Scripts had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to Express Scripts, as well as agreements related to the Manufacturers' at-issue drugs sold through Express Scripts' mail-order pharmacies.

179.    **Defendant UnitedHealth Group, Inc**. is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

180.    UnitedHealth Group, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

181.    UnitedHealth Group, Inc. is a diversified managed healthcare company. In 2015, UnitedHealth Group reported revenue in excess of $257 billion, and the company is currently ranked sixth on the Fortune 500 list. UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans through its wholly owned subsidiaries and prescription drugs through its PBM, OptumRx.[60]

---

[59] CHARLES E. GRASSLEY & RON WYDEN, STAFF REPORT ON INSULIN: EXAMINING THE FACTORS DRIVING THE RISING COST OF A CENTURY OLD DRUG, S. FIN. COMM., https://www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf; Letter from Joseph B. Kelley, Eli Lilly Vice President, Global Gov. Affairs, to Charles E. Grassley & Ron Wyden, S. Fin. Comm. (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Eli%20Lilly_Redacted%20v1.pdf

[60] FORTUNE, UnitedHealth Group: 2022 Fortune 500, https://fortune.com/company/unitedhealth-group/fortune500/ (last visited Sept. 9, 2022).

182.    Over one-third of the overall revenues of UnitedHealth Group come from OptumRx.[61]

183.    UnitedHealth Group, through its executives and employees, is directly involved in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme. For example, UnitedHealth Group executives structure, analyze, and direct the company's overarching policies, including with respect to PBM and mail-order services, as a means of maximizing profitability across the corporate family.

184.    UnitedHealth Group's Sustainability Report states that "OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies – or drug lists – to ensure people get the right medications. [*UnitedHealth Group*] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [*UnitedHealth Group*] also operate[s] [mail order pharmacies] . . . . [*UnitedHealth Group*] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply."

185.    In addition to being a PBM and a mail-order pharmacy, UnitedHealth Group owns and controls a major health insurance company, UnitedHealthcare. As a result, UnitedHealth Group controls the health plan/insurer, the PBM and the mail-order pharmacies utilized by approximately 26 million UnitedHealthcare members in the United States and in New York. UnitedHealth Group controls the entire drug pricing chain for these 26 million Americans.

---

[61] *Id.*

186.     UnitedHealth Group's conduct had a direct effect in New York and damaged Plaintiff.

187.     UnitedHealth Group states in its Annual Reports that UnitedHealth Group "utilizes Optum's capabilities to help coordinate patient care, improve affordability of medical care, analyze cost trends, manage pharmacy benefits, work with care providers more effectively and create a simpler consumer experience."[62]

188.     **Defendant Optum, Inc.**, is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.[63]

189.     Optum, Inc. is registered to do business in New York and has been since at least June 4, 2020. Optum, Inc. may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

190.     Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme, which had a direct effect in New York and damaged Plaintiff.

191.     For example, according to Optum Inc.'s press releases, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad healthcare marketplace, including care providers, plan

---

[62] CNN BUSINESS, https://money.cnn.com/quote/profile/profile.html?symb=UNH (last visited Sept. 9, 2022); UnitedHealth Group, Annual Report (Form 10-K) (Dec. 31, 2018).
[63] UnitedHealth Group, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2018).

sponsors, payors, life sciences companies and consumers."[64] In this role Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx"[65] and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction and mail order activities.

192. **Defendant OptumRx, Inc.** is a California corporation with its principal place of business at 2300 Main Street, Irvine, California, 92614.

193. OptumRx, Inc. operates as a subsidiary of OptumRx Holdings, LLC, which in turn operates as a subsidiary of Defendant Optum, Inc.

194. OptumRx, Inc. is registered to do business in New York and has been since at least July 31, 2001. OptumRx, Inc. may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

195. OptumRx, Inc. holds four active out-of-state pharmacy licenses (License Nos. 025749, 028050, 037354, 037505) in New York.

196. During the relevant time period, OptumRx, Inc. provided the PBM and mail order pharmacy services in New York that gave rise to the Insulin Pricing Scheme, which damaged Plaintiff.

197. **Defendant OptumInsight, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

---

[64] UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/ (last visited on Sept. 9, 2022); *UnitedHealth Group Announces "Optum" Master Brand for Its Health Services Businesses,* FIERCE HEALTHCARE (Apr. 11, 2011, 9:21 AM), https://www.fiercehealthcare.com/healthcare/unitedhealth-group-announces-optum-master-brand-for-its-health-services-businesses.
[65] *Id.*; UNITEDHEALTH GROUP, *UnitedHealth Group Announces "Optum" Master Brand for Its Health Services Businesses* (Apr. 11, 2011), https://www.unitedhealthgroup.com/newsroom/2011/0411optum.html.

198.    OptumInsight, Inc. is registered to do business in New York and has been since at least September 4, 1998. OptumRx, Inc. may be served through its registered agent: CT Corporation System, 28 Liberty Street, New York, New York 10005.

199.    OptumInsight, Inc. is an integral part of the Insulin Pricing Scheme and, during the relevant time, period OptumInsight coordinated directly with the Manufacturer Defendants in furtherance of the conspiracy. OptumInsight analyzed data and other information from the Manufacturer Defendants to advise the other Defendants with regard to the profitability of the Insulin Pricing Scheme to the benefit of all Defendants.

200.    As a result of numerous interlocking directorships and shared executives, UnitedHealth Group, OptumRx Holdings, LLC and Optum, Inc are directly involved in the conduct of and control OptumInsight's and Optum Rx's operations, management and business decisions related to the at-issue formulary construction, negotiations, and mail order pharmacy services to the ultimate detriment of Plaintiff. For example:

    a.    These parent and subsidiaries have common officers and directors, including:

    - Sir Andrew Witty is president of UnitedHealth Group and CEO of Optum, Inc.;[66]

---

[66] UNITEDHEALTH GROUP, *UnitedHealth Group Executive Management Team*, https://www.unitedhealthgroup.com/who-we-are/executives.html (last visited Sept. 9, 2022); Andrew Witty, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/who-we-are/executives.html (last visited Sept. 9, 2022); OPTUM, *Leadership*, https://www.optum.com/about-us/leadership.html (last visited Sept. 9, 2022); Terry Clark, LINKEDIN, https://www.linkedin.com/in/terryclark (last visited Sept. 9, 2022); OPTUM, *Leadership: John Prince*, https://www.optum.com/about/leadership/john-prince.html (last visited Sept. 9, 2022); OPTUM, *Leadership: Dan Schumacher*, https://www.optum.com/about/leadership/dan-schumacher.html (last visited Sept. 9, 2022); OPTUM, *Leadership: John Santelli*, https://www.optum.com/about/leadership/john-santelli.html (last visited Sept. 9, 2022); UnitedHealth Group, Inc. Form 10-K for fiscal year ended 2020, filed Mar. 1,

- Dan Schumacher is president of Optum, Inc and is also named to the Office of the Chief Executive at UnitedHealth Group, Inc.;[67]

- Terry Clark is a senior vice president and chief marketing officer at UnitedHealth Group and also oversees the branding, marketing and advertising for UnitedHealth Group and Optum, Inc.;[68]

- Tom Roos serves as chief accounting officer for UnitedHealth Group and Optum, Inc.;[69]

- Heather Lang is Deputy General Counsel, Subsidiary Governance at UnitedHealth Group, Inc. and also Assistant Secretary at OptumRx, Inc.;[70]

- Peter Gill is Vice President at UnitedHealth Group, Inc. and also Treasurer at OptumRx, Inc.;[71]

- John Santelli leads Optum Technology, the leading technology division of Optum, Inc serving the broad customer base of Optum and UnitedHealthcare and also serves as UnitedHealth Group's chief information officer;[72]

- Eric Murphy is the Chief Growth and Commercial Officer for Optum, Inc. and has also led OptumInsight, Inc.[73]

b.  UnitedHealth Group directly or indirectly owns all the stock of Optum, Inc., OptumRx, Inc and OptumInsight, Inc.[74]

c.  The UnitedHealth Group corporate family does not operate as separate entities. The public filings, documents and statements of

---

2021, Exhibit 21; Tom Roos, LINKEDIN, https://www.linkedin.com/in/tom-roos-80a62940 (last visited Sept. 9, 2022); *Our Leadership,* UNITED HEALTHCARE, https://www.uhc.com/about-us/leadership (last visited Sept. 9, 2022).

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] UnitedHealth Group, Annual Report (Form 10-K, Exhibit 21) (Dec. 31, 2018).

UnitedHealth Group presents its subsidiaries, including Optum, Inc., OptumRx, Inc., and OptumInsight as divisions or departments of a single company that is "a diversified family of businesses" that "leverages core competencies" to "help[] people live healthier lives and helping make the health system work better for everyone." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint.[75]

d.      All the executives of Optum, Inc., OptumRx, Inc., and OptumInsight ultimately report to the executives, including the CEO, of UnitedHealth Group.

e.      As stated above, UnitedHealth Group's executives and officers are directly involved in the policies and business decisions of Optum, Inc., OptumRx, Inc., and OptumInsight that gave rise to Plaintiff's claims in this Complaint.

201.   Collectively, Defendants UnitedHealth Group, Inc., OptumRx, Inc., OptumInsight, Inc. and Optum, Inc., including all predecessor and successor entities, are referred to as "OptumRx."

202.   OptumRx is named as a Defendant in its capacities as a PBM and mail-order pharmacy.

203.   OptumRx is a pharmacy benefit manager and, as such, coordinates with Novo Nordisk, Eli Lilly, and Sanofi regarding the price of the at-issue diabetes

---

[75] UnitedHealth Group, Quarterly Report (Form 10-Q) (Mar. 31, 2017).

medications, as well as for the placement of these firms' diabetes medications on OptumRx's drug formularies.

204.   OptumRx provides pharmacy care services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities.[76]

205.   In 2018, OptumRx managed more than $91 billion in pharmaceutical spending, representing 23% of the PBM market in the United States. OptumRx's 2018 revenue was $69 billion.[77]

206.   In 2019, OptumRx managed more than $96 billion in pharmaceutical spending, with a revenue of $74 billion.[78]

207.   At all times relevant hereto, OptumRx derived substantial revenue providing pharmacy benefits in New York.

208.   At all times relevant hereto, OptumRx offered pharmacy benefit management services nationwide and maintained standard formularies that are used nationwide, including in New York. During the relevant time period, those formularies included diabetes medications, including all of those at issue in this Complaint.

209.   At all times relevant hereto, and contrary to their express representations, OptumRx knowingly insisted that its payor clients use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

210.   At all times relevant hereto, OptumRx has concealed its critical role in the generation of those false list prices.

---

[76] UnitedHealth Group, Annual Report (Form 10-K) (Dec. 31, 2018).
[77] *Id.*; NATIONAL COMMUNITY PHARMACISTS ASSOCIATION, *PBM Resources*, http://www.ncpanet.org/advocacy/thetools/pbm-resources.
[78] UnitedHealth Group, Annual Report (Form 10-K) (Dec. 31, 2019).

211.    In its capacity as a mail-order pharmacy, OptumRx received payments from payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Plaintiff.

212.    At all times relevant hereto, OptumRx dispensed the at-issue medications nationwide and directly to Plaintiff and Plaintiff's Beneficiaries in New York through its mail order pharmacies and derived substantial revenue from these activities in New York.

213.    OptumRx purchases drugs produced by the Manufacturer Defendants, including the at-issue diabetes medications, for dispensing through its mail order pharmacies.

214.    At all times relevant hereto, OptumRx had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx's mail order pharmacies.

215.    Collectively, CVS Caremark, Optum Rx, and Express Scripts are referred to as the "PBM Defendants" or the "PBMs."

## III.    JURISDICTION AND VENUE

### A.    Subject-Matter Jurisdiction

216.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and pursuant to 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

### B.   Personal Jurisdiction

217.   This Court has personal jurisdiction over each Defendant. Each Defendant: (a) transacts business and/or is admitted to do business within New York, (b) maintains substantial contacts in New York, and (c) committed the violations of New York statutes, federal statutes, and common law at issue in this lawsuit in whole or part within the State of New York. The Insulin Pricing Scheme has been directed at, and has had the foreseeable and intended effect of, causing injury to persons residing in, located in, or doing business in New York, and to Plaintiff. All of the at-issue transactions occurred in the State of New York and/or involved New York residents. This Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New York.

218.   This Court also has personal jurisdiction over all defendants under 18 U.S.C. § 1965(b). This Court may exercise nationwide jurisdiction over the named Defendants where the "ends of justice" require national service and Plaintiff demonstrates national contacts. Here, the interests of justice require that Plaintiff be allowed to bring all members of the nationwide RICO enterprise before the Court in a single trial.

### C.   Venue

219.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in this District, and because some of the actions giving rise to the Complaint took place within this District. In particular, at all times during the relevant time period, Defendants provided pharmacy benefit services, provided mail-order pharmacy services, employed sales representatives, promoted and sold diabetes medications and published prices of the at issue drugs in this District.

220.    Venue is also proper in this District pursuant to 18 U.S.C. § 1965, because all Defendants reside, are found, have an agent or transact their affairs in this District, and the ends of justice require that any Defendant residing elsewhere be brought before this Court.

## IV.    ADDITIONAL FACTUAL ALLEGATIONS

### A.    Diabetes and Insulin Therapy

Diabetes: A Growing Epidemic

221.    Diabetes is a disease that occurs when a person's blood glucose, also called blood sugar, is too high. In a non-diabetic person, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to glucose, or sugar, in the blood. When there is not enough insulin or cells stop responding to insulin, too much blood sugar stays in the bloodstream. Over time, this can cause serious health problems, such as heart disease, vision loss, and kidney disease.[79]

222.    There are two basic types of diabetes. Roughly 90-95% of diabetics developed the disease because they do not produce enough insulin or have become resistant to the insulin their bodies do produce.[80] Known as Type 2, this form of diabetes often is developed later in life. While Type 2 patients can initially be treated with tablets, in the long term most patients have to switch to insulin injections.[81]

---

[79] CDC, *What is Diabetes?*, https://www.cdc.gov/diabetes/basics/diabetes.html (last visited Sept. 9, 2022).
[80] *Id.*
[81] *Id.*

223.    Type 1 diabetes occurs when a patient completely ceases insulin production. In contrast to Type 2 patients, people with Type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die.[82]

224.    Insulin treatments are a necessary part of life for those who have diabetes, and interruptions to a diabetic's insulin regimen can have severe consequences. Missed or inadequate insulin therapy can trigger hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days.[83]

225.    The number of Americans with diabetes has exploded in the last half century. In 1958, only 1.6 million people in the United States had diabetes. By the turn of the century, that number had grown to over ten million. Fourteen years later, the count tripled again. Now over thirty million people—9.4% of the country—live with the disease.[84]

226.    The prevalence of diabetes in New York has increased as well. Over 1.7 million New York adults now live with diabetes and another 5.2 million have prediabetes.[85]

<u>Insulin: A Century-Old Drug</u>

227.    Despite its potentially deadly impact, diabetes is highly treatable. Patients able to follow a prescribed treatment plan consistently may avoid the health complications associated with the disease.

228.    Unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

---

[82] *Id.*; NATIONAL INST. OF HEALTH, *What is Diabetes* (Nov. 2016), https://www.niddk.nih.gov/health- information/diabetes/overview/what-is-diabetes.
[83] *Id.*
[84] CDC, *National Diabetes Statistics Report 2020,* https://www.cdc.gov/diabetes/pdfs/data/statistics/national-diabetes-statistics-report.pdf (last visited Sept. 9, 2022); CDC, *Long-Term Trends in Diabetes* (Apr.2017), https://www.cdc.gov/diabetes/statistics/slides/long_term_trends.pdf.
[85] AM. DIABETES ASS'N, *supra* note 1.

229.    In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas that could then be used to treat diabetes. After discovery, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 (equivalent of $14 today), explaining "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[86]

230.    After purchasing the patent, the University of Toronto contracted with Defendants Eli Lilly and Novo Nordisk to scale their production. Under this arrangement, Eli Lilly and Novo Nordisk were allowed to apply for patents on variations to the manufacturing process.[87]

231.    Although early iterations of insulin were immediately perceived as lifesaving,[88] there have been numerous incremental improvements since its discovery. The earliest insulin was derived from animals and, until the 1980s, was the only treatment for diabetes.[89]

232.    While effective, animal-derived insulin created the risk of allergic reaction. This risk was lessened in 1982 when synthetic insulin, known as human insulin, was developed by Defendant Eli Lilly. Eli Lilly marketed this insulin as Humulin.[90] The

---

[86] Jessica DiGiacinto & Valencia Higuera, *Everything You Need to Know About Insulin*, HEALTHLINE (Oct. 5, 2021), http://www.healthline.com/health/type-2-diabetes/insulin; M. BLISS, THE DISCOVERY OF INSULIN (2013).

[87] *Id.*

[88] *Id.*; Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. ENG. J. MED. 1171, 1172 (2015).

[89] *Id.*; Celeste C. Quianzon & Issam Cheikh, *History of Insulin,* J. CMTY. HOSP. INTERNAL MED. PERSP. (July 16, 2012),

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3714061/.

[90] *Id.*

development of human insulin benefited heavily from government and non-profit funding through the National Institute of Health and the American Cancer Society.

233.    Over a decade later, Eli Lilly released the first analog insulin.

234.    Analog insulin is laboratory grown and genetically altered insulin. Analogs are slight variations on human insulin that make the injected treatment act more like the insulin naturally produced and regulated by the body.

235.    Defendant Eli Lilly developed the first analog insulin, Humalog, in 1996.[91]

236.    Other rapid-acting analogs are Defendant Novo Nordisk's Novolog and Defendant Sanofi's Apidra, which have similar profiles. Diabetics use these rapid-acting insulins in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

237.    Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

238.    In 2015, Sanofi introduced Toujeo, another long-acting insulin also similar to Lantus, however Toujeo is highly concentrated, making injection volume smaller than Lantus.[92]

239.    In 2016, Eli Lilly introduced Basaglar, which is a long-acting insulin that is biologically similar to Sanofi's Lantus.[93]

---

[91] *Id.*

[92] Jennifer Leavitt, *Toujeo vs. Lantus: How Do These Long-Acting Insulins Compare?,* HEALTHLINE (Mar. 6, 2019) https://www.healthline.com/health/diabetes/toujeo-vs-lantus.

[93] DIATRIBE, *FDA Approves New Insulin Glargine Basaglar – The Frist "Biosimilar" Insulin in the US (Jan. 11, 2016)* https://diatribe.org/fda-approves-new-insulin-glargine-basaglar-%E2%80%93-first-%E2%80%9Cbiosimilar%E2%80%9D-insulin-us.

240.   Even though insulin was first extracted nearly 100 years ago, only Defendants Eli Lilly, Novo Nordisk, and Sanofi manufacture insulin in the United States.

241.   Many of the at-issue diabetes medications are now off-patent. However, the Manufacturers have engaged in illicit tactics to maintain their complete market dominance.

242.   Due in large part to their ability to stifle all competition, the Manufacturer Defendants make 99% of the insulins in the market today.

<u>Current Insulin Landscape</u>

243.   While insulin today is generally safer and more convenient to use than when originally developed in 1922, there remain questions about whether the overall efficacy of insulin has significantly improved over the last twenty years.

244.   For example, while long-acting analogs may have certain advantages over human insulins, such as affording more flexibility around mealtime planning, it has yet to be shown that analogs lead to better long-term outcomes.

245.   A recent study published in the Journal of the American Medical Association suggests that older human insulins may work just as well as newer analog insulins for patients with Type 2 diabetes.[94]

246.   When discussing the latest iterations of insulins, Harvard Medical School professor David Nathan recently stated:

> I don't think it takes a cynic such as myself to see most of these [insulins] are being developed to preserve patent protection. The truth is they are

---

[94] Jing Luo *et al.*, *Implementation of Health Plan Program for Switching from Analogue to Human Insulin and Glycemic Control Among Medicare Beneficiaries with Type 2 Diabetes,* JAMA NETWORK (Jan. 29, 2019) https://jamanetwork.com/journals/jama/article-abstract/2722772.

marginally different, and the clinical benefits of them over the older drugs have been zero.[95]

247.     Moreover, all insulins at issue in this case have either been available in the same form since the late 1990s/early 2000s or are biologically equivalent to insulins that were available then.

248.     Dr. Kasia Lipska, a Yale researcher and author of a 2018 study in the Journal of the American Medical Association on the cost of insulin, explained:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . there's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more.[96]

249.     Nor have the production or research-and-development costs increased. In fact, in the last ten years, the production costs of insulin have decreased as manufacturers simplified and optimized processes. A September 2018 study published in BMJ Global Health calculated that, based on production costs, a reasonable price for a year's supply of human insulin is $48 to $71 per person and between $78 and $133 for analog insulins—which includes delivering a profit to manufacturers.[97]

---

[95] Carolyn Y. Johnson, *Why Treating Diabetes Keeps Getting More Expensive,* WASH. POST (Oct. 31, 2016) https://www.washingtonpost.com/news/wonk/wp/2016/10/31/why-insulin-prices-have-kept-rising-for-95-years/.

[96] Natalie Shure, *The Insulin Racket,* AMERICAN PROSPECT (June 24, 2019) https://prospect.org/health/insulin-racket/.

[97] *See* Dzintars Gotham, Melissa J. Barber, & Andrew Hill, *Production Costs and Potential Prices for Biosimilars Of Human Insulin And Insulin Analogues*, BMJ GLOBAL HEALTH, https://gh.bmj.com/content/3/5/e000850.

250.    Another recent study found that the Manufacturers could be profitable charging as little as $2 a vial. On average, however, diabetics spent $5,705 each for insulin in 2016.[98]

251.    Further, while research and development costs often make up a large percentage of the price of a drug, in the case of insulin the initial basic research—original drug discovery and patient trials—was performed 100 years ago.

252.    Even the more recent costs, such as developing the recombinant DNA fermentation process and the creation of insulin analogs, were incurred decades ago.[99]

253.    Today, Manufacturer Defendants only spend a fraction of the billions of dollars in revenue they generate from the at-issue drugs on research and development.

254.    Despite this decrease in production costs and no new research and development, the reported price of insulins has risen astronomically over the last fifteen years.

Insulin Adjuncts: Type 2 Medications

255.    Over the past decade, the Manufacturer Defendants also released a number of non-insulin medications that help control the level of insulin in the bloodstream of Type 2 diabetics.

256.    In 2010, Novo Nordisk released Victoza as an adjunct to insulin to improve glycemic control. In 2014, Eli Lilly released a similar drug, Trulicity. In 2016, Sanofi did the same with Soliqua. In 2017, Novo Nordisk did the same with Ozempic.

---

[98] *Id*.; SingleCare, *Insulin Prices: How Much Does Insulin Cost?* (Jan. 27, 2020), https://www.singlecare.com/blog/insulin-prices/.
[99] EVERY CRS REPORT, *Insulin Products and the Cost of Diabetes Treatment* (Nov. 19, 2018), https://www.everycrsreport.com/reports/IF11026.html.

257.   Victoza, Trulicity, and Ozempic are all medications known as glucagon-like peptide-1 receptor agonists ("GLP-1") and mimic the GLP-1 hormone that is already produced in the body. Soliqua is a combination long-acting insulin and GLP-1 drug. Each of these drugs can be used in conjunction with insulins to control diabetes.

258.   Today, Manufacturer Defendants dominate the market for all diabetes medications. The following is a list of diabetes medications at issue in this lawsuit:

**Table 1: Diabetes medications at issue in this case**

| Insulin Type | Action | Name | Company | FDA Approval | Current Reported Price |
|---|---|---|---|---|---|
| *Human* | **Rapid-Acting** | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1982 | $1,784 (vial) $689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | **Intermediate** | Humulin N | Eli Lilly | 1982 | $178 (vial) $566 (pens) |
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial) $566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| *Analog* | **Rapid-Acting** | Humalog | Eli Lilly | 1996 | $342 (vial) $636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial) $671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial) $658 (pens) |
| | **Long-Acting** | Lantus | Sanofi | 2000 | $ 340 (vial) $510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $ 370 (vial) $ 555 (pens) |
| | | Basaglar (Kwikpen) | Eli Lilly | 2016 | $392 (pens) |
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens) $622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial) $610 (pens – 100u) $732 (pens – 200u) |
| *Type 2 Medications* | | Trulicity | Eli Lilly | 2014 | $1,013 (pens) |
| | | Victoza | Novo Nordisk | 2010 | $813 (2 pens) $1,220 (3 pens) |
| | | Ozempic | Novo Nordisk | 2017 | $1,022 (pens) |
| | | Soliqua | Sanofi | 2016 | $927.9 (pens) |

**B.      The Dramatic Rise in the Price of Diabetes Medications**

259.    In 2003, the PBMs began their rise to power (which will be discussed in greater detail in the next section).

260.    That same year, the price of insulin began its dramatic rise to its current exorbitant prices.

261.    Since 2003, the reported price of certain insulins has increased in some cases by more than 1000%; an astounding increase especially when compared to a general inflation rate of  8.3% and a medical inflation rate of 46% during the same period.[100]

262.    By 2016, the average price-per-month of the four most popular types of insulin rose to $450 and costs continue to rise, so much so that one in four diabetics are now reducing or skipping lifesaving doses.[101] This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death.

263.    Since 1997, Defendant Eli Lilly has raised the price of a vial of Humulin R (500U/ML) from $165 to $1784 (*See* Figure 2).

---

[100] *See* Irl B. Hirsch, MD, *Changing Cost of Insulin Therapy in the U.S.* (Mar. 6, 2016), http://professional.diabetes.org/files/media/Changing_Cost_Insulin.pdf; Figure 1 of this
Complaint.
[101] Darby Herkert, et al, *Cost-Related Insulin Underuse Among Patients with Diabetes,* JAMA NETWORK (Jan. 2019*)*
https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2717499; Katie Thomas, *Express Scripts Offers Diabetes Patients a $25 Cap for Monthly Insulin,* N.Y. TIMES (Apr. 3, 2019) https://www.nytimes.com/2019/04/03/health/drug-prices-insulin-express-scripts.html.

**Figure 2: Rising reported prices of Humulin R (500U/mL) from 1997-2021**



264.   Since 1996, Defendant Eli Lilly has raised the price for a package of pens of Humalog from less than $100 to $663 and from less than $50 for a vial to $342 (*See* Figure 3).

**Figure 3: Rising reported prices of Humalog vials and pens from 1996-2021**



265.   Novo Nordisk has also increased its prices—from 2006 to 2020, Levemir rose from $162 to $555 for pens and from under $100 to $370 per vial (*See* Figure 4).

**Figure 4: Rising reported prices of Levemir from 2006-2021**



266.   From 2002 to 2020, Novo Nordisk raised the price of Novolog from $108 to $671 for a package of pens and from less than $50 to $347 for a vial (*See* Figure 5).

**Figure 5: Rising reported prices of Novolog vials and pens from 2002-2021**



267.   Defendant Sanofi has kept pace as well, increasing the prices for Lantus, the top-selling analog insulin, from less than $200 in 2006, to over $500 in 2020 for a package of pens and from less than $50 to $340 for a vial (*See* Figure 6).

**Figure 6: Rising reported prices of Lantus vials and pens from 2001-2021**



268.   The Manufacturer Defendants' non-insulin diabetes medications have experienced similar recent price increases. For example, since 2015 Eli Lilly has increased the price of Trulicity almost 50%.

269.   Driven by these price hikes, payors' and diabetics' spending on diabetes medications has skyrocketed with totals in the tens of billions of dollars.[102]

<u>The Defendant-Manufacturers Have Increased Prices in Lockstep</u>

270.   The timing of the price increases reveals that each Manufacturer Defendant has not only dramatically increased prices for the at-issue diabetes treatments, but they have also done so in perfect lockstep.

271.   In thirteen instances since 2009, competitors Sanofi and Novo Nordisk raised the reported prices of their insulins in tandem, taking the same price increase down to the decimal point within a few days of each other, and sometimes within a few hours.[103]

272.   This practice of increasing drug prices in lockstep with competitors is known as "shadow pricing" and, as healthcare expert Richard Evans from SSR Health recently stated, "is pretty much a clear signal that your competitor does not intend to price-compete with you."[104]

273.   In 2016, Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs were responsible for the highest drug price increases in the entire pharmaceutical industry.

274.   Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog. Figure 7

---

[102] Carolyn Y. Johnson, *Why Treating Diabetes Keeps Getting More Expensive*, WASH. POST (Oct.31, 2016), https://www.washingtonpost.com/news/wonk/wp/2016/10/31/why-insulin-prices-have-kept-rising-for-95-years/.

[103] Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, BLOOMBERG (May 6, 2015), https://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep; Grassley & Wyden, *supra* note 59.

[104] *Id.*

demonstrates this collusive behavior with respect to Lantus and Levemir. Figure 8 demonstrates this behavior with respect to Novolog and Humalog.

**Figure 7: Rising reported prices of long-acting insulins**



**Figure 8: Rising reported prices of rapid-acting insulins**



275.   Figure 9 demonstrates this behavior with respect to the human insulins, Eli Lilly's Humulin and Novo Nordisk's Novolin.

**Figure 9: Rising reported price increases for human insulins**



276.   Figure 10 demonstrates Defendants' lockstep price increases for their Type 2 drugs, Trulicity, Victoza and Ozempic.

**Figure 10: Rising reported prices of Type 2 drugs**



277.   Figure 11 shows how, collectively, the Manufacturer Defendants have exponentially raised the prices of insulin products in near perfect unison.

**Figure 11: Lockstep insulin price increases**



278.   While the list prices for all the at-issue diabetes medications have increased exponentially, tellingly the net price has not.

279.   Because of the Manufacturer Defendants' collusive price increases, nearly a century after the discovery of insulin, diabetes medications have become unaffordable for many diabetics.

### C.   Pharmaceutical Payment and Supply Chain

280.   The prescription drug industry consists of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include drug manufacturers, wholesalers, pharmacies, health plans/third-party payors, pharmacy benefit managers, and patients.

281.   Generally speaking, branded prescription drugs, such as the at-issue diabetes medications, are distributed in one of two ways: (1) from manufacturer to wholesaler, wholesaler to pharmacy, and pharmacy to patient or (2) from manufacturer to mail-order pharmacy to patient.

282.   The pharmaceutical industry, however, is unique in that the pricing chain is distinct from the distribution chain. The prices for the drugs distributed in the pharmaceutical chain are different for each participating entity: different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is tied directly to the price set by the manufacturer.

283.   There is no transparency in this pricing system; typically, only a brand drug's reported price—also known as its Average Wholesale Price (AWP) or the mathematically-related Wholesale Acquisition Cost (WAC)—is available.

284.   Drug manufacturers self-report AWP or other prices upon which AWP is based to publishing compendiums such as First DataBank, Redbook, and others who then publish that price.

285.   As a direct result of the PBMs' conduct, AWP persists as the most commonly and continuously used reported price in reimbursement and payment calculations and negotiations for both payors and patients.

**D.    The PBMs' Role in the Pharmaceutical Payment Chain**

286.   The PBMs are at the center of the convoluted pharmaceutical payment chain, as illustrated in Figure 12:

**Figure 12: Insulin distribution and payment chain**



287.   The PBM Defendants develop drug formularies, process claims, create a network of retail pharmacies, set the prices in coordination with the Manufacturers that the payor will pay for prescription drugs, and are paid by the payor to reimburse pharmacies for the drugs utilized by the payor's beneficiaries.

288.   The PBMs also contract with a network of retail pharmacies. Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs. The PBMs reimburse pharmacies for the drugs dispensed.

289.   The PBM Defendants also own mail-order and specialty pharmacies, which purchase and take possession of prescription drugs, including those at-issue here, and directly supply those drugs to patients by mail.

290.   Often—including for the at-issue drugs—the PBM Defendants purchase drugs directly from the Manufacturers and distribute them directly to the patients.

291.   Even where PBM-Defendant mail-order pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the manufacturers.

292.   In addition, and of particular significance here, the PBM Defendants contract with pharmaceutical manufacturers, including the Manufacturer Defendants. The PBMs extract from the Manufacturers rebates, fees, and other consideration that are paid back to the PBM, including the Manufacturer Payments related to the at issue drugs.

293.   The Manufacturers also interact with the PBMs related to other services outside the scope of the Insulin Pricing Scheme, such as health and educational programs and patient and prescriber outreach with respect to drugs not at-issue in this Complaint.

294.   These relationships allow PBMs to exert tremendous influence over what drugs are available throughout the United States, including in Albany County, on what terms and at what prices.

295.   Thus, PBMs are at the center of the flow of money in the pharmaceutical supply chain. In sum:

- the PBMs negotiate the price that payors pay for prescription drugs (based on prices generated by the Insulin Pricing Scheme);

- they separately negotiate a different (and often lower) price that pharmacies in their networks receive for that same drug;

- they set the amount in fees that the pharmacy pays back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme);

- they set the price paid for each drug sold through their mail-order pharmacies (based on prices generated by the Insulin Pricing Scheme); and

- they negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (based on prices generated by the Insulin Pricing Scheme).

296.   Yet, for the majority of these transactions, only the PBMs are privy to the amount that any other entity in this supply chain is paying or receiving for the same drugs.

This lack of transparency affords Defendants the opportunity to extract billions of dollars from this payment and supply chain without detection.

297.    In every interaction that the PBMs have within the pharmaceutical pricing chain, they stand to profit from the prices generated by the Insulin Pricing Scheme.

<u>The Rise of the PBMs in the Pharmaceutical Supply Chain</u>

298.    When they first came into existence in the 1960s, PBMs functioned largely as claims processors. Over time, however, they have taken on a larger and larger role in the pharmaceutical industry. Today, PBMs wield significant control over the drug pricing system.

299.    One of the roles PBMs took on, as discussed above, was negotiating with drug manufacturers ostensibly on behalf of payors. In doing so, PBMs affirmatively represented that they were using their leverage to drive down drug prices.

300.    In the early 2000s, PBMs started buying pharmacies.[105]

301.    When a PBM combines with a pharmacy, it has additional incentive to collude with manufacturers to keep certain prices high.[106]

302.    These perverse incentives still exist today with respect to both retail and mail-order pharmacies housed within the PBMs' corporate families.

303.    More recently, further consolidation in the industry has afforded PBMs a disproportionate amount of market power.

---

[105] Brian S. Feldman, *Big Pharmacies Are Dismantling the Industry That Keeps US Drug Costs Even Sort-Of Under Control*, QUARTZ (Mar. 17, 2016), https://qz.com/636823/big-pharmacies-aredismantlingthe-industry-that-keeps-us-drug-costs-even-sort-of-under-control/.
[106] *Id.*

304.    In total, nearly forty different PBM entities have merged or otherwise been absorbed into what are now the PBM Defendants.

305.    In addition, each of the PBM Defendants is now owned by other significant players within the pharmaceutical chain: Express Scripts merged with Cigna in a $67 billion-dollar deal,[107] Caremark was bought by the largest pharmacy in the United States, CVS, for $21 billion,[108] CVS also now owns Aetna following a $69 billion-dollar deal,[109] and OptumRx was acquired by the largest health insurance company in the United States, UnitedHealth Group.[110]

306.    Figure 13 depicts this consolidation within the PBM market.

---

[107] Peter High, *A View From Inside Cigna's $67 Billion Acquisition of Express Scripts,* FORBES (Jul. 8, 2019), https://www.forbes.com/sites/peterhigh/2019/07/08/a-view-from-inside-cignas-67-billion-acquisition-of-express-scripts/?sh=22eae0234fd0.
[108] Andre Ross Sorkin, *CVS to Buy Caremark in All-Stock Deal,* N.Y. TIMES (Nov. 1, 2006), https://www.nytimes.com/2006/11/01/business/01cnd-drug.html.
[109] Angelica LaVito, *CVS Creates New Health-Care Giant as $69 Billion Merger with Aetna Officially Closes,* CNBC (Nov. 28, 2019, 12:19 PM), https://www.cnbc.com/2018/11/28/cvs-creates-new-health-care-giant-as-69-billion-aetna-merger-closes.html.
[110] UNITEDHEALTH GROUP, *Catamaran and OptumRx to Combine* (Mar. 30, 2015), https://www.unitedhealthgroup.com/newsroom/2015/0330optumrxcatamaran.html.

## Figure 13: PBM consolidation



307.   After merging or acquiring all their competitors, and now backed by multi-billion-dollar corporations, the PBM Defendants have taken over the market in the past decade, controlling more than 80% of the market and managing pharmacy benefits for over 270 million Americans.[111]

308.   Together, the PBM Defendants report more than $300 billion in annual revenue.[112]

---

[111] Adam J. Fein, *The 2018 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers*, DRUG CHANNELS INSTITUTE (Feb. 27, 2018),
https://www.drugchannels.net/2018/02/new-2018-economic-report-on-us.html.
[112] *Id.*

309.   The PBMs use this market consolidation as leverage when negotiating with other entities in the pharmaceutical pricing chain. Last year, industry expert Lindsay Bealor Greenleaf from the Advice and Vision for the Healthcare Ecosystem (ADVI) consulting described this imbalance in power; "it's really difficult to engage in any type of fair negotiations when one of the parties has that kind of monopoly power . . . I think that is something that is going to continue getting attention, especially as we see more of these payors and PBMs continue to try to further consolidate."[113]

<u>The Insular Nature of the Pharmaceutical Industry</u>

310.   The insular nature of the pharmaceutical industry has provided Defendants with ample opportunity for contact and communication with their competitors, as well as with the other PBM and Manufacturer Defendants, in order to devise and agree to the Insulin Pricing Scheme.

311.   Each Manufacturer Defendant is a member of the Pharmaceutical Research and Manufacturers of America ("PhRMA") and has routinely communicated through PhRMA's meetings and platforms in furtherance of the Insulin Pricing Scheme.

312.   David Ricks (CEO of Eli Lilly), Paul Hudson (CEO of Sanofi), and Douglas Langa (Executive Vice President of Novo Nordisk), are all part of the members of the PhRMA board of directors and/or part of the PhRMA executive leadership team.[114]

---

[113] *See* Paige Minemyer, *Senate Hearing Puts Spotlight on Debate Over Consolidation in PBM Market,* FIERCE HEALTHCARE (Apr. 11, 2019, 7:50 AM), https://www.fiercehealthcare.com/payer/senate-hearing-puts-spotlight-debate-overconsolidation-pbm-market.
[114] PHRMA, *Our Mission,* https://www.phrma.org/About (last visited Sept. 9, 2022).

313.     The PBM Defendants also routinely communicate through direct interaction with their competitors and the Manufacturers at trade associations and industry conferences.

314.      Each year during the relevant time period, the main PBM trade association, the Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.

315.     The current board of the PCMA includes Alan Lotvin (Executive Vice President of PBM Defendant CVS Health and President of CVS Caremark); Amy Bricker (President of PBM Defendant Express Scripts); and Heather Cianfrocco (CEO of PBM Defendant OptumRx).[115]

316.     All PBM Defendants are members of, and as a result of their leadership positions, control the PCMA. The Manufacturer Defendants are affiliate members of this organization.

317.     Every year, high-level representatives and corporate officers from both the PBM and Manufacturer Defendants attend these conferences to meet in person and engage in discussions, including those in furtherance of the Insulin Pricing Scheme.

318.     In fact, for at least the last six years, all Manufacturer Defendants have been "Presidential Sponsors" of these PBM conferences.[116]

---

[115] PCMA, *Board of Directors,* https://www.pcmanet.org/about/board-of-directors/ (last visited Sept. 9, 2022).

[116] PCMA, *Thank You to All of Our Sponsors,* https://www.pcmanet.org/pcma-event/annual-meeting-2020/sponsors/; https://www.pcmanet.org/pcma-event/annual-meeting-2019/ (last visited Sept. 9, 2022); PCMA, *PCMA Annual Meeting 2018,* https://www.pcmanet.org/pcma-event/annual-meeting-2018/; sPCMA, *Business Forum 2015,* https://www.pcmanet.org/wp-content/uploads/2016/10/2015_sPCMA-Business-Forum_Program-Book.pdf.

319.   Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, Manufacturer Defendants each hosted "private meeting rooms" that offer "excellent opportunities for . . . one-on-one interactions between PBM and pharma executives."[117]

320.   From at least 2010-2019, representatives from each Manufacturer Defendant met privately with representatives from each PBM Defendant during the Annual Meetings and Business Forum conferences that the PCMA held each year.

321.   In addition, all PCMA members, affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community."[118]

322.   As PCMA members, the PBM and Manufacturer Defendants utilized both PCMA-Connect, as well as the private meetings at the PCMA conferences, to exchange information and to reach agreements in furtherance of the Insulin Pricing Scheme.

323.   Notably, key at-issue lockstep price increases occurred shortly after the Defendants met at PCMA meetings. For example, on September 26 and 27, 2017, the PCMA held its annual meeting where each of the Manufacturer Defendants hosted private rooms and executives from each Defendant engaged in several meetings throughout the conference. Mere days after the conference, on October 1, 2017, Sanofi increased Lantus's list price by 3% and Toujeo's list by 5.4%. Novo Nordisk also recommended that their

---

[117] *Id.*; PCMA, *The PCMA Annual Meeting 2021 Will Take Place at the Broadmoor in Colorado Springs, CO September 20 and 21,* https://www.pcmanet.org/pcma-event/annual-meeting-2021/ (last visited Sept. 2022).

[118] PCMA, *PCMA-Connect*, https://www.pcmanet.org/contact/pcma-connect/ (last visited Sept. 9, 2022).

company make a 4% list price increase effective on January 1, 2018, to match the Sanofi increase.[119]

324.    Likewise, on May 30, 2014, Novo Nordisk raised the list price of Levemir several hours after Sanofi made its list price increase on Lantus and this occurred only a few weeks after the 2014 PCMA spring conference in Washington, D.C. attended by representatives from all the PBM Defendants.[120]

325.    Further, the PBMs control the PCMA and have weaponized it to further their interests and to hide the Insulin Pricing Scheme. The PCMA has brought numerous lawsuits and lobbying campaigns aimed at blocking drug pricing transparency efforts, including recently suing the Department of Health and Human Services (HHS) to block the finalized HHS "rebate rule," which would eliminate anti-kickback safe harbors for Manufacturer Payments and instead offer them as direct-to-consumer discounts.[121]

326.    Communications among the PBM Defendants are facilitated by the fluidity and frequency with which executives move from one PBM Defendant to another. Representative examples include:

- Mark Thierer worked as an executive at CVS Caremark prior to becoming the CEO of OptumRx in 2016;[122]

---

[119] Grassley & Wyden, *supra* note 59; Letter from Raphael A. Prober, Counsel for Novo Nordisk Inc., to Charles E. Grassley & Ron Wyden, S. Fin. Comm. (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Novo_Redacted.pdf; Letter from Jeffery L. Handwerker, Counsel for Sanofi US, to Charles E. Grassley & Ron Wyden, S. Fin. Comm. (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Sanofi_Redacted.pdf.
[120] *Id.*
[121] Paige Minemyer, *PCMA Sues Trump Administration Over Rebate Rule,* FIERCE HEALTHCARE (Jan. 12, 2021, 11:00 AM), https://www.fiercehealthcare.com/payer/pcma-sues-trump-administration-over-rebate-rule.
[122] Mark Thierer, LINKEDIN, https://www.linkedin.com/in/mark-thierer-b417095 (last visited Sept. 9, 2022).

- Bill Wolfe was the President of the PBM Catalyst Rx (now OptumRx) prior to becoming the President of Aetna Rx in 2015;[123]

- Duane Barnes was the Vice President of Medco (now Express Scripts) prior to becoming division President of Aetna Rx in 2006;[124]

- Everett Neville was the division President of Aetna Rx before becoming Senior Vice President of Express Scripts of 2015;[125]

- Albert Thigpen was a Senior Vice President at CVS Caremark prior to becoming a Senior Vice President at OptumRx in 2011;[126]

- Harry Travis was the Chief Operating Officer at Medco (now Express Scripts) before becoming a Vice President at Aetna Rx in 2008;[127] and

- Bill Kiefer was a Vice President of Express Scripts before becoming a Senior Vice President at OptumRx in 2015.[128]

### E.  The Insulin Pricing Scheme

327.  The market for the at-issue diabetes medications is unique in that it is highly concentrated with little to no generic/biosimilar options. These drugs also have similar efficacy and risk profiles.

328.  These qualities should afford the PBMs great leverage in negotiating with the Manufacturer Defendants for formulary placement. In such a scenario, competition should drive prices down.

329.  But the PBMs do not want the prices for diabetes medications to go down.

---

[123] Bill Wolfe, LINKEDIN, https://www.linkedin.com/in/bill-wolfe-5725775/ (last visited Sept. 9, 2022).
[124] Duane H. Barnes, LINKEDIN, https://www.linkedin.com/in/duanehbarnes76 (last visited Sept. 9, 2022).
[125] Everett Neville, LINKEDIN, https://www.linkedin.com/in/everett-neville1 (last visited Sept. 9, 2022).
[126] Albert Thigpen, LINKEDIN, https://www.linkedin.com/in/albert-thigpen-3483335 (last visited Sept. 9, 2022).
[127] Harry Travis, LINKEDIN, https://www.linkedin.com/in/hjtravis (last visited Sept. 9, 2022).
[128] Bill Kiefer, LINKEDIN, https://www.linkedin.com/in/billkiefer (last visited Sept. 9, 2022).

330.    The Manufacturer Defendants understand that contrary to their public representations PBM Defendants make more money from increasing prices. For example, the January 2021 Senate Insulin Report, in summarizing the internal documents produced by the Manufacturers, noted the following:

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price . . . In other words, the drug makers were aware that higher list prices meant higher revenue for PBMs.[129]

331.    The documents released by the Senate contemporaneous with the January 2021 Senate Insulin Report further corroborate the degree to which the Manufacturers' pricing strategy is focused on the PBMs' profitability. In an internal August 6, 2015, email, Novo Nordisk executives debated delaying increasing the price of an at-issue drug in order to make the increase more profitable for CVS Caremark, stating:

> Should we take 8/18 [for a price increase], as agreed to by our [pricing committee], or do we recommend pushing back due to the recent CVS concerns on how we take price? . . . We know CVS has stated their disappointment with our price increase strategy (ie taking just after the 45th day) and how it essentially results in a lower price protection, admin fee and rebate payment for that quarter/time after our increase . . . it has been costing CVS a good amount of money.[130]

332.    The Manufacturer Defendants also understand that because of the PBMs' market dominance, most payors, including in Albany County, accept the baseline national formularies offered by the PBMs with respect to the at-issue drugs.

333.    For example, Olivier Brandicourt, Sanofi's Chief Executive Officer, in a recent interview stressed the importance of the PBMs' national formularies: "if you look at

---

[129] Grassley & Wyden, *supra* note 59.
[130] Letter from Raphael A. Prober, Counsel for Novo Nordisk Inc., to Charles E. Grassley & Ron Wyden, S. Fin. Comm. (Mar. 8, 2019), https://www.finance.senate.gov/imo/media/doc/Novo_Redacted.pdf.

the way [CVS Caremark] is organized in the U.S . . . 15 million [lives] are part of [CVS Caremark's] national formulary and that's very strict, all right. So, [if we were not included in CVS Caremark's national formulary] we wouldn't have access to those 15 million lives."[131]

334.   The Insulin Pricing Scheme was born from these understandings. Both sets of Defendants realized that if the Manufacturers artificially inflate their prices, while at the same time paying large, undisclosed Manufacturer Payments back to the PBMs, both the PBMs and Manufacturers could make billions. The plan worked.

335.   Over the course of the last fifteen years the Manufacturers in unison have raised their prices exponentially and paid larger and larger amounts of Manufacturer Payments back to the PBMs.

336.   In exchange for the Manufacturers artificially inflating their prices and paying the PBMs substantial amounts in Manufacturer Payments, the PBM Defendants grant the Manufacturer Defendants' diabetes medications with the most elevated price and the highest Manufacturer Payment amount preferred status on their national formularies.

337.   During the last fifteen years the amount of Manufacturer Payments paid to the PBMs has increased substantially. For example, the January 2021 Senate Insulin Report found that:

> In July 2013, Sanofi offered rebates between 2% and 4% for preferred placement on CVS Caremark's commercial formulary. Five years later, in 2018, Sanofi rebates were as high as 56% for preferred formulary placement. Similarly, rebates to Express Scripts and OptumRx increased dramatically between 2013 and 2019 for long-acting insulins. For example, in 2019, Sanofi offered OptumRx rebates up to 79.75% for Lantus for preferred formulary placement on their client's commercial formulary, compared to

---

[131] Bank of America Merrill Lynch Global Health Conference, London, UK (Sept. 16, 2016),
http://edge.media-server.com/m/p/7neehd6y.

just 42% in 2015. Similarly, Novo Nordisk offered Express Scripts rebates up to 47% for Levemir for preferred formulary placement on their client's commercial formulary, compared to 25% in 2014.[132]

338.   Beyond increased rebate demands, the PBMs have also requested and received larger and larger administrative fee payments from the Manufacturers during the relevant time period.

339.   A recent study by the Pew Charitable Trust estimated that, between 2012 and 2016, the amount of administrative and other fees that the PBMs requested and received from the Manufacturers tripled, reaching more than $16 billion.[133]

340.   Thus—and contrary to their public representations—the PBM Defendants' negotiations and agreements with the Manufacturer Defendants (and the formularies that result from these agreements) are causing the precipitous price increases for the at-issue drugs.

341.   As a result of the Insulin Pricing Scheme, every payor, including Plaintiff, that pays for and/or reimburses for the at-issue drugs has been overcharged.

342.   Moreover, the PBMs use this false price to misrepresent the amount of "savings" they generate for diabetics, payors, and the healthcare system. For example, in January 2016, Express Scripts' president Tim Wentworth stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary."[134] Likewise, in April

---

[132] Grassley & Wyden, *supra* note 59.

[133] PEW, *The Prescription Drug Landscape, Explore* (Mar. 8, 2019), dhttps://www.pewtrusts.org/en/research-and-analysis/reports/2019/03/08/the-prescription-drug-landscape-explored.

[134] Surabhi Dangi- Garimella, *PBMs Can Help Bend the Cost Curve: Express Scripts' Tim Wentworth,* AJMC (Jan. 12, 2016), https://www.ajmc.com/view/pbms-can-help-bend-the-cost-curve-express-scripts-tim-wentworth.

2019, CVS Caremark president Derica Rice stated, "Over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend."[135]

343.    The PBM Defendants also misrepresent the amount of "savings" they generate to their payor clients and prospective clients.

344.    In making these representations, the PBMs fail to disclose that the amount of "savings" they have generated is calculated based on the false list price, which is not paid by any entity in the pharmaceutical pricing chain and which the PBMs are directly responsible for artificially inflating.

345.    Importantly, the Insulin Pricing Scheme is a coordinated effort between the Manufacturer and PBM Defendants that each agreed to and participated in, and that created enormous profits for all of Defendants. For example:

  a.  The Manufacturers and the PBMs are in constant communication and regularly meet and exchange information to construct and refine the PBM formularies that fuel the scheme. As part of these communications, the Manufacturers are directly involved in determining not only where their own diabetes medications are placed on the PBMs' formularies and with what restrictions, but also determining the same for competing products;

  b.  The Manufacturers and the PBMs share confidential and proprietary information with each other in furtherance of the Insulin Pricing Scheme, such as market data gleaned from the PBMs' drug utilization tracking efforts and mail order pharmacy claims, internal medical efficacy studies, and financial data. Defendants then use this information in coordination to set the false prices for the at-issue medications and construct their formularies in the manner that is most profitable for both sets of Defendants. The data that is used to further this coordinated scheme is compiled, analyzed, and shared either by departments directly housed

---

[135] CVS HEALTH, *CVS Health PBM Solutions Blunted the Impact of Drug Price Inflation*, Helped Reduce Member Cost, and Improved Medication Adherence in 2018 (Apr. 11, 2019), https://www.cvshealth.com/news-and-insights/press-releases/cvs-health-pbm-solutions-blunted-the-impact-of-drug-price.

within the PBM or by subsidiaries of the PBM, as is the case with OptumRx which utilizes OptumInsight and Optum Analytics; and

c. The Manufacturers and the PBMs engage in coordinated outreach programs directly to patients, pharmacies, and prescribing physicians to convince them to switch to the diabetes medications that are more profitable for the PBMs and Manufacturers, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBMs' clients. For example, the January 2021 Senate Insulin Report released an email where Eli Lilly discussed paying Defendant UnitedHealth Group and OptumRx additional rebates for every client that was converted to formularies that exclusively preferred Eli Lilly's at-issue drugs, including Humalog. The email continued: "United's leadership committee made one ask of Lilly – that we are highly engaged in the communication/pull through plan.[136] I of course indicated we fully expect to support this massive patient transition [to Eli Lilly's at-issue drugs favored by United] and provider education with the full breadth of Lilly resources. UHC also proactively thanked Lilly for our responsiveness, solution generation and DBU execution."[137]

346.    Far from using their prodigious bargaining power to lower drug prices as they claim, Defendants use their dominant positions to work together to generate billions of dollars in illicit profits at the expense of payors. Further, this scheme endangers the lives of diabetics and payors by inflating the prices of these life-saving drugs.

---

[136] "Pull through" is an industry term that refers to an integrated process between PBMs and Manufacturers aimed at moving market share and increasing sales for a certain product following the PBM granting that product preferred placement on its formulary.
[137] Grassley & Wyden, *supra* note 59.

### F. Defendants Admit That They Have Engaged in the Insulin Pricing Scheme and That It Is Harming Diabetics

347.     On April 10, 2019, the United States House of Representatives Committee on Energy and Commerce held a hearing on Defendants' Insulin Pricing Scheme titled, "Priced Out of a Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."[138]

348.     Representatives from all Defendants testified at the hearing and each acknowledged before Congress that the price for insulin has increased exponentially in the past fifteen years.[139]

349.     Further, each Defendant explicitly admitted that the price that diabetics pay out-of-pocket for insulin is too high. For example:[140]

- Dr. Sumit Dutta, Chief Medical Officer of OptumRx stated, "A lack of meaningful competition allows the [M]anufacturers to set high [reported] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."

- Thomas Moriarty, Chief Policy and External Affairs Officer and General Counsel for CVS Health testified, "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, [reported] prices for insulin have increased nearly 50 percent. And over the last ten years, [reported] price of one product, Lantus, rose by 184 percent."

- Mike Mason, Senior Vice President of Eli Lilly when discussing how much diabetics pay out-of-pocket for insulin stated "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications . . ."

- Kathleen Tregoning, Executive Vice President External Affairs at Sanofi, testified, "Patients are rightfully angry about rising out-of-pocket costs and

---

[138] *Priced Out of a Lifesaving Drug: Getting Answers on the Rising Before the H. Comm. Energy and Commerce Subcomm. on Oversight and Inv.*, 116th Cong. (2019-2020), https://www.congress.gov/event/116th-congress/house-event/109299?s=1&r=3 [hereinafter *Priced out of a Lifesaving Drug*].
[139] *Id.*
[140] *Id.*

we all have a responsibility to address a system that is clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . Since 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent for patients . . ."

- Doug Langa, Executive Vice President of Novo Nordisk, stated, "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the [reported] prices of our medicines. We also know that [reported] price matters to many, particularly those in high-deductible health plans and those that are uninsured."

350. Notably, none of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased costs or improved clinical benefit.

351. Defendants admitted that they agreed to and did participate in the Insulin Pricing Scheme and that the rise in prices was a direct result of the scheme.

352. For example, at the April 2019 Congressional hearing Novo Nordisk's President, Doug Langa, explained Novo Nordisk's and PBM Defendants' role in perpetuating the "perverse incentives" of the Insulin Pricing Scheme:[141]

[T]here is this perverse incentive and misaligned incentives (in the insulin pricing system) and this encouragement to keep [reported] prices high. And *we've been participating in that system* because the higher the [reported] price, the higher the rebate . . . There is a significant demand for rebates. We spend almost $18 billion in rebates in 2018 . . . [I]f we eliminate all the rebates . . . we would be in jeopardy of losing [our formulary] positions. (emphasis supplied)

353. Eli Lilly, too, has admitted that it raises reported prices as a *quid pro quo* for formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly testified:[142]

Seventy-five percent of our [reported] price is paid for rebates and discounts to secure [formulary position] . . . $210 of a vial of Humalog is paid for

---

[141] *Id.*
[142] *Id.*

84

discounts and rebates. . . We have to provide rebates [to PBMs] in order to provide and compete for [formulary position].

354.    Sanofi also conceded its participation in the Insulin Pricing Scheme. When testifying at the April 2019 Congressional hearing, Kathleen Tregoning, Executive Vice President for External Affairs of Sanofi, testified:[143]

> The rebates are how the system has evolved. . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.

355.    The PBM Defendants also admitted at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by the Manufacturer Defendants.

356.    Amy Bricker, Senior Vice President of Express Scripts, when asked to explain why Express Scripts did not grant an insulin with a lower reported price preferred formulary status, answered, "Manufacturers do give higher [payments] for exclusive [formulary] position . . ."[144]

357.    While all Defendants acknowledged their participation in the Insulin Pricing Scheme before Congress, in an effort to avoid culpability for the precipitous price increase each Defendant group pointed the finger at the other as the more responsible party.

358.    The PBM Defendants specifically testified to Congress that the Manufacturer Defendants are solely responsible for their reported price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

359.    This statement is objectively false. A February 2020 study by the Leonard D. Schaeffer Center for Health Policy & Economics at the University of South California found

---

[143] *Id.*
[144] *Id.*

that an increase in the amount that the Manufacturers pay back to the PBMs is directly correlated to an increase in prices—on average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in price—and that reducing or eliminating Manufacturer Payments could result in lower prices and reduced out-of-pocket expenditures.[145]

360.    Further, in large part because of the increased reported prices, and related Manufacturer Payments, the PBMs' profit per prescription has grown exponentially over the same time period that insulin prices have been increasing. By way of example, since 2003 Defendant Express Scripts has seen its profit per prescription increase over 500% per adjusted prescription.[146]

361.    The Manufacturers, on the other hand, argued before Congress that the PBMs were to blame for high insulin prices because of their demands for higher Manufacturer Payments in exchange for formulary placement. As a result, the Manufacturers argue, they have not been profiting off insulin due to declining net prices of these drugs.

362.    However, that also is not true. A 2020 study by JAMA recently published in the *Wall Street Journal* provides data suggesting that the net prices of branded insulin products have actually increased by 51% in the past ten years.[147]

---

[145] Neeraj Stood *et al.*, *The Association Between Drug Rebates and List Prices,* USC (Feb. 11, 2020), http://healthpolicy.usc.edu/research/the-association-between-drug-rebates-and-list-prices/.

[146] David Balto, *How PRMs Make the Drug Price Problem Worse,* HILL (Aug. 31, 2016, 5:51 PM), https://thehill.com/blogs/pundits-blog/healthcare/294025-how-pbms-make-the-drug-price-problem-worse

[147] Inmaculada Hernandez *et al.*, *Changes in List Prices, Net Prices, and Discounts for Branded Drugs in the US, 2007-2018*, JAMA NETWORK (Mar. 3, 2020), https://jamanetwork.com/journals/jama/fullarticle/2762310.

363.    In addition, a 2020 study from the Institute of New Economic Thinking titled, "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that the Manufacturer Defendants are still making vast profits from the sale of insulin products regardless of any Manufacturer Payments they are sending back to the PBMs. During the same time when insulin price increases were at their steepest, distributions to the Manufacturers' shareholders in the form of cash dividends and share repurchases totaled *$122 billion*. In fact, during this time period the Manufacturers spent a significantly lower proportion of profits on research and development compared to shareholder payouts.[148]

364.    Further, in January 2021, the U.S. Senate Finance Committee issued a report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug" that detailed Congress's findings after reviewing over 100,000 pages of internal company documents from Sanofi, Novo Nordisk, Eli Lilly, CVS Caremark, Express Scripts, OptumRx, and Cigna ("Senate Insulin Report"). The Senate Insulin Report concluded, *inter alia*:[149]

- The Manufacturer Defendants retain more revenue from insulin than in the 2000s—for example, Eli Lilly has reported a steady increase in Humalog revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018;

- The Manufacturer Defendants have aggressively raised the reported price of their insulin products absent significant advances in the efficacy of the drugs; and

---

[148] Rosie Collington, *Profits, Innovation and Financialization in the Insulin Industry*, Inst. For New Econ. Thinking (Apr. 2020), https://www.ineteconomics.org/research/research-papers/profits-innovation-and-financialization-in-the-insulin-industry.

[149] Grassley & Wyden, *supra* note 59.

- The Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin, and Basaglar between 2014-2018 during which time the company generated $22.4 billion in revenue on these drugs.

365.    The truth is—despite their finger pointing in front of Congress—the Manufacturers and PBMs are both responsible for their concerted efforts in creating the Insulin Pricing Scheme.

### G.    Defendants Profit Off the Insulin Pricing Scheme

366.    The Insulin Pricing Scheme affords the Manufacturer Defendants the ability to pay the PBM Defendants significant, yet undisclosed, Manufacturer Payments in exchange for formulary placement, which garners the Manufacturer Defendants greater revenues from sales, without decreasing their profit margins. During the relevant time period, the PBM Defendants granted national formulary position to each at-issue drug in exchange for large Manufacturer Payments and inflated prices.

367.    The Manufacturer Defendants also use the inflated price to earn hundreds of millions of dollars in additional tax breaks by basing their deductions for donated insulins on the inflated reported price.

368.    Because of the increased list prices, and related Manufacturer Payments, the PBMs' profit per prescription has grown exponentially during the relevant time period as well. A recent study published in the Journal of the American Medical Association concluded that the amount of money that goes to the PBM Defendants for each insulin prescription increased over 150% from 2014 to 2018. In fact, for transactions where the PBM Defendants control the PBM and the pharmacy (i.e., Caremark-CVS pharmacy) these Defendants now capture an astonishing 40% of the money spent on each insulin

prescription (up from only 25% in 2014), despite the fact that they do not contribute to the development, manufacture, innovation or production of the product.[150]

369.    The PBM Defendants profit off the artificially inflated prices created by the Insulin Pricing Scheme in a myriad of ways, including (1) retaining a significant, yet undisclosed, percentage of the Manufacturers Payments, (2) using the inflated reported price to generate profits from pharmacies, and (3) relying on the inflated reported price to drive up the PBMs' margins through their own mail-order pharmacies.

<u>The PBMs Pocket a Majority of Manufacturers' Secret Payments</u>

370.    The first way in which the PBMs profit off the Insulin Pricing Scheme is by keeping a significant portion of the secret Manufacturer Payments.

371.    The amount that the Manufacturers pay back to the PBMs has increased to represent a large percentage of the reported price of diabetes medications.

372.     Historically, when the PBMs contracted with payors, the contract allowed the PBMs to keep all or at least some of the Manufacturer Payments they received, rather than pass them along to the payor.

373.    Over time, payors have secured contract provisions guaranteeing them all or some portion of the "rebates" paid by the Manufacturers to the PBMs. But—critically— "rebates" are only a portion of the total secret Manufacturer Payments.

374.    In this regard, the PBM and Manufacturer Defendants have created a "hide-the-ball" system where the consideration exchanged between them (and not shared with payors) is labeled and relabeled. As more payors moved to contracts that require PBMs to

---

[150] Karen Van Nuys, *et al.*, *Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies, and Health Plans From 2014 to 2018*, JAMA Network (Nov. 5, 2021), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2785932.

pass a majority of the manufacturer "rebates" through to the payor, the PBMs have begun renaming the Manufacturer Payments in order to keep a larger portion of this money. Payments once known as "rebates" are now called administrative fees, volume discounts, service fees, inflation fees or other industry-jargon terms designed to obfuscate and distract from the substantial sums being secretly exchanged.

375.    And these renamed secret Manufacturer Payments are substantial. A recent heavily redacted complaint filed by Defendant Express Scripts revealed that Express Scripts now retains up to thirteen times more in "administrative fees" than it passes through to payors in formulary rebates.[151]

376.    In addition, the PBMs have come up with numerous ingenious methods to hide these renamed Manufacturer Payments in order keep them for themselves.

377.    For example, with regards to the Manufacturer Payments now known as "inflation fees," the PBMs often create a hidden gap between how much the Manufacturers pay them to increase their prices and the amount in "price protection guarantees" that the PBMs agree to pay back to their client payors.

378.    In particular, the Manufacturer Defendants often pay the PBM Defendants "inflation fees" in order to increase the price of their diabetes medications. The thresholds for these payments are typically set at around 6% to 8%—if the Manufacturer Defendants raise their prices by more than 6% (or 8%) during a specified time period, they pay the PBM Defendants an additional "inflation fee" (based on a percentage of the reported prices).

---

[151] *Express Scripts, Inc. v. Kaleo, Inc.*, No. 4:17-cv-01520-RLW (E.D. Mo. 2017).

379.   For many of their clients, the PBMs have separate "price protection guarantees" that state that if the overall drug prices for that payor increase by more than a set amount, then the PBMs will revert a portion of that amount back to these clients.

380.   The PBMs set these "price protection guarantees" at a higher rate than the thresholds that trigger the Manufacturers' "inflation fees," usually around 10%-15%.

381.   If the Manufacturers increase their reported prices more than the 6% (or 8%) inflation fee rate but less than the 10%-15% client price protection guarantee rate, then the PBMs keep 100% of these "inflation fee" payments. This is a win-win for the Manufacturers and PBMs—they get to mutually retain and share the entire benefit of these price increases.

382.   The PBMs also hide the renamed Manufacturer Payments with "rebate aggregators."

383.   Rebate aggregators, sometimes referred to as rebate group purchasing organizations ("GPOs"), are entities that negotiate for and collect payments from drug manufacturers, including the Manufacturer Defendants, on behalf of a large group of pharmacy benefit managers (including the PBM Defendants) and different entities that contract for pharmaceutical drugs.

384.   These rebate aggregators are often affiliated with or owned by the PBM Defendants, such as Ascent Health Services (Express Scripts), Coalition for Advanced Pharmacy Services and Emisar Pharma Services (OptumRx), and Zinc (CVS Caremark).

385.   The PBMs carefully guard the revenue streams from their rebate aggregator activities, hiding them in complex contractual relationships and not reporting them separately in their quarterly SEC filings.

386.   Certain rebate-aggregator companies are located offshore, for example, in Switzerland (Express Scripts' Ascent Health) and Ireland (Emisar Pharma Services), making oversight even more difficult.

387.   Moreover, during the relevant time period, the PBM Defendants have used their controlled rebate aggregator entities in furtherance of their conspiracy. For example, a 2017 audit conducted by a local governmental entity on Defendant OptumRx related to its PBM activities from January 1, 2013, until December 31, 2015, concluded that the auditor was unable to verify the percentage of rebates OptumRx passed through to its client payor because OptumRx would not allow the auditor access to its rebate contracts. The audit report explained:

> Optum[Rx] has stated that it engaged the services of an aggregator to manage its rebate activity. Optum[Rx] shared that under this model, they are paid by their aggregator a certain amount per prescription referred. Then, the aggregator, through another entity, seeks rebates from the drug manufacturers, based upon the referred [Payor Client] prescription utilization, and retains any rebate amounts that may be received. Optum[Rx] states that they have paid [Payor Client] all amounts it has received from its aggregator, and that they do not have access to the contracts between the aggregator (and its contractors) and the manufacturer. However, our understanding is that Optum[Rx] has an affiliate relationship with its aggregator.[152]

388.   A footnote in the audit report clarifies that "Optum[Rx] contracted with Coalition for Advanced Pharmacy Services (CAPS), and CAPS in turn contracted with Express Scripts, Inc."[153]

---

[152] Laura Rogers & Stacey Thomas, BROWARD COUNTY FLORIDA, AUDIT OF PHARMACY BENEFIT MANAGEMENT SERVICES AGREEMENT, No. 18-13 (Dec. 7, 2017), https://www.broward.org/Auditor/Reports/Documents/2017_1212%20Agenda%20Review%20of%20Pharmacy%20Benefit%20Management%20Services%20by%20StoneBridge/2017_1212%20Exh1_OptumRx.pdf.
[153] *Id.*

389.    In other words, according to this audit report, OptumRx contracts with its own affiliate rebate aggregator, Coalition for Advanced Pharmacy Services, which then contracts with OptumRx's co-conspirator, Express Scripts, which then contracts with the Manufacturers for rebates related to OptumRx's client's drug utilization. OptumRx then uses this complex relationship between itself, its affiliate, and its co-conspirator to obscure the amount of Manufacturer Payments that are being generated from its client's utilization.

390.    The January 2021 Senate Report summarizing Congress's findings of their two-year probe into the Insulin Pricing Scheme contained the following observation on these rebate aggregators:[154]

> [I]t is noteworthy that industry observers have suggested that the recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss-based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.

391.    Because the PBMs are able to hide (and retain) a majority of the secret Manufacturer Payments that they receive, they are able to make significant profits on the Insulin Pricing Scheme.

392.    Even in the rare cases where certain sophisticated payor clients receive a portion of the Manufacturer Payments from their pharmacy benefit manager (whether it is a PBM Defendant or not), those payors are still significantly overcharged as a direct

---

[154] Grassley & Wyden, *supra* note 59.

result of the Insulin Pricing Scheme given the extent to which Defendants have deceptively and egregiously inflated the prices of the at-issue drugs.

<u>The Insulin Pricing Scheme Allows the PBMs to Profit Off Pharmacies</u>

393.    A second way that the PBM Defendants profit off the Insulin Pricing Scheme is by using the Manufacturers' inflated price to profit off the pharmacies with whom they contract, including those in Albany County.

394.    The PBM Defendants decide which pharmacies are included in the PBM's network and how much they will reimburse these pharmacies for each drug dispensed.

395.    The PBMs pocket the spread between the amount that the PBMs get paid by their clients for the at-issue drugs (which are based on the prices generated by the Insulin Pricing Scheme) and the amount the PBM reimburses the pharmacy (which is often less).

396.    The PBMs do not disclose to their clients or network pharmacies how much the PBM receives from or pays to the other.

397.    This spread pricing, like the secret Manufacturer Payment negotiation, happens behind closed doors. There is no transparency, no commitment from the PBM Defendants to take into account the cost effectiveness of a drug, and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal.

398.    The higher the Manufacturers inflate their prices, the more money the PBMs make off this spread.

399.    The PBMs also use the Insulin Pricing Scheme to generate additional profits from pharmacies by charging the pharmacies post-purchase fees, including DIR fees, based on the reported prices—and again, the higher the reported price for each diabetes medication sold, the more the PBMs generate in these pharmacy fees.

94

The Insulin Pricing Scheme Increases PBM Mail-Order Profits

400.    A third way PBMs profit off the Insulin Pricing Scheme is through the PBM Defendants' own mail-order pharmacies. The higher the price that PBM Defendants are able to get customers, such as Plaintiff, to pay for diabetes medications, the higher the profits PBM Defendants realize through their mail-order pharmacies.

401.    Because the PBMs base the price they charge for the at-issue diabetes medications on the Manufacturers' price, the more the Manufacturers inflate their prices, the more money the PBMs make. For example, because of their conspiracy with the Manufacturers, the PBMs often know when the Manufacturers are going to raise their prices. The PBMs use this opportunity to purchase a significant amount of the at-issue drugs prior to the price increase, at the lower rate. Then, after the Manufacturers raise their price, the PBMs charge their mail-order customers based on the higher, increased prices and pocket the difference. The PBMs make significant amounts of money on this arbitrage scheme.

402.    The PBMs also charge the Manufacturer Defendants fees related to their mail-order pharmacies, such as pharmacy supplemental discount fees, that are directly tied to the Manufacturers' price. Thus, once again, the higher the price is, the more money the PBMs make on these fees.

403.    In sum, every way in which the PBMs make money on diabetes medications is directly tied to creating higher prices and inducing larger secret Manufacturer Payments. The PBMs are not lowering the price of diabetes medications as they publicly represent—they are making billions of dollars by fueling these skyrocketing prices.

### H.     Plaintiff Purchases the At-Issue Drugs from Defendants

404.   As a government employer, Plaintiff serves its residents by providing public safety, emergency management, and health services, just to name a few of its vital roles. As more federal and state responsibilities are mandated to local government, Plaintiff has a growing list of demands on a limited budget. Consequently, any significant increase in spending can have a severe detrimental effect on Plaintiff's overall budget and, in turn negatively impact its ability to provide necessary services to the community

405.   One of the benefits Plaintiff provides its Beneficiaries is paying for a large portion of their pharmaceutical purchases. In this role, Plaintiff spent millions of dollars on the at-issue diabetes medications during the relevant time period.

406.   Plaintiff also has purchased the at-issue drugs for use at in county-run facilities.

407.   To administer its health plan's pharmaceutical program, Plaintiff relies on the PBMs as administrative agents, for the alleged purposes of limiting its administrative burden and controlling pharmaceutical drugs costs.

408.   At different times during the relevant time period, Plaintiff relied on Defendant Express Scripts and Defendant CVS Caremark to provide PBM services to its health plan. These PBM services included developing and offering formularies for Plaintiff's prescription plan, constructing and managing Plaintiff's pharmacy network (which included the PBMs' retail and mail order pharmacies), processing pharmacy claims, and providing mail order pharmacy services to Plaintiff.

409.   In providing these services, Defendant Express Scripts and Defendant CVS Caremark set the amount Plaintiff paid in coordination with the Manufacturer Defendants

and, utilizing the false prices, generated by the Insulin Pricing Scheme. Plaintiff paid Express Scripts and CVS Caremark for the at-issue drugs.

**I.      Defendants Deceived Plaintiff**

410.    At no time has either Defendant group disclosed the Insulin Pricing Scheme or the false list prices produced by it.

<u>The Manufacturer Defendants Deceived Plaintiff</u>

411.    At all times during the relevant period, the Manufacturer Defendants knew that the prices generated by the Insulin Pricing Scheme were false and untethered to any legal, competitive or fair market price.

412.    The Manufacturer Defendants knew that these prices did not bear a reasonable relationship to the actual prices realized by Defendants, did not result from transparent market forces, and were artificially and arbitrarily inflated for the sole purpose of generating profits for Defendants.

413.    The Manufacturer Defendants also knew that payors, including Plaintiff, relied on the false list prices generated by the Insulin Pricing Scheme to pay for the at-issue drugs.

414.    The Manufacturer and PBM Defendants further knew that Plaintiff expected and desired to pay the lowest fair-market price possible for the at-issue drugs.

415.    Despite this knowledge, the Manufacturer Defendants published the prices generated by the Insulin Pricing Scheme throughout the United States and New York through publishing compendia, in various promotional and marketing materials distributed by entities downstream in the drug supply chain and directly to pharmacies which then used these prices to set the amount that the pharmacies charged for the at-issue drugs.

416.   The Manufacturer Defendants also publish these prices to the PBMs and pharmacies which then use them to charge diabetics and payors, like Plaintiff Albany County, for the at-issue drugs.

417.   By publishing their prices throughout New York, the Manufacturer Defendants held these prices out as a reasonable price by which to base the prices payors pay for the at-issue drugs.

418.   These representations are false. The Manufacturer Defendants knew that their artificially inflated list prices were not remotely related to the net price they received for the at-issue drugs and were not based on transparent or competitive factors such as cost of production, or research and development.

419.   Notably, during the relevant time period, the Manufacturer Defendants published prices in New York of $300-$400 for the same at-issue drugs that would have been profitable at less than $5.

420.   The Manufacturer Defendants have also publicly represented that they price the at-issue drugs according to each drug's value to the health care system and the need to fund innovation. For example, briefing materials prepared for CEO Dave Ricks as a panelist at the 2017 Forbes Healthcare Summit included "Reactive Key Messages" on pricing that emphasized the significant research and development costs for insulin. During the relevant time period, executives from Sanofi and Novo Nordisk also represented that research and development costs were key factors driving the at-issue price increases.[155]

---

[155] Drug Pricing Investigation, H.R. Comm. On Oversight and Reform, 117th Cong. (2021), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/DRUG%20PRIC ING%20REPORT%20WITH%20APPENDIX.pdf.

421.    These statements also are false. Between 2005 and 2018, Eli Lilly only spent $680 million on R&D costs related to Humalog while earning $31.35 billion in *net* sales during that same time period. In other words, Eli Lilly made more than 46 times its reported R&D costs on Humalog during this portion of the relevant time period. And Novo Nordisk has spent triple the amount it spends on R&D on stock buyouts and shareholder dividend payouts in recent years.[156]

422.    The Manufacturer Defendants' list prices were artificially inflated in furtherance of the Insulin Pricing Scheme to generate profits for the Manufacturer Defendants and the PBM Defendants.

423.    The Manufacturer Defendants affirmatively withheld the truth from Plaintiff and specifically made these misrepresentations in furtherance of the Insulin Pricing Scheme and to induce reliance in Plaintiff to purchase their at-issue drugs.

424.    The PBM Defendants ensured that the Manufacturer Defendants' artificially inflated list prices harmed diabetics and payors by selecting the highest price at-issue drugs for preferred formulary placement and by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

425.    The PBM Defendants perpetuate the use of the artificially inflated insulin prices because it allows them to obscure the actual price any entity in the drug pricing chain is paying for the at-issue drugs. This lack of transparency affords Defendants the opportunity to construct and perpetuate the Insulin Pricing Scheme, and to profit therefrom at the expense of New York payors.

---

[156] *Id.*

426.   The Manufacturer Defendants affirmatively withheld the truth from Plaintiff, and specifically made these misrepresentations to induce reliance by payors, including Albany County.

<u>The PBM Defendants Deceived Plaintiff</u>

427.   At all times throughout the relevant period, the PBMs have purposefully, consistently and routinely misrepresented that they negotiate with Manufacturer Defendants and construct formularies for the benefit of payors and patients by lowering the price of the at-issue drugs and by promoting the health of diabetics. Representative examples include:[157]

- In every annual report for at least the past ten years, Defendant CVS Caremark has consistently stated that its design and administration of formularies are aimed at reducing the costs and improving the safety, effectiveness and convenience of prescription drugs.

- In every annual report for at least the past ten years, CVS Caremark has stated that it maintains an independent panel of doctors, pharmacists and other medical experts to review and approve the selection of drugs based on safety and efficacy for inclusion on one of Caremark's template formularies and that CVS Caremark's formularies lower the cost of drugs.

- In every annual report for at least the past ten years, Defendant Express Scripts has consistently represented that it works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes.

- In every annual report for at least the past ten years, Express Scripts has further represented that in making formulary recommendations, Express Scripts' Pharmacy & Therapeutics Committee considers the drug's safety and efficacy, without any information on or consideration of the cost of the drug, including any discount or rebate arrangement that Express Scripts negotiates with the Manufacturer, and that Express Scripts fully complies with the P&T Committee's clinical recommendations regarding drugs that

---

[157] CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2010-2019); OptumRx, Annual Reports (Form 10-K) (Dec. 31, 2010-2019); Express Scripts, Annual Reports (Form 10-K) (Dec. 31, 2010-2019).

must be included or excluded from the formulary based on their assessment of safety and efficacy.

- In every annual report for at least the past ten years, Defendant OptumRx has consistently stated that OptumRx's rebate contracting and formulary management assist customers in achieving a low-cost, high-quality pharmacy benefit.

- In every annual report for at least the past ten years, Defendant OptumRx has stated that it promotes lower costs by using formulary programs to produce better unit costs, encouraging patients to use drugs that offer improved value and that OptumRx's formularies are selected for health plans based on their safety, cost and effectiveness.

428.   In addition to these general misrepresentations, throughout the relevant time period, the PBM Defendants have purposefully, consistently, and routinely made misrepresentations specifically about the at-issue diabetes medications. Representative examples include:

- In a public statement issued in November 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."[158]

- In 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark stated on national television that "CVS is working to develop programs to hold down [diabetes] costs."[159]

- In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."[160]

- In 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts represented in an interview with a national publication that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of

---

[158] Chain Drug Review, *CVS Expands Extracare for Diabetes Products* (May 11, 2010), https://www.chaindrugreview.com/cvs-expands-extracare-for-diabetes-products/.
[159] CBS News, Diabetes Epidemic Growing (June 22, 2010, 11:29 AM), https://www.cbsnews.com/news/diabetes-epidemic-growing/.
[160] Jon Kamp & Peter Loftus, *CVS' PBM Business Names Drugs It Plans to Block Next Year*, WSJ (Nov. 8, 2012), https://www.wsj.com/articles/SB10001424127887324439804578107040729812454.

costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."[161]

- o  Mr. Stettin continued on to represent that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."[162]

- In a 2018 Healthline interview, Mark Merritt, President of the PBM trade association, PCMA, in response to a question about PBMs' role in the insulin pricing system stated, "[Through their formulary construction], PBMs are putting pressure on drug companies to reduce insulin prices."[163]

- CVS Caremark's Chief Policy and External Affairs Officer testified during the April 2019 hearings that, CVS Caremark "has taken a number of steps to address the impact of insulin price increases. We negotiate the best possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."[164]

- Chief Medical Officer of OptumRx, testified before the U.S. Congress in the April 2019 hearing that for "insulin products . . . we negotiate with brand manufacturers to obtain significant discounts off list prices on behalf of our customers."[165]

- The PCMA website contains the following misrepresentations, "the insulin market is consolidated, hindering competition and limiting alternatives, leading to higher list prices on new and existing brand insulins. PBMs work hard to drive down costs using formulary management and rebates."[166]

---

[161] https://www.bizjournals.com/stlouis/news/2016/08/31/express-scripts-launches-program-to-control.html
[162] Angela Mueller, *Express Scripts Launches Program to Control Diabetes Costs,* St. Louis Bus. J. (Aug. 31, 2016), https://drugstorenews.com/pharmacy/express-scripts-implements-latest-diabetes-care-value-program.
[163] Dave Muoio, *Insulin Prices: Are PBMs and Insurers Doing Their Part?*, POPULATION HEALTH LEARNING NETWORK (Dec. 2016), https://www.hmpgloballearningnetwork.com/site/frmc/article/insulin-prices-are-pbms-and-insurers-doing-their-part.
[164] *Priced Out of a Lifesaving Drug, supra* note 138.
[165] *Id.*
[166] PCMA, *PCMA on National Diabetes Month: PBMs Lowering Insulin Costs, Providing Support to Patients* (Nov. 16, 2020), https://www.pcmanet.org/pcma-on-national-diabetes-month-pbms-lowering-insulin-costs-providing-support-to-patients/; VISANTE, *Insulins: Managing Costs with Increasing Manufacturer Prices* (Aug. 2020), https://www.pcmanet.org/wp-content/uploads/2020/08/PCMA_Visante-Insulins-Prices-and-Costs-.pdf.

429. The PBM Defendants not only falsely represent that they negotiate with the Manufacturer Defendants to lower the price of the at-issue diabetes medications for *payors*, but also for diabetic *patients* as well. Representative examples include:

- Express Scripts' publicly available code of conduct states, "[a]t Express Scripts we're dedicated to keeping our promises to *patients and clients* . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable." (emphasis added)[167]

- Amy Bricker, Senior Vice President at Express Scripts testified before Congress in April 2019, "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs." (emphasis added)[168]

- Amy Bricker of Express Scripts also testified at the Congressional hearing that "Express Scripts remains committed to . . . *patients* with diabetes and creating affordable access to their medications." (emphasis added)[169]

- OptumRx has stated "[t]he services we provide help *improve health outcomes for patients* while making prescription drugs more affordable for plan sponsors and *individuals*, and more sustainable for the country . . . the reason is simple: drug manufacturers are responsible for the high cost of prescription drugs . . . OptumRx negotiates better prices with drug manufacturers for our customers *and consumers* . . . At OptumRx, *our mission is helping people live healthier lives* and *to help make the health system work better for everyone*. (emphasis added)[170]

- In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of *patient* outcomes . . . in 2018, we are doing even more to

---

[167] EXPRESS SCRIPTS, *Code of Conduct*, https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf (last visited Sept. 9, 2022).

[168] *Priced Out of a Lifesaving Drug*, *supra* note 138.

[169] *Id*.

[170] *Testimony of John M. Prince, Chief Executive Officer, OptumRx Before the United States Senate Committee on Finance "Drug Pricing in America: A Prescription for Change, Part III",* (Apr. 9, 2019), https://www.finance.senate.gov/imo/media/doc/John%20Prince%20OptumRx%20Testimony%20Senate%20Finance%20Committee_04.09.19.pdf.

help keep drugs affordable with our new Savings *Patients* Money initiative." (emphasis added)[171]

- The PCMA website states, "PBMs have kept average out-of-pocket (OOP) payments flat for beneficiaries with commercial insurance."[172]

430. Not only have PBM Defendants intentionally misrepresented that they use their market power to save payors and diabetics money, but they have also specifically, knowingly, and falsely disavowed that their conduct drives prices higher. Representative examples include:

- On an Express Scripts' earnings call in February 2017, CEO Tim Wentworth stated: "Drugmakers set prices, and we exist to bring those prices down."[173]

- Larry Merlo, head of CVS Caremark sounded a similar refrain in February 2017: "Any suggestion that PBMs are causing prices to rise is simply erroneous."[174]

- In 2017, Express Scripts' Wentworth went on CBS News to argue that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."[175]

- During the April 2019 Congressional hearings, when asked if PBM-negotiated rebates and discounts were causing the insulin price to increase,

---

[171] CVS HEALTH, *2017 Drug Trend Report* (Apr. 5, 2018), https://payorsolutions.cvshealth.com/insights/2017-drug-trend-report.
[172] PCMA, *The INSULIN Act Will Increase Insulin Costs While Giving Drug Manufacturers Another Way to Game the System To Maximize Profits,* https://www.pcmanet.org/insulin-managing-costs-with-increasing-manufacturer-prices/ (last visited Sept. 9, 2022).
[173] Samantha Liss, *Express Scripts CEO Addresses Drug Pricing 'Misinformation'*, ST. LOUIS POST-DISPATCH (Feb. 17, 2017), https://www.stltoday.com/business/local/express-scripts-ceo-addresses-drug-pricing-misinformation/article_8c65cf2a-96ef-5575-8b5c-95601ac51840.html.
[174] Lynn R. Webster, *Who Is To Blame For Skyrocketing Drug Prices?*, THE HILL (July 27, 2017, 11:40 AM), https://thehill.com/blogs/pundits-blog/healthcare/344115-who-is-to-blame-for-skyrocketing-drug-prices.
[175] CBS NEWS, *Express Scripts CEO Tim Wentworth Defends Role of Pbms in Drug Prices* (Feb 7, 2017), https://www.cbsnews.com/news/express-scripts-tim-wentworth-pbm-rising-drug-prices-mylan-epipen-heather-bresh/.

OptumRx's Chief Medical Officer answered, "we can't see a correlation when rebates raise list prices."[176]

- In 2019, when testifying under oath before Congress on the rising price of insulins, Senior Vice President Amy Bricker of Express Scripts testified, "I have no idea why the prices [for insulin] are so high, none of it is the fault of rebates."[177]

431.    Throughout the relevant time period, the PBM Defendants have consistently and repeatedly represented that: (1) their interests are aligned with their payor clients; (2) they work to lower the price of the at-issue drugs and, in doing so, they achieve substantial savings for diabetics and payors; and (3) that the Manufacturer Payments that the PBMs' receive and the PBMs' formulary construction is for the benefit of diabetics and payors and is consistent, and in accordance with, their payor clients' interests of reducing drug costs and improving the health of their beneficiaries.

432.    The PBM Defendants understand that payors such as Plaintiff Albany County rely on the PBMs to achieve the lowest prices for the at-issue drugs and to construct formularies designed to improve their health.

433.    Throughout the relevant time period, the PBM Defendants also misrepresented that they are transparent about the Manufacturer Payments that they receive and that they pass along (or do not pass along) to payors. As stated above, this representation is false—the PBM Defendants retain many times more in total Manufacturer Payments than the traditional formulary "rebates" they may pass through—in whole or part—to payors.

434.    Despite this, in 2011, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . [e]veryday we strive to show our commitment

---

[176] *Priced Out of a Lifesaving Drug*, *supra* note 138.
[177] *Id*.

to our clients, and one element of that commitment is to be open and honest about our pricing structure."[178]

435.   In a 2017 CBS News interview, Express Scripts' CEO represented, among other things, that Express Scripts was "absolutely transparent" about the Manufacturer Payments they receive and that payors "know exactly how the dollars flow" with respect to these Manufacturer Payments.[179]

436.   When testifying before Congress in April 2019, Amy Bricker, Senior Vice President of Defendant Express Scripts, had the following exchange with Representative John Sarbanes of Maryland regarding the transparency (and lack thereof) of the Manufacturer Payments:[180]

> Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate for them is transparent to them. . . [However] the reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].
>
> Mr. Sarbanes. What about if we made it completely transparent? Who would be for that?
>
> Ms. Bricker. Absolutely not . . . it will hurt the consumer.
>
> Mr. Sarbanes. I don't buy it.
>
> Ms. Bricker – prices will be held high.
>
> Mr. Sarbanes. I am not buying it. I think a system has been built that allows for gaming to go on and you have all got your talking points. Ms. Tregoning [of Sanofi], you have said you want to guarantee patient access and affordability at least ten times, which is great, but there is a collaboration going on here . . . the system is working for both of you at the expense of the

---

[178] UNITEDHEALTH GROUP, *Prescription Solutions by OptumRx Receives4th Consecutive TIPPS Certification for Pharmacy Benefits Transparency Standards* (Sept. 13, 2011), https://www.unitedhealthgroup.com/newsroom/2011/0913tipps.html.
[179] CBS NEWS, *supra* note 175.
[180] *Priced Out of a Lifesaving Drug*, *supra* note 138.

patient. Now I reserve most of my frustration for the moment in this setting for the PBMs, because I think the lack of transparency is allowing for a lot of manipulation. I think the rebate system is totally screwed up, that without transparency there is opportunity for a lot of hocus-pocus to go on with the rebates. Because the list price ends up being unreal in certain ways except to the extent that it leaves certain patients holding the bag, then the rebate is negotiated, but we don't know exactly what happens when the rebate is exchanged in terms of who ultimately benefits from that. And I think we need more transparency and I do not buy the argument that the patient is going to be worse off, the consumer is going to be worse off if we have absolute transparency . . . *I know when you started out, I understand what the mission was originally with the PBMs . . . But now things have gotten out of control. You are too big and the lack of transparency allows you to manipulate the system at the expense of the patients.* So I don't buy the argument that the patient and consumer is going to get hurt if we have absolute transparency. (emphasis added)

437.    Moreover, during the relevant time period, each PBM Defendant represented to Plaintiff Albany County that it constructs formularies and negotiates with the Manufacturer Defendants for the benefit of payors and patients by lowering the price of the at-issue drugs and by promoting the health of diabetics.

438.    Throughout the relevant period, the PBMs have made the foregoing misrepresentations consistently and directly to New York payors, including Albany County Beneficiaries, through member communications, formulary change notifications, and through extensive direct-to-consumer pull through efforts engaged in with the Manufacturers.

439.    All these representations are patently false—the Manufacturer and PBM Defendants' coordinated conduct in publishing their prices and negotiating for and constructing their formularies created the Insulin Pricing Scheme and caused the price of the at-issue drugs to skyrocket.

440.    For example, diabetics and payors in both Europe and Canada pay significantly less for their diabetes medications than diabetics in the United States who are

affected by the Insulin Pricing Scheme. In 2018, the US spent $28 billion (USD) on insulin compared with $484 million in Canada. The average American insulin user spent $3490 on insulin in 2018 compared with $725 among Canadians.[181]

441.    Diabetics who receive their medications from federal programs that do not utilize PBMs also pay significantly less. For example, in December 2020, the United States House of Representatives Committee on Oversight and Reform issued a Drug Pricing Investigation Report finding that federal health care programs that negotiate directly with the Manufacturers (such as the Department of Veterans Affairs), and thus are outside the PBM Defendants' scheme, paid $16.7 billion less from 2011 through 2017 for the at-issue drugs than the Medicare Part D program which relies on the PBM Defendants to set their at-issue drug prices (and thus are victims of the PBMs' concerted efforts to drive up the list prices).

442.    Contrary to the PBM Defendants' representations that they work to promote the health of diabetics and as a direct result of the PBMs' conduct, many diabetics have been priced out of these life-sustaining medications. As a result, many of these diabetics are forced to either ration their insulin or to skip doses. This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death.

443.    Defendants knew that these representations were false when they made them and affirmatively withheld this truth from Plaintiff.

444.    Defendants concealed the falsity of these representations by closely guarding their pricing structures, agreements, and sales figures.

---

[181] Tyler Schneider *et al.*, *Comparisons of Insulin Spending and Price Between Canada and the United States,* MAYO CLINIC PROCEEDINGS (Mar. 1, 2022), https://www.mayoclinicproceedings.org/article/S0025-6196(21)00883-1/fulltext#relatedArticles.

445.   The Manufacturer Defendants do not disclose to payors or the public the actual prices they receive for the at-issue drugs or the amount in Manufacturer Payments they offer to and pay to the PBM Defendants.

446.   The PBM Defendants do not disclose the details of their agreements with the Manufacturer Defendants or the Manufacturer Payments they receive from them—nor do they disclose the details related to their agreements with payors and pharmacies.

447.   Further, the PBMs' agreements with their clients regarding how much of the Manufacturer Payments that they will pass through to their clients are negotiated in an aggregate amount over all drugs purchased, not on an individual drug-by-drug basis. Thus, payors, like Plaintiff, have no way of determining how much of the Manufacturer Payments they receive for any particular drug. This allows the PBM Defendants to hide the large Manufacturer Payments that they receive for the at-issue diabetes medications.

448.   The PBM Defendants have gone so far as to sue governmental entities to block the release of details on their pricing agreements with the Manufacturers and pharmacies.[182]

449.   Even when audited by payors, the PBM Defendants often still refuse to disclose their agreements with the Manufacturers and pharmacies, relying on overly broad confidential agreements, claims of trade secrets, and other unnecessary restrictions.

450.   To make matters worse, diabetic Beneficiaries of the Plaintiff's health plans, institutions, and programs, have no choice but to pay Defendants' egregiously inflated

---

[182] Catherine Candisky, *CVS Sues State to Block Release of Report On Its Drug Pricing*, THE COLUMBUS DISPATCH (July 16, 2018), https://stories.usatodaynetwork.com/sideeffects/cvs-sues-state-block-release-report-drug-pricing/.

prices because they need these medications to survive, and the Manufacturer Defendants make virtually all diabetes medications available in the United States.

451.    In sum, the entire insulin pricing structure created by the Defendants—from the false prices to the Manufacturers' misrepresentations related to the reason behind the price, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that they work to lower prices and promote the health of diabetics—is unconscionable and deceptive.

452.    Plaintiff Albany County and Plaintiff's Beneficiaries relied on these misrepresentations in paying for the at-issue diabetes medications at Defendants' egregiously inflated prices.

453.    Plaintiff did not know, because the Defendants affirmatively concealed, that (i) the list prices were falsely inflated; (ii) the list prices were manipulated to satisfy PBM profit demands; (iii) the list prices bore no relationship to the prices paid for the at-issue drugs as they were sold to the PBMs; and (iv) that the entire insulin pricing structure Defendants created was false.

### J.    The Insulin Pricing Scheme Has Damaged Plaintiff

454.    Since 2002, Plaintiff has engaged in business with Defendants for the at-issue diabetic medications.

455.    In 2006, Plaintiff entered into an agreement with non-party PharmaCare Management Services, Inc. ("PharmaCare"), whereby PharmaCare agreed to provide Plaintiff prescription drug benefits and other at-issue services. PharmaCare is now owned by Defendant CVS Caremark.

456.   In 2010, Plaintiff and Medco entered into an agreement whereby Medco agreed to provide Plaintiff prescription drug benefits and other at-issue services, and Plaintiff agreed that Medco would be the exclusive formulary administrator for Plaintiff's prescription drug benefit programs during the terms of the agreement.

457.   Since 2010, Plaintiff has had an active agreement in place with either Express Scripts or Medco.

458.   Express Scripts acquired Medco in 2012 (*see infra* ¶ 144.)

459.   In 2017, Plaintiff requested proposals from the PBM Defendants for the at-issue services.

460.   In recognizing the costs associated with provided such benefits to its Beneficiaries, Plaintiff specified in its 2017 Requests for PBM Proposals that "the County has placed significant importance on the reimbursement rates paid by each proposer to pharmacies for covered medications." The County specifically requested that "all proposals be quoted utilizing a 'transparent pricing' model," meaning "that the chosen provider will not retain any money associated with prescription drug rebates or any money associated with the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies."

461.   In response to Plaintiff's 2017 request, all PBM Defendants submitted proposals.

462.   Plaintiff was unaware of the Insulin Pricing Scheme. Plaintiff relied on Defendants' public statements and material omissions.

463.   In or around September 2020, Plaintiff contracted with Defendant Express Scripts, Inc. for PBM services. The effective date of the contract was February 1, 2019.

464.    Defendants' Insulin Pricing Scheme has cost Plaintiff millions of dollars in overcharges.

465.    Indeed, since 2013, Albany County has spent more than $5.4 million on the at-issue diabetes medications.

466.    Plaintiff has been directly damaged by the Insulin Pricing Scheme as a payor/purchaser of Defendants' at-issue diabetes medications.

467.    A substantial portion of this $5.4 million is attributable to Defendants' inflated prices, which did not arise from competitive market forces; rather, the artificially inflated costs arose from the Defendants' Insulin Pricing Scheme.

468.    With regards to its employee health plans, Albany County serves almost 375,000 residents providing public safety, emergency management, and health services just to name a few vital roles.

469.    As an employer, Plaintiff Albany County provides health benefits to its Beneficiaries, including employees, retirees, and their dependents.

470.    One of the benefits that Plaintiff offers its Beneficiaries through its employee health plan is payment of a significant portion of the Beneficiaries' prescription drug purchases.

471.    Importantly, because of Defendants' success in hiding the Insulin Pricing Scheme, no payor, including Plaintiff, knows (or should know) that the prices for the at-issue diabetes medications are generated by Defendants' scheme and are artificially inflated.

472.    As a result, despite paying a negotiated discount off the reported price, Plaintiff has been unknowingly overpaying for the Manufacturer Defendants' diabetes medications by millions of dollars.

473.   Plaintiff's expenses incurred includes the at-issue diabetes medications purchased and administered in county-run facilities. All of these purchases have likewise been impacted by the Insulin Pricing Scheme described herein, causing the Plaintiff millions of dollars of harm.

474.   Thus, the Insulin Pricing Scheme has directly and proximately caused Plaintiff to substantially overpay for diabetes medications.

475.   Because Defendants continue to generate exorbitant, unfair and deceptive prices for the at-issue drugs through the Insulin Pricing Scheme, the harm to Plaintiff Albany County is ongoing.

### K.   Defendants' Recent Efforts in Response to Rising Insulin Prices

476.   In reaction to mounting political and public outcry, Defendants have taken action both on Capitol Hill and in the public relations space.

477.   First, in response to public criticism, Defendants have increased their spending to spread their influence in Washington D.C.

478.   For example, in recent years Novo Nordisk's political action committee ("PAC") has doubled its spending on federal campaign donations and lobbying efforts. In 2017 alone, Novo Nordisk spent $3.2 million lobbying Congress and federal agencies, its biggest ever investment in directly influencing U.S. policymakers. Eli Lilly and Sanofi have also contributed millions of dollars through their PACs in recent years.[183]

479.   Likewise, the PBM Defendants have steadily increased their political spending for the past five years as public outcry has grown against them.

---

[183] Jay Hancock, *et al.*, *Novo Nordisk Chastised for Hiking Insulin Prices, Makes a Textbook Response: More Lobbying*, PHILA. INQUIRER (Apr. 30, 2018), https://www.inquirer.com/philly/business/novo-nordisk-insulin-lobbying-prices-20180430.html.

480. Second, Defendants have recently begun publicizing programs ostensibly aimed at lowering the cost of insulins.

481. These affordability measures fail to address the structural issues that gave rise to the price hikes. Rather, these are mere public relations stunts that do not solve the problem.

482. For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

483. However, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies.

484. Following this the staff of the Offices of U.S. Senators Elizabeth Warren and Richard Blumenthal prepared a report examining the availability of this drug. The investigative report, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, concluded that Eli Lilly's lower-priced, authorized generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.[184]

485. The conclusion of the report was that: "Eli Lilly has failed to deliver on its promise to put a more-affordable insulin product on the shelves. Instead of giving patients

---

[184] Sen. Elizabeth Warren & Sen. Richard Blumenthal, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, (Dec. 2019), https://www.fdanews.com/ext/resources/files/2019/12-16-19-InaccessibleInsulinreport.pdf?1576536304.

access to its generic alternative, this pharmaceutical behemoth is still charging astronomical prices for a drug people require daily and cannot live without."[185]

486.   In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling. In particular, for many diabetics, especially Type 1 diabetics, these insulins can be dangerous.

487.   In fact, in August 2019, a Type 1 diabetic who could no longer afford his $1,200 a month insulin prescription died months after switching to ReliOn brand insulin due to complications from the disease.[186]

488.   Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem. Plaintiff Albany County continues to suffer great harm as a result of the Insulin Pricing Scheme.

## V.   TOLLING OF THE STATUTES OF LIMITATIONS

489.   Plaintiff has diligently pursued and investigated the claims asserted in this Complaint. Through no fault of its own, Plaintiff did not learn, and could not have learned, of the factual bases for its claims or the injuries suffered therefrom until recently. Consequently, the following tolling doctrines apply.

---

[185] Sen. Elizabeth Warren, *Senators Warren and Blumenthal Release Investigation Revealing Diabetes Patients' Lack of Access to Lower-Priced Insulin*, (Dec. 16, 2019), https://www.warren.senate.gov/oversight/reports/senators-warren-and-blumenthal-release-investigation-revealing-diabetes-patients-lack-of-access-to-lower-priced-insulin.
[186] Joshua Bote, *A Man Who Switched to More Affordable Insulin Died. Here's What Happened in the Viral Story,* USA TODAY (Aug, 9, 2019, 5:12 PM), https://www.usatoday.com/story/news/nation/2019/08/09/man-dies-otc-insulin/1942908001/.

## A.     Discovery Rule Tolling

490.   Plaintiff had no way of knowing about the Insulin Pricing Scheme.

491.   As discussed above, the PBM and Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants or the details of the Defendants' negotiations and payments between each other or their pricing structures and agreements, labeling them trade secrets and protecting them with confidentiality agreements.

492.   Each Defendant group also affirmatively blamed the other for the price increase described herein, both during their Congressional testimonies and through the media.

493.   Plaintiff did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the Insulin Pricing Scheme, nor would a reasonable and diligent investigation have disclosed the true facts.

494.   Even today, lack of transparency in the pricing of diabetes medications and the arrangements, relationships, and agreements between and among the Manufacturer Defendants and the PBM Defendants continue to obscure Defendants' unlawful conduct from Plaintiff and the general public.

495.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims identified herein.

## B.     Fraudulent Concealment Tolling

496.   Any applicable statutes of limitation have also been tolled by the Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action, as described above.

### C.      Estoppel

497.   Defendants were under a continuous duty to disclose to Plaintiff the true character, quality and nature of the prices upon which payments for diabetes medications were based, and the true nature of the services being provided.

498.   Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

### D.      Continuing Violations

499.   Any applicable statutes of limitations are also tolled because Defendants' activities have not ceased and continue to this day, such that their individual and concerted acts and omissions constitute a series of continuing wrongs and, therefore any causes of action are not complete and do not accrue until the tortious and anticompetitive acts have ceased.

## VI.    CLAIMS FOR RELIEF

### First Cause of Action (Count I)
### Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)
(against Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark)

500.   Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in paragraphs 1-488.

501.    This cause of action is brought by Plaintiff against Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark for violations of 18 U.S.C. § 1962(c).

502.    Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark are (a) culpable "persons" who (b) willfully and knowingly (c) committed and conspired to commit two or more acts of mail and wire fraud (d) through a "pattern" of

racketeering activity (e) involving an "association in fact" enterprise (f) the results of which had an effect on interstate commerce.

### A. Defendants Are Culpable "Persons" Under RICO.

503. Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark, separately, are "persons" as that term is defined in 18 U.S.C. § 1961(3) because each is capable of holding a legal or beneficial interest in property.

504. Each one of Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark are separate entities and "persons" that are distinct from the RICO enterprises alleged below.

### B. The Manufacturer-PBM RICO Enterprises

505. For the purposes of this claim, the RICO enterprises are six separate associations-in-fact consisting of one of each of CVS Caremark and Express Scripts and one of each of the Manufacturer Defendants, including those entities' directors, employees, and agents:

   a. The "Eli Lilly-PBM Enterprises" are two separate associations-in-fact consisting of each of CVS Caremark and Express Scripts and Eli Lilly. Each Eli Lilly-PBM Enterprise is associated for the common and/or shared purposes of manufacturing, selling and facilitating the purchase of Humulin N, Humulin R, Humalog, Trulicity, and Basaglar. In particular, the Eli Lilly-PBM Enterprise are: (1) the Eli Lilly-CVS Caremark association-in-fact enterprise; and (2) the Eli Lilly-Express Scripts association-in-fact enterprise.

   b. The "Novo Nordisk-PBM Enterprises" are two separate associations-in-fact consisting of each of CVS Caremark and Express Scripts and Novo Nordisk. Each Novo Nordisk-PBM Enterprise is associated for the common and/or shared purposes of manufacturing, selling and facilitating the purchase of Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza, and Ozempic. In particular, the Novo Nordisk-PBM Enterprises are: (1) the Novo Nordisk-CVS Caremark association-in-fact enterprise; and (2) the Novo Nordisk-Express Scripts association-in-fact enterprise.

   c. The "Sanofi-PBM Enterprises" are two separate associations-in-fact consisting of each of CVS Caremark and Express Scripts and Sanofi. Each

Sanofi-PBM Enterprise is associated for the common and/or shared purposes of manufacturing, selling and facilitating the purchase of Lantus, Toujeo, Apidra, and Soliqua. In particular, the Sanofi-PBM Enterprises are: (1) the Sanofi-CVS Caremark association-in-fact enterprise; and (2) the Sanofi-Express Scripts association-in-fact enterprise.

506.     These associations-in-fact enterprises are collectively referred to herein as the "Manufacturer-PBM Enterprises."

507.     Each Manufacturer-PBM Enterprise is a separate, ongoing, and continuing business organization consisting of both corporations and individuals that are and have been associated for the common and/or shared purposes of manufacturing, selling, and facilitating the purchase of the at-issue drugs.

508.     With respect to the Insulin Pricing Scheme, each Manufacturer-PBM Enterprise engaged in the shared purposes of exchanging false list prices and secret Manufacturer Payments for preferred formulary positions for the at-issue drugs in order to profit off diabetics and payors, including the Plaintiff.

509.     Each of the Manufacturer-PBM Enterprises has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between Eli Lilly and CVS Caremark, Eli Lilly and Express Scripts, Novo Nordisk and CVS Caremark, Novo Nordisk and Express Scripts, Sanofi and CVS Caremark, and Sanofi and Express Scripts.

510.     As to each of these Manufacturer-PBM Enterprises, there is a common communication network by which Eli Lilly and CVS Caremark, Eli Lilly and Express Scripts, Novo Nordisk and CVS Caremark, Novo Nordisk and Express Scripts, Sanofi and CVS Caremark, and Sanofi and Express Scripts share information and meet on a regular basis. These communications include those that relate to the use of the false list prices for the at-issue diabetes medications and the regular flow of Manufacturer Payments from

each Manufacturer Defendant to CVS Caremark and Express Scripts for formulary placement.

511.     Each Defendant within the Manufacturer-PBM Enterprises functions as continuing but separate unit.

512.     At all relevant times, each of the Manufacturer-PBM Enterprises was operated and conducted for unlawful purposes by each Manufacturer Defendant and Express Scripts and CVS Caremark, namely, carrying out the Insulin Pricing Scheme.

513.     From these activities, each Manufacturer-PBM Enterprise derived secret profits that are greater than any one of the Manufacturer Defendants or either Express Scripts or CVS Caremark could obtain absent their misrepresentations regarding their non-transparent pricing schemes.

514.     To accomplish this common purpose, each Manufacturer Defendant periodically and systematically inflated the prices of the at-issue drugs and then secretly paid a significant, yet undisclosed, portion of this inflated price back to Express Scripts and CVS Caremark in the form of Manufacturer Payments.

515.     Each Manufacturer-PBM Enterprise did so willfully and with knowledge that Plaintiff paid for the at-issue drugs at prices directly based on the false list prices.

516.     Each Manufacturer-PBM Enterprise's inflation of the list prices and secret Manufacturer Payments were a *quid pro quo* exchange for preferred formulary placement.

517.     Each Manufacturer-PBM Enterprise concealed from Plaintiff that these false prices and secret Manufacturer Payments resulted in each Manufacturer gaining formulary access without requiring significant price reductions; and they resulted in higher profits for Express Scripts and CVS Caremark, whose earnings increase the more inflated the price is and the more payment it receives from each Manufacturer Defendant.

518.     Each Manufacturer-PBM Enterprise also shares a common purpose of perpetuating the use of the false list prices for the at-issue drugs as the basis for the price that payors, including the Plaintiff, and diabetics pay for diabetes medications.

519.     The Manufacturer Defendants would not be able to offer large pricing spreads to Express Scripts and CVS Caremark in exchange for favorable formulary positions without the use of the false list prices as the basis for the price paid by diabetics and payors, including the Plaintiff, for the at-issue drugs.

520.     Express Scripts and CVS Caremark share this common purpose because nearly all of their profit and revenue that is generated from the at-issue drugs is tied to the false inflated prices generated by the Insulin Pricing Scheme. Without diabetics and payors, including the Plaintiff, paying for diabetes medications based on the inflated list prices, their profits from the Insulin Pricing Scheme would decrease.

521.     As a result, CVS Caremark and Express Scripts have, with the knowing and willful participation and assistance of each Manufacturer Defendant, engaged in hidden profit-making schemes falling into four general categories: (i) garnering undisclosed Manufacturer Payments from each Manufacturer Defendant that Express Scripts and CVS Caremark retains to a large extent; (ii) generating substantial profits from pharmacies because of the falsely inflated prices; (iii) generating profits on the diabetes medications sold through Express Scripts and CVS Caremark's own mail order and retail pharmacies and (iv) keeping secret discounts each Manufacturer Defendant provides in association with Express Scripts and CVS Caremark's mail order and retail operations.

522.     At all relevant times, Express Scripts and CVS Caremark and each Manufacturer Defendant has been aware of their respective Manufacturer-PBM

Enterprise's conduct, has been a knowing and willing participant in and coordinator of that conduct and has reaped profits from that conduct.

523. But for each Manufacturer-PBM Enterprise's common purpose of engaging in the Insulin Pricing Scheme, each Manufacturer Defendant and Express Scripts and CVS Caremark would have had the incentive to disclose the fraudulence of the scheme.

524. By failing to disclose this fraud, each Manufacturer Defendant and Express Scripts and CVS Caremark has perpetuated the conduct of the Manufacturer-PBM Enterprises.

525. Each Manufacturer-PBM Enterprise knowingly made material misrepresentations to the public and the Plaintiff in furtherance of the fraudulent scheme, including publishing inflated prices for insulin and representing that:

   a. the false list prices for the at-issue diabetes medications were reasonably related to the actual prices realized by Defendants and were a reasonable and fair basis on which to base the price Plaintiff paid for these drugs;

   b. each Manufacturer priced its at-issue drugs according to each drug's value to the healthcare system and the need to fund innovation.

   c. the Manufacturer Payments paid back Express Scripts and CVS Caremark for each at-issue drug was for the benefit of Plaintiff;

   d. each Manufacturer Defendant and Express Scripts and CVS Caremark were transparent with Plaintiff regarding the Manufacturer Payments and that these Manufacturer Payments did, in fact, save Plaintiff money; and

   e. Express Scripts and CVS Caremark constructed formularies in a manner that lowered the price of the at-issue drugs and promoted the health and safety of diabetics.

526. At all times relevant to this Complaint, each Manufacturer-PBM Enterprise knew these representations to be false.

527.     At all times relevant to this Complaint, each Manufacturer-PBM Enterprise intentionally made these representations for the purpose of inducing Plaintiff into paying for diabetes medications at these false list prices.

528.     Plaintiff relied on the material misrepresentations and omissions made by each Manufacturer-PBM Enterprise in paying prices for the at-issue diabetes medications based upon the false prices generated by Insulin Pricing Scheme.

529.     Neither Express Scripts, CVS Caremark, nor the Manufacturer Defendants alone could have accomplished the purposes of the Manufacturer-PBM Enterprises without the other entities.

530.     Express Scripts and CVS Caremark need the Manufacturers to falsely inflate their published prices and to pay large Manufacturer Payments back to them.

531.     For the Manufacturers to profit from the scheme, Express Scripts and CVS Caremark needed to convince Plaintiff to pay prices for the at-issue drugs based upon the false list prices.

532.     Express Scripts and CVS Caremark did so by utilizing the misrepresentations listed above to convince Plaintiff that they had secured lower prices when, in fact, they did the opposite, all while concealing the Insulin Pricing Scheme.

533.     Without these misrepresentations, each Manufacturer-PBM Enterprise could not have achieved its common purpose, as Plaintiff would not have been willing to pay based upon these false list prices.

534.     The Manufacturer Defendants and Express Scripts and CVS Caremark were each willing participants in the Manufacturer-PBM Enterprises, had a common fraudulent purpose and interest in the objective of the scheme, and functioned within a

structure designed to effectuate the Enterprises' purposes, *i.e.*, to increase profits for each Defendant at the expense of Plaintiff.

### C.      Defendants' Use of the U.S. Mails and Interstate Wire Facilities

535.      Each of the Manufacturer-PBM Enterprises engaged in and affected interstate commerce because each engaged in the following activities across state boundaries: the sale, purchase and/or administration of diabetes medications; the setting and publishing of the prices of these drugs; and/or the transmission of pricing information of diabetes medications; and/or the transmission and/or receipt of sales and marketing literature; and/or the transmission of diabetes medications through mail-order and retail pharmacies; and/or the transmission and/or receipt of invoices, statements, and payments related to the use or administration of diabetes medications; and/or the negotiations and transmissions of contracts related to the pricing of and payment for diabetes medications.

536.      Each Manufacturer-PBM Enterprise participated in the administration of diabetes medications to millions of individuals located throughout the United States, including in Albany County and elsewhere in this District.

537.      Each Manufacturer Defendant and Express Scripts and CVS Caremark's illegal conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents and information and products and funds through the U.S. mails and interstate wire facilities.

538.      The nature and pervasiveness of the Insulin Pricing Scheme, which included each Manufacturer Defendant's and Express Scripts' and CVS Caremark's corporate headquarters operations, necessarily required those headquarters to communicate directly and frequently by the U.S. mails and by interstate wire facilities with

each other and with pharmacies, physicians, payors and diabetics in Albany County and throughout New York State.

539.    Some of the precise dates of each Manufacturer-PBM Enterprise uses of the U.S. mails and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to each entity's books and records. Indeed, an essential part of the successful operation of the Insulin Pricing Scheme depended upon secrecy, as alleged above. And each Manufacturer Defendant and Express Scripts and CVS Caremark took deliberate steps to conceal its wrongdoing.

540.    Each Manufacturer-PBM Enterprise's use of the U.S. mails and interstate wire facilities to perpetrate the Insulin Pricing Scheme involved thousands of communications including:

    a.  Marketing materials about the published prices for diabetes medications, which each Manufacturer Defendant sent to Express Scripts and CVS Caremark located across the country, in Albany County, and throughout the State of New York;

    b.  Written and oral representations of the false list prices of diabetes medications that each Manufacturer Defendant and Express Scripts and CVS Caremark made at least annually and, in many cases, several times during a single year to the public;

    c.  Thousands of written and oral communications discussing, negotiating, and confirming the placement of each Manufacturer Defendant's diabetes medications on Express Scripts and CVS Caremark's formularies;

    d.  Written and oral representations made by each Manufacturer Defendant regarding information or incentives paid back to each Express Scripts and CVS Caremark for each diabetes medications sold and/or to conceal these incentives or the Insulin Pricing Scheme;

    e.  Written communications made by each Manufacturer Defendant, including checks, relating to Manufacturer Payments paid to Express Scripts and CVS Caremark to persuade them to advocate the at-issue diabetes medications;

f.  Written and oral communications with U.S. government agencies that misrepresented what the published prices were or that were intended to deter investigations into the true nature of the published prices or to forestall changes to reimbursement based on something other than published prices;

g.  Written and oral communications with payors, including the Plaintiff, regarding the price of diabetes medications;

h.  Written and oral communications to the Plaintiff, including marketing and solicitation material sent by Express Scripts and CVS Caremark regarding the existence, amount, or purpose of payments made by each Manufacturer Defendant to Express Scripts and CVS Caremark for the diabetes medications described herein and the purpose of Express Scripts and CVS Caremark's formularies;

i.  Transmission of published prices to third parties and payors, including the Plaintiff; and

j.  Receipts of money on tens of thousands of occasions through the U.S. mails and interstate wire facilities—the wrongful proceeds of the Insulin Pricing Scheme.

### D.  Conduct of the Manufacturer-PBM Enterprises' Affairs

541.   Each Manufacturer Defendant and Express Scripts and CVS Caremark has participated in and exerted control over the Manufacturer-PBM Enterprises with which they were associated and, in violation of Section 1962(c) of RICO, each Manufacturer Defendant and Express Scripts and CVS Caremark has conducted or participated in the conduct of the affairs of those association-in-fact RICO enterprises, directly or indirectly. Such participation was carried out in the following ways:

a.  Each Manufacturer Defendant directly controls the secret Manufacturer Payments it provides to Express Scripts and CVS Caremark for its diabetes medications.

b.  Express Scripts and CVS Caremark directly control their respective drug formularies, which determines the utilization of the at-issue diabetes medications.

c.  Each Manufacturer Defendant directly controls the publication of the false list prices generated by the Insulin Pricing Scheme.

d. Each Manufacturer Defendant directly controls the creation and distribution of marketing, sales and other materials used to inform Express Scripts and CVS Caremark of the profit potential from its diabetes medications.

e. Express Scripts and CVS Caremark directly controls the creation and distribution of marketing, sales and other materials used to inform payors and the public of the benefits and cost-saving potential of Express Scripts and CVS Caremark formularies and negotiations with the Manufacturers.

f. Express Scripts and CVS Caremark and each Manufacturer Defendant has relied upon its employees and agents to promote the Insulin Pricing Scheme through the U.S. mails, through interstate wire facilities and through direct contacts with payors.

g. Each Manufacturer Defendant has controlled and participated in the affairs of each Manufacturer-PBM Enterprises by providing Manufacturer Payments and/or other inducements to place the at-issue diabetes medications on Express Scripts and CVS Caremark's formularies.

h. Express Scripts and CVS Caremark has controlled and participated in the affairs of the Manufacturer-PBM Enterprise with which it is associated by incentivizing and agreeing with each Manufacturer Defendant to exchange formulary placement for false list prices and payments as described above. Furthermore, Express Scripts and CVS Caremark hide the actual amount of secret Manufacturer Payments received from each Manufacturer Defendant by relabeling them discounts, credits, concession fees, administrative fees, etc. and then not disclosing the amount paid under these labels.

i. Express Scripts and CVS Caremark distributed through the U.S. mail and interstate wire facilities, promotional and other materials which claimed that the Manufacturer Payments paid from each Manufacturer Defendant to Express Scripts and CVS Caremark saved Plaintiff money on the at-issue drugs.

j. Each Manufacturer Defendant represented to the Plaintiff—by publishing and promoting false list prices without stating that these published prices differed substantially from the prices realized by each Manufacturer Defendant and Express Scripts and CVS Caremark—that the published prices of diabetes medications reflected or approximated the actual price realized by Defendants and resulted from transparent and competitive, fair market forces.

k. Each of the Manufacturer-PBM Enterprises identified above had a hierarchical decision-making structure headed by each Manufacturer Defendant and Express Scripts and CVS Caremark.

l. In violation of Section 1962(c) of RICO, each Manufacturer Defendant and Express Scripts and CVS Caremark has conducted the affairs of each of the

Manufacturer-PBM Enterprises with which they associated in order to carry out the Insulin Pricing Scheme.

### E.   Defendants' Pattern of Racketeering Activity

542.     Each Manufacturer Defendant and Express Scripts and CVS Caremark has conducted and participated in the affairs of their respective Manufacturer-PBM Enterprises through a pattern of racketeering activity, including acts that are unlawful under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.

543.     Each Manufacturer Defendant's and Express Scripts and CVS Caremark's pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of the Insulin Pricing Scheme described above. Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which each Manufacturer Defendant and Express Scripts and CVS Caremark intended to defraud Plaintiff.

544.     By intentionally and falsely inflating the list prices, by misrepresenting the purpose behind both the Manufacturer Payments made from each Manufacturer Defendant to Express Scripts and CVS Caremark and Express Scripts and CVS Caremark's formulary construction and by subsequently failing to disclose such practices to Plaintiff, each Manufacturer Defendant and Express Scripts and CVS Caremark engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

545.     Each Manufacturer Defendant's and Express Scripts and CVS Caremark's racketeering activities amounted to a common course of conduct, with similar patterns and purposes, intended to deceive Plaintiff.

546.     Each separate use of the U.S. mails and/or interstate wire facilities employed by each Manufacturer Defendant and Express Scripts and CVS Caremark was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiff.

547.     Each Manufacturer Defendant and Express Scripts and CVS Caremark engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the respective Manufacturer-PBM Enterprises with which each of them is and was associated in fact.

### F.     Defendants' Motive

548.     Each Manufacturer Defendant's and Express Scripts and CVS Caremark's motives in creating and operating the Insulin Pricing Scheme and conducting the affairs of the Manufacturer-PBM Enterprises described herein was to falsely obtain sales of and profits from diabetes medications.

549.     The Insulin Pricing Scheme was designed to, and did, encourage others, including payors such as the Plaintiff, to advocate the use of each Manufacturer Defendant's products and to pay for those diabetes medications based on a falsely inflated price. Each Manufacturer Defendant used the Insulin Pricing Scheme to obtain formulary placement to sell more of its drugs without having to cut into its profits. Express Scripts and CVS Caremark used the Insulin Pricing Scheme to falsely inflate the price payors such as the Plaintiff paid for diabetes medications in order to profit off the Insulin Pricing Scheme, as discussed above.

**G.     The Manufacturer-PBM Enterprises' Insulin Pricing Scheme Damaged Plaintiff**

550.    Each Manufacturer-PBM Enterprise's violations of federal law and pattern of racketeering activity has directly and proximately caused the Plaintiff to be injured in its business or property.

551.    The price the Plaintiff pays for the at-issue drugs is directly tied to the false list prices generated by the Insulin Pricing Scheme.

552.    No other intermediary in the supply chain has control over or is responsible for the list prices on which nearly all Plaintiff's payments are based other than the Manufacturer-PBM Defendant Enterprises.

553.    Defendants collectively set the price that the Plaintiff paid for the at-issue diabetes medications.

554.    During the relevant time period, Express Scripts and CVS Caremark provided PBM services to the Plaintiff and benefitted therefrom.

555.     During the relevant time period, the Plaintiff paid Express Scripts and CVS Caremark for the at-issue drugs.

556.    The entire basis behind each Manufacturer-PBM Enterprise's fraudulent scheme was to convince Plaintiff to pay false prices for diabetes medications in order to reap enormous profits.

557.    Each Manufacturer-PBM Enterprise controlled and participated in the Insulin Pricing Scheme that was directly responsible for the false list prices upon which the price Plaintiff paid was based.

558.    Thus, Plaintiff was damaged as a result of the Insulin Pricing Scheme. But for the misrepresentations and false prices created by the Insulin Pricing Scheme that each

Manufacturer-PBM Enterprise employed, Plaintiff would have paid less for diabetes medications.

559.    As a direct result of the Insulin Pricing Scheme the Plaintiff was further damaged by incurring increased healthcare costs and by losing tax revenue due to decreased workforce productivity.

560.    The Plaintiff was directly harmed by the Insulin Pricing Scheme and is entitled to seek a remedy for the harms caused by Defendants' fraudulent scheme.

561.    The Plaintiff's damages are separate and distinct from any other victim that was harmed by the Manufacturer-PBM Defendant Enterprises' Insulin Pricing Scheme.

562.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(c) of RICO, Defendants are jointly and severally liable to the Plaintiff for three times the damages that were sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

563.    By virtue of these violations of 18 U.S.C. § 1962(c), under the provisions of Section 1964(a) of RICO, the Plaintiff seeks injunctive relief against each Manufacturer and Express Scripts and CVS Caremark for their fraudulent reporting of their prices and their continuing acts to affirmatively misrepresent and/or conceal and suppress material facts concerning their false and inflated prices for diabetes medications, plus the costs of bringing this suit, including reasonable attorneys' fees.

564.    Absent an injunction, the effects of this fraudulent, unfair, and unconscionable conduct will continue. The Plaintiff continues to purchase the at-issue diabetes medications. The Plaintiff will continue to pay based on the Defendants' false list prices. This continuing fraudulent, unfair, and unconscionable conduct is a serious matter

that calls for injunctive relief as a remedy. The Plaintiff seeks injunctive relief, including an injunction against each Manufacturer and Express Scripts and CVS Caremark, to prevent them from affirmatively misrepresenting and/or concealing and suppressing material facts concerning their conduct in furtherance of the Insulin Pricing Scheme.

## Second Cause of Action (Count II)

### Violations of RICO, 18 U.S.C. § 1962(d)
### By Conspiring to Violate 18 U.S.C. § 1962(c)
(against All Defendants)

565.   Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraph 1 through paragraph 488, 500-564, and 598-609.

566.   Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

567.   Defendants have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in the Insulin Pricing Scheme.

568.   As set forth in detail above, as well as in the Civil Conspiracy section below, Defendants each knowingly agreed to facilitate the Insulin Pricing Scheme and each has engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy. Specifically, Defendants agreed to and did inflate the prices of the at-issue drugs in lockstep to achieve an unlawful purpose; Defendants agreed to and did make false or misleading statements or material omissions regarding the reasons for these price increases, the purpose of the Manufacturer Payments exchanged between Defendants and the PBMs' formulary construction; and PBMs agreed to and did, in concert, request and receive larger Manufacturer Payments and higher prices in exchange for formulary placement.

569.     The nature of the above-described Defendant co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

570.     Defendants have engaged and continue to engage in the commission of overt acts, including the following unlawful racketeering predicate acts:

    a.   Multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

    b.   Multiple instances of wire fraud in violations of 18 U.S.C. § 1343; and

    c.   Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

571.     Defendants' conspiracy to violate the above federal laws and the effects thereof detailed above are continuing and will continue. Plaintiff has been injured in its property by reason of these violations: Plaintiff has paid more for the at-issue drugs than it would have but for Defendants' conspiracy to violate 18 U.S.C. § 1962(c).

572.     By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiff for three times the damages this District has sustained, plus the cost of this suit, including reasonable attorneys' fees.

### Third Cause of Action (Count III)

**Violation of New York General Business Law**
**N.Y. Gen. Bus. Law § 349**
(against Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark)

573.     Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraph 1 through paragraph 488.

574.    The New York General Business Law makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."[187]

575.    Plaintiff is a "person" within the meaning of N.Y. Gen. Bus. Law § 349(h).

576.    Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark are each a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

577.    Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark's conduct, collectively and as individuals, as described in this Complaint, constitutes deceptive acts in violation of the New York General Business Law.

578.    Because these Defendants' willful and knowing conduct caused injury to Plaintiff, Plaintiff seeks to recover actual damages; discretionary treble damages; punitive damages; reasonable attorneys' fees and costs; an order enjoining Defendants' unlawful conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

579.    By engaging in the Insulin Pricing Scheme, as described herein, Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark have committed acts of unfair and deceptive trade practices in the conduct of trade or commerce within New York and Albany County causing harm to Plaintiff as a reimbursor for, purchaser and payor of the at-issue drugs.

580.    Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark have engaged in the following materially misleading conduct, which constitutes deceptive trade practice in violations of the New York General Business Law:

---

[187] N.Y. Gen. Bus. Law. § 349.

- Making false and misleading misrepresentations of fact that the prices for the at-issue diabetes medications were legal, competitive, and fair market value prices. In particular:

  o A characteristic of every commodity in New York's economy is its price, which is represented by every seller to every buyer that the product being sold is being sold at a legal, competitive, and fair market value.

  o At no point did these Defendants reveal that the prices associated with the lifesaving diabetic treatments at issue herein were not legal, competitive or at fair market value.

  o At no point did these Defendants disclose that the prices associated with the at-issue drugs were generated by the Insulin Pricing Scheme.

  o At least once a year for each year during the relevant time period, these Defendants reported and published false prices for each at-issue drug and in doing so represented that the reported prices were the actual, legal and fair prices for these drugs and resulted from competitive market forces.

  o In addition, by granting the at-issue drugs preferred formulary position— formulary positions that the PBMs represent are reserved for reasonably priced drugs and that are meant to promote the health of diabetics—the PBM Defendants knowingly and purposefully utilized the false prices that were generated by the Insulin Pricing Scheme.

  o By granting the at-issue diabetes medications preferred formulary positions, the PBM Defendants ensured that prices generated by the Insulin Pricing Scheme would harm Plaintiff.

  o The PBM Defendants also misrepresented their formularies promoted the cost-savings to Plaintiff.

  o Defendants' representations are false and Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark knew they were false. Defendants knew that the prices they reported and utilized are artificially inflated for the purpose of maximizing profits pursuant to the Insulin Pricing Scheme.

  o These Defendants also knew that the PBMs' formulary construction fueled the precipitous price increases that damaged Plaintiff's financial well-being.

  o Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark affirmatively withheld this truth from Plaintiff Albany County, even though these Defendants knew that the Plaintiff's intention was to pay the lowest possible price for diabetes medications and expectation

was to pay a legal, competitive price that resulted from transparent market forces.

- Making false and misleading misrepresentations of fact related to the Manufacturer Payments and the negotiations that occurred between the PBM and Manufacturer Defendants.

  o The PBM Defendants knowingly made false and misleading statements concerning the reasons for, existence of, and amount of price reductions by misrepresenting that the Manufacturer Payments lower the overall price of diabetes medications and promote the health of diabetics.

  o These representations were false and Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark knew they were false. The PBM Defendants knew that the Manufacturer Payments were not reducing the overall price of diabetes medications but rather are an integral part of the Insulin Pricing Scheme and are responsible for the inflated prices.

- Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark continue to make these misrepresentations and publish prices generated by the Insulin Pricing scheme, and Plaintiff continues to purchase diabetes medications at inflated prices.

581.   Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark acted knowingly and in a willful, wanton, or reckless disregard for the safety of others in committing the violation of the New York General Business Law described herein.

582.   Each at-issue purchase Plaintiff Albany County made for diabetes medications at the prices generated by the Insulin Pricing Scheme constitutes a separate violation of the New York General Business Law.

583.   The acts and practices alleged herein are ongoing, repeated, and affect the public interest.

584.   The acts and practices alleged herein substantially impact the community of diabetics, their families, healthcare providers, and the public, and have caused substantial actual harm, including to Plaintiff Albany County and its beneficiaries.

585.    These Defendants' acts and practices in violation of the New York General Business Law caused Plaintiff Albany County to suffer injuries alleged herein, including but not limited to paying excessive and inflated prices for diabetes medications as described herein.

586.    As a direct and proximate result of these Defendants' conduct in committing the above and foregoing violations of the New York General Business Law, these Defendants are directly and jointly and severally liable to Plaintiff Albany County for all restitution, damages, punitive damages, treble damages, penalties and disgorgement for which recovery is sought herein, including but not limited to the Plaintiff Albany County paying excessive and inflated prices for diabetes medications described herein every time it paid for an at-issue drug.

587.    Additionally, Plaintiff Albany County did not receive the benefit of its bargain, or otherwise paid a price premium, for the at-issue diabetes medications because it paid an artificially inflated price due to these Defendants' illegal practices.

### Fourth Cause of Action (Count IV)

**Unjust Enrichment**
(against Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark)

588.    Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraph 1 through paragraph 488.

589.    This cause of action is alleged in the alternative to any claim Plaintiff may have for legal relief.

590.    Plaintiff conferred a benefit upon Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark. These Defendants deceived Plaintiff Albany County

and have received a financial windfall from the Insulin Pricing Scheme at Plaintiff's expense.

591.   These Defendants wrongfully secured and retained unjust benefits from Plaintiff Albany County in the form of amounts paid for diabetes medications and fees and payments collected based on the prices generated by the Insulin Pricing Scheme. They did not adequately compensate Plaintiff therefor.

592.   Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark was aware of the benefit, voluntarily accepted it, and retained and appreciated the benefit, to which it was not entitled, at Plaintiff's expense.

593.   It is inequitable and unfair for these Defendants to retain these benefits.

594.   The benefit these Defendants have wrongfully retained is in an amount not less than the difference between the reasonable or fair market value of the at-issue drugs for which Plaintiff paid and the actual value of the at-issue drugs these Defendants delivered.

595.   Accordingly, Defendants Eli Lilly, Novo Nordisk, Sanofi, Express Scripts, and CVS Caremark should not be permitted to retain the proceeds from the benefits conferred upon them by Plaintiff Albany County, which seeks disgorgement of these Defendants' unjustly acquired profits and other monetary benefits resulting from their unlawful conduct and seeks restitution and/or recission, in an equitable and efficient fashion to be determined by the Court.

596.   As a direct and proximate cause of these Defendants' unjust enrichment at the expense of Plaintiff Albany County as referenced above, Plaintiff has suffered and continues to suffer ascertainable losses and damages as specified herein in an amount to be determined at trial.

## Fifth Cause of Action (Count V)

### Civil Conspiracy
(against All Defendants)

597.   Plaintiff re-alleges and incorporates herein by reference each of the allegations from paragraph 1 through paragraph 488.

598.   Defendants' conduct described herein constitutes an agreement between two or more parties to commit an unlawful act or a lawful act by unlawful means and Defendants' overt acts in furtherance of this conspiracy caused Plaintiff's damages.

599.   Defendants aided and abetted one another to violate federal laws and New York General Business Law and to obtain unjust enrichment.

600.   Each Defendant agreed to and carried out acts in furtherance of the Insulin Pricing Scheme that artificially and egregiously inflated the price of diabetes medications.

601.   Each PBM Defendant made a conscious commitment to participate in the Insulin Pricing Scheme.

602.   Manufacturer Defendants agreed with each other and PBM Defendants to intentionally raise their diabetes medication prices and then pay back a significant portion of those prices to the PBMs.

603.   In exchange for Manufacturer Defendants' inflating their prices and making large secret payments, PBM Defendants agreed to and did grant preferred formulary status to Manufacturer Defendants' diabetes medications.

604.   Each Defendant shares a common purpose of perpetuating the Insulin Pricing Scheme and neither the PBM Defendants nor Manufacturer Defendants alone could have accomplished the Insulin Pricing Scheme without their co-conspirators.

605.   PBM Defendants need Manufacturer Defendants to inflate the reported price of their diabetes medications and to make secret payments back to PBM Defendants in order for PBM Defendants to profit off the Insulin Pricing Scheme.

606.   Manufacturer Defendants need PBM Defendants to grant their diabetes medications preferred formulary placement in order to maintain access to a majority of payors and diabetics.

607.   As discussed throughout this Complaint, the Insulin Pricing Scheme resulted from explicit agreements, direct coordination, constant communication and exchange of information between the PBMs and the Manufacturers.

608.   In addition to the preceding direct evidence of an agreement, Defendants' conspiracy is also demonstrated by the following indirect evidence that infers Defendants conspired to engage in fraudulent conduct:

- Defendants refuse to disclose the details of their pricing structures, agreements and sales figures in order maintain the secrecy of the Insulin Pricing Scheme;

- Numerous ongoing government investigations, hearings and inquiries have targeted the Insulin Pricing Scheme and the collusion between the Manufacturer and PBM Defendants, including:

  o In 2016, the Manufacturer Defendants received civil investigative demands from at least the State of Washington relating to the pricing of their insulin products and their relationships with the PBM Defendants;

  o In 2017, the Manufacturer Defendants received civil investigation demands from the States of Minnesota, California and Florida related to the pricing of their insulin products and their relationships with the PBMs;

  o Letters from numerous senators and representatives in recent years to the Justice Department and the Federal Trade Commission asking them to investigate potential collusion among Defendants;

  o A 2017 House Oversight committee investigation into the corporate strategies of drug companies, including Manufacturer Defendants,

seeking information on the increasing price of drugs and manufacturers efforts to preserve market share and pricing power;

o A 2018 Senate report titled "Insulin: A Lifesaving Drug Too Often Out of Reach" aimed addressing the dramatic increase in the price of insulin; and

o Several 2019 hearings before both the Senate Financing Committee and the House Oversight and Reform Committees on the Insulin Pricing Scheme and the collusion between the PBMs and the Manufacturers; and

o Senate Finance Committee's recent two-year probe into the Insulin Pricing Scheme and the conspiracy between the Manufacturers and the PBMs.

- The astronomical rise in the price of the at-issue drugs coincides with PBM Defendants' rise to power within the pharmaceutical pricing system starting in 2003.

609.    Plaintiff Albany County was and continues to be damaged by the conspiracy when it overpaid for the diabetes medications as result of Defendants' unlawful actions.

## VII.   MOTION FOR INJUNCTION

610.    Plaintiff Albany County re-alleges and incorporates paragraphs 1–488.

611.    By Defendants' violations of the New York General Business Law, RICO, and common law, Plaintiff Albany County has suffered, and will continue to suffer, immediate and irreparable injury, loss, and damage, as discussed herein.

612.    The ongoing and threatened injury to Plaintiff Albany County and its beneficiaries outweighs the harm that an injunction might cause Defendants.

613.    As a direct and proximate result of the conduct of the Defendants in committing the above and foregoing acts, Plaintiff Albany County moves this Honorable Court for injunctive relief against the Defendants pursuant N.Y. Gen. Bus. Law § 349(h) and 18 U.S.C. § 1964(a), thereby enjoining Defendants from committing future violations of the New York General Business Law and RICO.

614.   Granting an injunction is consistent with the public interest because it will protect the health and economic interests of Plaintiff Albany County, as well as the integrity of the New York marketplace.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff Albany County prays for entry of judgment against the Defendants for all the relief requested herein and to which the Plaintiff may otherwise be entitled, specifically, but without limitation, to-wit:

A.   That the Court determine that Defendants have violated the New York General Business Law, have violated RICO, have been unjustly enriched and have engaged in a civil conspiracy;

B.   Judgment in favor of Plaintiff and against the Defendants for damages in excess of the minimum jurisdictional requirements of this Honorable Court, in a specific amount to be proven at trial;

C.   That the Plaintiff Albany County be granted the following specific relief:

1.   In accordance with N.Y. Gen. Bus. Law § 349(h) and 18 U.S.C. § 1964(a), that Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein in violation of the New York General Business Law and RICO, or from entering into any other contract, conspiracy or combination having a similar purpose or

effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

2.  In accordance with N.Y. Gen. Bus. Law § 349(h), that Defendants be ordered to restitute any and all monies to Plaintiff Albany County of New York for its purchases of the at-issue drugs and the purchases of its citizens.

3.  That Plaintiff:

    i.   be awarded restitution, damages, disgorgement, penalties and/or all other legal and equitable monetary remedies available under the state laws set forth in this Complaint and the general equitable powers of this Court in an amount according to proof;

    ii.  be awarded punitive damages because Defendants knowingly, willfully, wantonly and intentionally harmed the health, wellbeing and financial interests Plaintiff Albany County and its Beneficiaries;

    iii. be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

    iv.  recover its costs of suit, including its reasonable attorney's fees, as provided by law and pursuant to N.Y. Gen. Bus. Law § 349(h) and 18 U.S.C. § 1964(c); and

    v.   be awarded such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## IX.   JURY DEMAND

Plaintiff Albany County demands trial by jury on all issues so triable.


RESPECTFULLY SUBMITTED this 16th day of September, 2022.


*/s/ Benjamin J. Widlanski*

Benjamin J. Widlanski
bwidlanski@kttlaw.com
Registration Number: 4586293
Tal J. Lifshitz (*pending pro hac vice*)
tjl@kttlaw.com
Rachel Sullivan (*pending pro hac vice*)
rs@kttlaw.com
Jorge L. Piedra (*pending pro hac vice*)
jpiedra@kttlaw.com
Javier A. Lopez (*pending pro hac vice*)
jal@kttlaw.com
Daniel T. DiClemente (*pending pro hac vice*)
ddiclemente@kttlaw.com
**KOZYAK TROPIN & THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800

 */s/ Troy A. Rafferty*
Troy A. Rafferty, Esq. (*pending pro hac vice*)
trafferty@levinlaw.com
Matthew D. Schultz, Esq. (*pending pro hac vice*)
mschultz@levinlaw.com
William F. Cash, Esq. (*pending pro hac vice*)
bcash@levinlaw.com
**LEVIN, PAPANTONIO, RAFFERTY, PROCTOR,
BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A**.
316 S. Baylen St., Suite 600
Pensacola, Florida 32502
Tel: (850) 435-7140


  */s/ Archie Lamb Jr.*
Archie C. Lamb, Jr., Esq. (*pending pro hac vice*)
alamb@archielamb.com
**Archie Lamb & Associates**
P.O. Box 2088
Birmingham, Alabama  35201
205-612-6789 (C)

*/s/ Donald Davis*
Donald W. Davis, Jr. (*pending pro hac vice*)
dwdavis@bmdllc.com
**Brennan, Manna & Diamond, LLC**
75 East Market Street
Akron, Ohio 44308
P: (330) 253-5060/Fax: (330) 253-1977