**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**ALBANY DIVISION**

COUNTY OF ALBANY, NEW YORK,

                                   Plaintiff,

                             v.

ELI LILLY AND COMPANY, *et al.*,

                                  Defendants.

Case No.: 1:22-cv-00981-DNH-CFH

**MEMORANDUM OF LAW IN
SUPPORT OF EXPRESS SCRIPTS
DEFENDANTS' MOTION TO
DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................. 1

BACKGROUND .................................................................................................. 3

ARGUMENT .................................................................................................. 4

I.     Albany's Contracts with Express Scripts Fatally Contradict Albany's Allegations of Fraud, Deceptive Conduct, and Unjust Enrichment...................... 5

     A.    Express Scripts Passes Through Not Less Than 100% of Rebates to Albany and Discloses Any Other Manufacturer Revenue. ....................... 6

     B.    Albany Pays No More Than What Express Scripts Pays Network Pharmacies for Insulin. .................................................................... 9

     C.    Albany Receives Greater Discounts for Mail-Order Pharmacy Orders When Manufacturers Raise the List Price of Insulin. ................. 10

II.    The Statute of Limitations Bars Albany's RICO, GBL § 349, and Unjust Enrichment Claims................................................................................. 11

III.    Albany Failed to Plead Actionable Misrepresentations to Support Counts I–III. ............................................................................................... 12

     A.    Albany Failed to Plead Misrepresentations with Particularity to Support Its RICO Claims. ....................................................... 12

     B.    The Specific Alleged Misrepresentations Are Not Actionable............... 14

         1.    Express Scripts' general commitments to its clients................... 14

         2.    Express Scripts' statements supporting transparency ................. 16

         3.    Express Scripts' representations about the price of insulin for patients ............................................................... 17

         4.    Representations about Express Scripts' P&T Committee .......... 18

IV.    Albany's Contracts with Express Scripts Doom Its Unjust Enrichment Claim (Count IV). .................................................................................. 19

V.    Albany's Section 1962(c) RICO Claim Fails for Additional Reasons (Count I)........................................................................................... 20

     A.    The County Failed to Plead a RICO Enterprise...................................... 20

     B.    The Indirect Purchaser Rule Bars Albany's Insulin Pricing Claims........ 22

VI.    The County's RICO Conspiracy Claim Under Section 1962(d) Fails Because Its Section 1962(c) Claim Fails. ........................................................ 23

VII.   The County's Civil Conspiracy Claim Fails Because It Is Not an Independent Cause of Action.......................................................................... 24

VIII.   The County's Claims Against Evernorth Fail Because It Is Not Liable for
the Actions of Its Subsidiaries. ............................................................................ 24

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Berg Harmon Assocs.*,
816 F. Supp. 919 (S.D.N.Y. 1993) ...................................................................14

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
483 U.S. 143 (1987) ...................................................................................11

*Alpine Bank v. Hubbell*,
555 F.3d 1097 (10th Cir. 2009) ................................................................15

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ...................................................................................20

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019) ..........................................................................22, 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................4, 5, 6

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020) ......................................................16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................................4, 5

*Bologna v. Allstate Ins. Co.*,
138 F. Supp. 2d 310 (E.D.N.Y. 2001) ......................................................15

*Boyle v. United States*,
556 U.S. 938 (2009) ...................................................................................21

*Carter v. Berger*,
777 F.2d 1173 (7th Cir. 1985) .................................................................22

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC*,
2013 WL 57861 (N.D. Cal. Jan. 3, 2013) ................................................15

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
516 N.E.2d 190 (N.Y. 1987) .....................................................................19

*Cohen v. Cap. One Funding, LLC*,
489 F. Supp. 3d 33 (E.D.N.Y. 2020) ........................................................16

*Compton v. Pavone*,
   2022 WL 1039966 (2d Cir. Apr. 7, 2022) ...............................................................20

*Corsello v. Verizon N.Y., Inc.*,
   967 N.E.2d 1177 (N.Y. 2012).........................................................................19, 20

*Crawford v. Franklin Credit Mgmt. Corp.*,
   758 F.3d 473 (2d Cir. 2014)..................................................................................13

*D. Penguin Bros. Ltd. v. City Nat'l Bank*,
   2014 WL 982859 (S.D.N.Y. Mar. 11, 2014) ..........................................................20

*Das v. Rio Tinto PLC*,
   332 F. Supp. 3d 786 (S.D.N.Y. 2018)....................................................................16

*Duesler v. Cloverleaf Modular Homes Inc.*,
   2006 WL 8453637 (N.D.N.Y. Mar. 8, 2006) .........................................................13

*Endemann v. Liberty Ins. Corp.*,
   390 F. Supp. 3d 362 (N.D.N.Y. 2019) .....................................................................6

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)..................................................................................21

*Forsyth v. Humana, Inc.*,
   114 F.3d 1467 (9th Cir. 1997) ...............................................................................15

*Friedman v. Nationwide Ins. Co. of Am.*,
   2017 WL 11635406 (C.D. Cal. Feb. 9, 2017)........................................................14

*Gagliardi v. Ward*,
   967 F. Supp. 67 (N.D.N.Y. 1997) ..........................................................................14

*Gaidon v. Guardian Life Ins. Co. of Am.*,
   750 N.E.2d 1078 (N.Y. 2001)................................................................................11

*Gee Chan Choi v. Jeong-Wha Kim*,
   2006 WL 3535931 (E.D.N.Y. Dec. 7, 2006) .........................................................21

*Georgia Malone & Co. v. Rieder*,
   973 N.E.2d 743 (N.Y. 2012).............................................................................6, 19

*Gerschel v. Christensen*,
   40 N.Y.S.3d 41 (N.Y. App. Div. 2016) ..................................................................11

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender
   & Co., Inc.*,
   171 N.E.3d 1192 (N.Y. 2021).................................................................................5

*Illinois Brick v. Illinois*,
  431 U.S. 720 (1977)................................................................................22, 23

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*,
  871 F. Supp. 709 (S.D.N.Y. 1995) .............................................................24

*In re Insulin Pricing Litig.*,
  2019 WL 643709 (D.N.J. Feb. 15, 2019) ...................................................22

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
  62 F.3d 69 (2d Cir. 1995)..............................................................................5

*Kansas v. UtiliCorp United, Inc.*,
  497 U.S. 199 (1990)....................................................................................23

*Manchester Equip. Co. v. Panasonic Indus. Co.*,
  529 N.Y.S.2d 532 (N.Y. App. Div. 1988) ..................................................17

*Marshall v. Hyundai Motor Am.*,
  334 F.R.D. 36 (S.D.N.Y. 2019) ..................................................................14

*Matana v. Merkin*,
  957 F. Supp. 2d 473 (S.D.N.Y. 2013)..........................................................11

*McCarthy v. Recordex Serv., Inc.*,
  80 F.3d 842 (3d Cir. 1996)..........................................................................22

*Moody v. Ocwen Loan Servicing, LLC*,
  2016 WL 8814352 (C.D. Cal. Feb. 22, 2016).............................................15

*Morris v. N.Y. State Dep't of Tax. & Fin.*,
  82 N.Y.2d 135 (N.Y. 1993) .........................................................................25

*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*,
  2019 WL 1418129 (D.N.J. Mar. 29, 2019)..................................................22

*Nelson v. Publishers Circulation Fulfillment, Inc.*,
  2012 WL 760335 (S.D.N.Y. Mar. 7, 2012) .................................................14

*One World, LLC v. Onoufriadis*,
  2021 WL 4452070 (2d Cir. Sept. 29, 2021) ................................................23

*Puebla Palomo v. DeMaio*,
  403 F. Supp. 3d 42 (N.D.N.Y. 2019)...........................................................24

*Rotella v. Wood*,
  528 U.S. 549 (2000).....................................................................................11

*Sanchez v. ASA Coll., Inc.*,
  2015 WL 3540836 (S.D.N.Y. June 5, 2015) .................................................................14

*Schwab v. Philip Morris USA, Inc.*,
  449 F. Supp. 2d 992 (E.D.N.Y. 2006) ........................................................................22

*Sperber v. Boesky*,
  849 F.2d 60 (2d Cir. 1988)........................................................................................22

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008)......................................................................................11

*Stanley v. Direct Energy Servs., LLC*,
  466 F. Supp. 3d 415 (S.D.N.Y. 2020) ........................................................................19

*Sulieman v. Igbara*,
  --- F. Supp. 3d ---, 2022 WL 2900016 (E.D.N.Y. Apr. 20, 2022)..........................13

*Trollinger v. Tyson Foods, Inc.*,
  370 F.3d 602 (6th Cir. 2004) ....................................................................................22

*United States v. Bestfoods*,
  524 U.S. 51 (1998)....................................................................................................24

*United States v. Turkette*,
  452 U.S. 576 (1981)..................................................................................................21

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) .......................................................................17

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
  127 F. Supp. 3d 156 (S.D.N.Y. 2015).........................................................................3

*Wender v. Gilberg Agency*,
  716 N.Y.S.2d 40 (N.Y. App. Div. 2000) ...................................................................11

*Williams v. Affinion Grp., LLC*,
  889 F.3d 116 (2d Cir. 2018)......................................................................................13

**Statutes**

15 U.S.C. § 15b.................................................................................................................11

18 U.S.C. § 1962(c) .........................................................................................................20

18 U.S.C. § 1962(d) .........................................................................................................23

N.Y. C.P.L.R. § 214..........................................................................................................11

**Other Authorities**

42 C.F.R. § 423.120(b) ....................................................................................................18

## INTRODUCTION

The County of Albany, New York ("Albany" or "the County") complains about manufacturers increasing their insulin list prices by amounts that are largely offset by manufacturer-paid revenues passed back to Albany on terms that Albany negotiated, at times in amounts more than the rebates themselves. Although the County may be frustrated by insulin manufacturers' increasing prices, its allegations about Express Scripts[1] are misguided. The County speculates that the reason insulin prices have risen over the last decade is that certain Pharmacy Benefit Managers—Express Scripts, CVS Caremark, OptumRx ("PBMs")—conspired with the three largest insulin manufacturers—Eli Lilly, Novo Nordisk, and Sanofi-Aventis ("Manufacturers")—to drive up insulin prices in exchange for rebates paid by the Manufacturers to the PBMs. Albany avoids acknowledging the favorable contract terms that it negotiated for more than the past decade.

Albany's complaint also paints an incomplete, distorted picture of the insulin market. Yet for brief moments, Albany identifies what it describes as the key drivers of rising insulin prices. Insulin is a lifesaving drug necessary for millions of Americans. *See, e.g.*, Compl. ¶¶ 221–26. But the market for insulin drugs is "unique" because of the concentration of only a few manufacturers and "little to no generic/biosimilar options." Compl. ¶ 327. Manufacturers alone have the power to set the list price of its insulin products, and the prices they set impact what everyone in the distribution chain pays for such products. *See* Compl. ¶ 282. With a lack of biosimilar competition and sky-high demand for an essential product, Manufacturers have repeatedly and "dramatically" raised their list prices over the years. *See* Compl. ¶¶ 270–79.

---

[1] Evernorth Health, Inc. (formerly Express Scripts Holding Company), Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc. (sued as ESI Mail Pharmacy Services, Inc.), and Express Scripts Pharmacy, Inc. are referred to collectively as "Express Scripts."

1

PBMs serve as an essential bulwark against Manufacturers' discretion to raise prices. In such a concentrated market with patented drugs, absent price restraints imposed by competition from generic and biosimilar alternatives, PBMs' influence to resist "exponential" price increases is more limited. *See* Compl. ¶ 277. But by leveraging the purchasing behavior of its collective clients, Express Scripts can negotiate discounts—frequently paid as rebates—to blunt Manufacturers' price increases. Albany acknowledges that rebates have generated material savings to *clients*. *See* Compl. ¶ 278 (list prices "have increased exponentially" while "the net price has not"). But clients are free to apply those savings in whatever way they determine is the best use of funds—to reduce members' retail prices for particular drugs at the point of sale, to offset premium increases, to invest in wellness or education programs, or to address costs borne elsewhere in the health plans they sponsor. When clients choose to retain the rebates instead of passing them on to beneficiaries, it undisputedly can lead to higher out-of-pocket costs for diabetics, even if other plan participants (or all participants collectively) benefit from those savings in other ways. If Albany believes that diabetics are bearing a disproportionate share of Manufacturers' increasing drug prices, then Albany need look only to itself to determine why.

Albany's contracts with Express Scripts reveal that Albany benefits immensely from Express Scripts' efforts to reduce the County's cost of insulin, even if the County chooses not to share that savings with its members. For more than twelve years, Albany has contracted for PBM services with Express Scripts, Inc. ("ESI") or its predecessor, Medco Health Solutions ("Medco"), and those contracts have clear and unambiguous terms. Albany avoids discussing those terms, which show the hollowness of claims premised on a supposed "Insulin Pricing Scheme" involving a complex, multi-party conspiracy between the PBMs and Manufacturers. For this and other reasons discussed below, the Court should dismiss Albany's complaint for failure to state a claim.

## BACKGROUND

The "unifying factor" in drug pricing "is that the price that each entity in the pharmaceutical chain pays for a drug is tied directly to the price set by the manufacturer." Compl. ¶ 282. One "reported price" of a drug is its Average Wholesale Price ("AWP"). Compl. ¶ 283.

At least until very recently, Manufacturers have raised the reported price of insulin "exponentially." *See* Compl. ¶¶ 261–77. However, the "net price"—the amount of money Manufacturers actually receive for such products—has not materially increased over that time. *See* Compl. ¶ 278. PBMs have no control over the reported price, but PBMs have been able to negotiate substantial rebates from insulin Manufacturers to lower the net prices, which directly benefits clients like Albany. *See* Compl. ¶ 337. Albany alleges that PBMs historically have retained what it calls "substantial" portions of rebates or other payments from Manufacturers. Compl. ¶ 375. To guard against this perceived practice, Albany's 2017 Request for Proposals ("RFP") required any PBM to pass through 100% of the rebates received from Manufacturers—in some circumstances passing through *more than* 100% of the revenue received—and utilize a "transparent pricing model" for its bid. Compl. ¶ 460; Ex. 1, p. 8 & 44.[2]

While all PBM Defendants bid on the RFP, ESI's proposal won. Compl. ¶¶ 461, 463; *see also* Ex. 2. Albany engaged benefits consultant Locey & Cahill, LLC to analyze the competing proposals. Ex. 3.[3] The consultant noted that "actual drug pricing models" were "very competitive," which was "not surprising in this very competitive marketplace." *Id.* at 48. The

---

[2]    Exhibits are attached to the declaration of Jason R. Scherr submitted with this memorandum. Relevant portions of the exhibits are highlighted in yellow. Pin cites refer to the page number of the PDF rather than any internal pagination.

[3]    The analysis is publicly available at https://www.albanycounty.com/home/showpublisheddocument/6134/636990902276400000. The Court may take judicial notice of government records "retrieved from official government websites." *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (collecting cases).

consultant also emphasized that under Albany's "transparent pricing" requirement, the selected PBM "will not have the ability to retain any portion of the negotiated price relative to the ingredient cost nor will [it] be able to retain any portion of the prescription drug rebates." *Id.* at 50. The parties entered into a contract with a February 1, 2019 effective date memorializing the pricing ESI offered in response to Albany's RFP. Compl. ¶ 463; Ex. 4.

ESI had served as Albany's long-term PBM (through ESI's predecessor, Medco) since 2010. Compl. ¶ 456; Ex. 5. Both ESI and Medco delivered "transparent pricing" that Albany specified. And both contracts also explicitly state that Express Scripts does *not* serve as a fiduciary of Albany for the services at issue here. Ex. 4 § 5.2, p. 8 ("Sponsor [i.e. Albany] acknowledges and agrees that . . . neither it nor the Plan intends for ESI to be a fiduciary (as defined under ERISA or state law) of the Plan . . . ."); Ex. 5 § 14.8, p. 14 ("SPONSOR will not name or represent that Medco is, and Medco will not be, a Plan Administrator or, except as specifically set forth in this section, a fiduciary of any prescription drug benefit plan . . . .").

Albany alleges it has paid too much for insulin by providing self-funded health care coverage for its employees and by purchasing insulin for County facilities like prisons. *See* Compl. ¶¶ 40–43. Albany bases five causes of action on what it terms an "Insulin Pricing Scheme": (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (2) violation of RICO, 18 U.S.C. § 1962(d); (3) violation of New York General Business Law § 349 ("GBL § 349"), (4) unjust enrichment, and (5) civil conspiracy. Compl. ¶¶ 500–609.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550

U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. In a case alleging conspiracy, the "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft 'to show that the pleader is entitled to relief.'" *Twombly*, 550 U.S. at 557 (quoting Rule 8).

In reviewing a Rule 12(b)(6) motion, the Court may consider not only the allegations within the four corners of the complaint, but also referenced documents that are "integral to the complaint." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

## I.  Albany's Contracts with Express Scripts Fatally Contradict Albany's Allegations of Fraud, Deceptive Conduct, and Unjust Enrichment.

Albany's "Insulin Pricing Scheme" is alleged to involve Manufacturers raising the list prices of insulin to "artificially" high levels and then using the higher prices to fund rebates and other payments to PBMs. Compl. ¶ 334. Albany repeatedly criticizes the supposed secrecy of PBMs negotiating with pharmacies and manufacturers to lower the price of insulin. In particular, Albany claims Express Scripts and other PBMs profit by "(1) retaining a significant, yet undisclosed, percentage of the Manufacturers Payments, (2) using the inflated reported price to generate profits from pharmacies, and (3) relying on the inflated reported price to drive up the PBMs' margins through their own mail-order pharmacies." Compl. ¶ 369.

The crux of Albany's complaint is that these practices are "fraudulent," "unfair and deceptive," and "unjust" in contravention of the various standards for each theory. *See* 18 U.S.C. §§ 1961(1), 1962(a) (using mail or wires to obtain money by "false or fraudulent pretenses"); *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 171 N.E.3d 1192, 1197 (N.Y. 2021) (GBL § 349 requiring "deceptive or misleading" practices);

*Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (unjust enrichment when retention of benefit is "against equity and good conscience").

Albany must plead facts to make its allegations plausible. *See Iqbal*, 556 U.S. at 678. But Albany's allegations, and the terms of the contracts Albany alleged it negotiated, show that Express Scripts did not engage in fraudulent, unfair, deceptive, or unjust conduct. These contracts, integral to Albany's allegations, "control" over any contrary allegations in the complaint. *Endemann v. Liberty Ins. Corp.*, 390 F. Supp. 3d 362, 370 (N.D.N.Y. 2019).

## A.   Express Scripts Passes Through Not Less Than 100% of Rebates to Albany and Discloses Any Other Manufacturer Revenue.

Albany's own contracts refute its theory that Express Scripts unlawfully retains Manufacturer rebates and fails to disclose non-rebate Manufacturer revenues. *See* Compl. ¶¶ 370–99. Regarding rebates, Albany received *the greater of* 100% of what ESI received or certain guaranteed amounts, enabling Albany to potentially receive more than ESI did. Ex. 2 at Ex. A-3. This identical pass-through was included in the 2019 contract memorializing the agreement. Ex. 4 at Ex. A-3. In its earlier contract, Medco also provided a similar pass-through and guarantee for Albany. Ex. 5 § 6.2, p. 8 ("Medco will provide SPONSOR with the greater of (i) 100% of the Total Rebates received by Medco based on the dispensing of each manufacturer's formulary drugs under SPONSOR'S Program or (ii) the Guaranteed Rebates (as defined [later in contract]).").

Express Scripts never "hid the ball" about other retained Manufacturer payments, as demonstrated by Albany's contracts plainly defining rebates as directly attributable to members' utilization of rebate-driving drugs. *Compare* Compl. ¶ 374, *with* Ex. 4 § 1.25, p. 3. Rebates do not include, among other things, Manufacturer Administrative Fees ("MAFs")—which are both identified and defined in plain language as fees paid by Manufacturers not for drug utilization driven by formulary design, but for separate services provided by ESI to Manufacturers "in

connection with ESI's invoicing, allocating and collecting the Rebates under the Rebate program." Ex. 4 § 1.15, p. 3.  The maximum MAF that ESI can receive is expressly disclosed.  *Id.* Ex. D, p. 40.  Express Scripts also disclosed in both the RFP response and in the contract that it may have other sources of revenue from Manufacturers.  *See* Ex. 2 at 4; Ex. 4 at Ex. D pp. 40–41.  And Albany negotiated for the right to audit rebate payments and other pass-through arrangements.  *See id.* Ex. 4 at Ex. B, pp. 34–35.

Prior to the ESI Agreement, Albany alleges that "[h]istorically," all PBMs' contracts have allowed them to "keep all or at least some of the Manufacturer Payments they received." Compl.¶ 372.  But Albany's contract with Medco (in effect since 2010) showed that, even back then, Albany received not just formulary rebates but also other rebates or fees paid by Manufacturers.  Medco expressly recognized that it received "Additional Rebates and Fees" that include amounts "which may take into account various factors, including the utilization of certain drugs."  Ex. 5 § 6.2, p. 7. Albany negotiated those "Additional Rebates and Fees" to be passed through to Albany *in addition to* the "Formulary Rebates" that Medco received "as a result of the inclusion of those manufacturers' branded products" on Medco's formulary.  *See id.*  Albany also fully knew which payments from Manufacturers it contracted for Medco to retain, namely: "payments [for] services rendered by Medco on behalf of or to pharmaceutical manufacturers." *Id.*[4]  There is nothing secret about these terms; neither is there anything "unfair" or "deceptive" about abiding by the contract terms that Albany negotiated for retention or pass-through of Manufacturer payments.

---

[4]      These services include, for example, "adherence, compliance, nursing, and other patient support services; patient referral and assistance services; product launch and other support services; equipment replacement services; clinical and research studies, data and analytics; and services related to high-risk biopharmaceuticals." Ex. 5 § 6.2, p. 8.

Albany also implies something mischievous about Manufacturer inflation payments—i.e., payments Manufacturers agree to pay if they decide to raise their list prices above a set amount— and the inflation price protections ESI offers its clients.  *See* Compl. ¶¶ 377–81.  But Albany itself negotiated to participate in ESI's Inflation Protection Program.  *See* Ex. 4 at Ex. A-5, p. 31.  The terms of the program show that ESI is willing to assume the risk of Manufacturers increasing the list price of drugs *irrespective of Express Scripts' ability to negotiate discounts from Manufacturers*.  Indeed, the agreement provides that ESI's "Inflation Protection Program, and the underlying economics[,] is separate and apart from, any Rebates/Total Rebates paid to Sponsor [i.e. Albany] and the amounts described above will be paid to Sponsor in addition to any Rebate/Total Rebate payments to which Sponsor is entitled."

Express Scripts is neither a charity nor a fiduciary for Albany, or its guarantor.  There is nothing wrong with Express Scripts making a profit, or suffering a loss, based on the allocation of risk for which it contracts with sponsors like Albany.  If Manufacturers unilaterally raise the list price of their drugs enough to trigger an "inflation fee," but less than the price protection guarantee provided to a client as Albany suggests, *see* Compl. ¶¶ 379–81, then Express Scripts benefits precisely as the contract contemplates.  This lawful possibility is fully disclosed in the agreement: "ESI contracts for inflation payments from manufacturers for its own account and ESI may realize positive margin between amounts paid to Sponsors and amounts received from pharmaceutical manufacturers."  Ex. 4 at Ex. A-5, p. 33.  But what Albany ignores is that ESI can lose money if it negotiates inflation fees from Manufacturers less than payments due Albany.  *See id.*  The protection to which Albany is entitled is precisely what it negotiated.

**B.      Albany Pays No More Than What Express Scripts Pays Network Pharmacies for Insulin.**

Albany alleges that the so-called pricing scheme allows Express Scripts "to profit off the pharmacies with whom they contract, including those in Albany County." Compl. ¶ 393. Albany asserts that the profiting occurs when PBMs "pocket the spread between the amount that the PBMs get paid by their clients for the at-issue drugs . . . and the amount the PBM reimburses the pharmacy." Compl. ¶ 395. Putting aside that there is nothing tortious or unlawful about Express Scripts earning revenue in this disclosed and well-known manner in the industry, Albany's own requirements refute the County's allegation that Express Scripts earned any revenue under the Albany contracts through "spread pricing."

This was by Albany's design. Albany acknowledges that it specified a pricing proposal in which the PBM would "not retain . . . any money associated with the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies." Compl. ¶ 460; Ex. 1 at 8. In its cost proposal responding to Albany's RFP, Express Scripts incorporated that specification:

> The retail program offered is a "transparent pricing" model. **This means that Express Scripts will not retain any money associated with the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies.**

Ex. 2 at 5 (emphasis added). The reimbursement rates Albany would pay are also described in detail in Exhibit A-2 of the cost proposal. *See id.* at 18. For in-network pharmacies, the reimbursements are a "pass-through" with a backstop guarantee of a certain percentage off the AWP for drugs. *See id.* The pass-through nature of the pricing continued forward in the final contract with Express Scripts. Ex. 4 at Ex. A-2, p. 16.

Albany also negotiated and received such pass-through pricing to avoid any "pharmacy spread" in its prior contract with Medco. For drugs dispensed and submitted in Medco's retail pharmacy network, Albany agreed to reimburse Medco "*the lowest of* (i) the pharmacy's usual and

customary price, as submitted ('U&C') plus applicable taxes, (ii) the maximum allowable cost ('MAC'), where applicable, plus the Dispensing Fee *contracted with the pharmacy* plus applicable taxes, or (iii) AWP less the AWP discount and Dispensing Fee *contracted with the pharmacy* plus applicable taxes." Ex. 5 at Schedule A § 1, p. 17 (emphases added).  Albany's allegations claiming any fraud, deception, or inequity with regard to spread pricing cannot be squared with the documents referenced in and incorporated by the complaint.

### C.    Albany Receives Greater Discounts for Mail-Order Pharmacy Orders When Manufacturers Raise the List Price of Insulin.

Albany also includes a series of allegations about Express Scripts making money through its mail-order pharmacies, claiming in conclusory fashion that "the more the Manufacturers inflate their prices, the more money the PBMs make."  Compl. ¶ 401.  Once again, there is nothing unlawful or tortious by Express Scripts making money in this way, if it had happened.  But it didn't.  Albany's newfound theory cannot be squared with its PBM agreements with Express Scripts and Medco.  Albany receives a *percentage* discount off the AWP set by the insulin Manufacturers.  Ex. 4 at Ex. A-2 § 2.2, p. 17; Ex. 5 at Schedule A § 2 & Chart A, pp. 17, 22–23.  Thus, if Manufacturers raise their list prices, Albany receives a *larger* discount—that's how percentages work.

Albany also alleges (implausibly) that Express Scripts needs to engage in "arbitrage" by stocking up on insulin—which usually needs to be refrigerated for long-term storage—before a price increase by supposedly receiving advance notice when manufacturers are going to raise insulin prices.  *See* Compl. ¶ 401 ("[T]he PBMs often know when the Manufacturers are going to raise their prices.  The PBMs use this opportunity to purchase a significant amount of the at-issue drugs prior to the price increase, at the lower rate.").  But even if this allegation were sufficiently

plausible to be credible, such arbitrage only shows a potential revenue stream for Express Scripts. It does not show deception, fraud, unfairness, or inequity.

## II.   The Statute of Limitations Bars Albany's RICO, GBL § 349, and Unjust Enrichment Claims.

Albany's demand for "transparent pricing" shows that Albany knew, or at least should have known, of its alleged injuries from the so-called "Insulin Pricing Scheme" before the statute of limitations expired.  As a result, the Court should dismiss Albany's objections as barred by the applicable statute of limitations.

The RICO statute of limitations, borrowed from the Clayton Act, is four years.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 152, 156 (1987); 15 U.S.C. § 15b. GBL claims are governed by a three-year limitations period that similarly bars actions that were not commenced in that window.  *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E.2d 1078, 1081–83 (N.Y. 2001); N.Y. C.P.L.R. § 214.  And where, as here, a plaintiff seeks damages, the statute of limitations applicable to an unjust enrichment claim is three years under New York law.  *Matana v. Merkin*, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013).  The RICO limitations period begins to run when the plaintiff knew, or should have known, of its *injuries*—not when it discovers the last predicate act to support a RICO claim.  *Rotella v. Wood*, 528 U.S. 549, 555 (2000).  Similarly, the GBL and unjust enrichment limitations periods cannot be extended based on the discovery rule. *Gerschel v. Christensen*, 40 N.Y.S.3d 41, 43 (N.Y. App. Div. 2016); *Wender v. Gilberg Agency*, 716 N.Y.S.2d 40, 41–42 (N.Y. App. Div. 2000).

Although the statute of limitations is an affirmative defense, a court may dismiss claims on limitations grounds on a Rule 12(b)(6) motion when "the defense appears on the face of the complaint."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  Such is the case here.  Albany alleges that in 2017—June 19, 2017, to be precise (Ex. 1 at p. 5)—it

11

demanded proposals with "a 'transparent pricing' model," meaning the PBM must propose pricing in which it "will not retain any money associated with prescription drug rebates or any money associated with the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies." Compl. ¶ 460; *accord* Ex. 1 at 8.[5]  The existence of such a condition in the RFP demonstrates Albany's awareness (or at least belief) that the referenced practices may cause it an injury.  Thus, at the very latest, the statute of limitations began accruing no later than June 19, 2017, when the RFP was issued.  Albany filed its complaint more than five years later, on September 16, 2022.  *See generally* Compl.  Because the RICO claims and the GBL § 349 and unjust enrichment claims are subject to four- and three-year limitations periods, respectively, those claims are time-barred.  The Court should dismiss with prejudice Counts I through IV of Albany's Complaint on limitations grounds.

**III.   Albany Failed to Plead Actionable Misrepresentations to Support Counts I–III.**

Both Albany's RICO claims and its claim under GBL § 349 sound in fraud.  The sole predicate acts supporting Albany's RICO claims are mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.  *See* Compl. ¶ 542.  And Albany's alleged violations of GBL § 349 all turn on supposed "false and misleading representations of fact." Compl. ¶ 580.  Albany's lengthy complaint fails to plead facts to show Express Scripts made any actionable representations that could support these claims sounding in fraud.

**A.   Albany Failed to Plead Misrepresentations with Particularity to Support Its RICO Claims.**

The County predicates its RICO claims on mail and wire fraud but fails to plead particularized facts supporting its fraud allegations.  Rule 9(b) requires the County to "set forth the

---

[5]   Albany's claims are also barred by the statute of limitations for the reasons provided in the CVS Defendants' and Manufacturer Defendants' memorandum of law in support of their motion to dismiss.

who, what, when, where and how of the alleged fraud." *Sulieman v. Igbara*, --- F. Supp. 3d ---, 2022 WL 2900016, *4 (E.D.N.Y. Apr. 20, 2022) (quotation omitted).  That means the County's "complaint must detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018).

In this circuit, the obligation to plead with particularity is doubly important for RICO claims.  "Given the routine use of mail and wire communications in business operations . . . 'RICO claims premised on mail or wire fraud,'" like those the County raises here, "'must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'"  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)).

In its 32-page Civil RICO Statement, the only statements Albany challenges by Express Scripts are two representations in Express Scripts' publicly available annual reports "for the past ten years."  *See* RICO Statement § 5(b–c) (citing Compl. ¶ 427).  And despite the Complaint's prolixity, Express Scripts has identified only nine specific representations made by Express Scripts or its officers, discussed in detail below.

But even without digging into the content of representations themselves, the Court can dismiss Albany's RICO claims for failing to comply with Rule 9(b).  Albany fails to identify whom at Albany ever heard or saw any of the alleged misrepresentations, even though the RICO Statement specifically requires disclosure of that information.  RICO Statement § 5(c).  That alone requires dismissal.  *See Duesler v. Cloverleaf Modular Homes Inc.*, 2006 WL 8453637, at *2 (N.D.N.Y. Mar. 8, 2006) (dismissing Plaintiffs' RICO claims for failing to comply with general

order requiring RICO Statement); *Gagliardi v. Ward*, 967 F. Supp. 67, 69 (N.D.N.Y. 1997) (same);

*Adler v. Berg Harmon Assocs.*, 816 F. Supp. 919, 925 (S.D.N.Y. 1993) (allegation that does not

state "when, where, how, or to whom" statements were made does not satisfy Rule 9(b)).

The absence of allegations about whom at Albany heard such misrepresentations is even

more telling because of the ongoing business relationship between the parties.  Despite contracting

with Express Scripts since 2010—and continuing to utilize Express Scripts' PBM services to this

day—Albany does not identify a single misrepresentation made by an Express Scripts

representative in connection with the performance of the contracts.  Albany's complaint flunks

Rule 9(b)'s heightened pleading standard.

## B.   The Specific Alleged Misrepresentations Are Not Actionable.

In addition to a lack of particularity, Albany fails to identify actionable misrepresentations.

"[O]pinions and puffery or ultimately unfulfilled promises" do not state a violation of the mail or

wire fraud statutes supporting a RICO claim.  *Nelson v. Publishers Circulation Fulfillment, Inc.*,

2012 WL 760335, at *4 (S.D.N.Y. Mar. 7, 2012).  A plaintiff cannot base a fraud claim on

"subjective claims about products, which cannot be proven either true or false."  *Sanchez v. ASA

Coll., Inc.*, 2015 WL 3540836, at *9 (S.D.N.Y. June 5, 2015).  The same requirement to plead

statements of facts that can be proven false, rather than opinions, also applies to Albany's GBL

§ 329 claim.  *See, e.g.*, *Marshall v. Hyundai Motor Am.*, 334 F.R.D. 36, 52 n.14 (S.D.N.Y. 2019)

(noting that puffery is "not actionable under . . . New York's consumer protection statutes").  The

particular misrepresentations Albany details in its complaint fail to state a viable claim.

### 1.   *Express Scripts' general commitments to its clients.*

Statements that an entity will be on a client's "side" or advocate for them "constitute

puffery and are therefore not actionable."  *See Friedman v. Nationwide Ins. Co. of Am.*, 2017 WL

11635406, at *3 (C.D. Cal. Feb. 9, 2017) ("Nationwide's advertisements that it is on the insured's

side and will act as the insured's advocate . . . constitute puffery and are therefore not actionable."); *see also Bologna v. Allstate Ins. Co.*, 138 F. Supp. 2d 310, 323 (E.D.N.Y. 2001) ("'You're in good hands with Allstate,' is general, subjective, and cannot be proven true or false."); *Moody v. Ocwen Loan Servicing, LLC*, 2016 WL 8814352, at *4–5 (C.D. Cal. Feb. 22, 2016) (loan servicer's slogan that "Helping Homeowners Is What We Do!" was "a quintessential example of non-actionable puffery" under state false-advertising law); *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106–07, 1112–13 (10th Cir. 2009) (bank's slogan that "You concentrate on your dream. We'll take care of everything else." was puffery and nonactionable under state consumer-protection act). The same is true for statements that a defendant will lower costs. *See, e.g., Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir. 1997) (concluding that statements that defendant could "control costs" and save money were "too general" to support fraud claim), *overruled on other grounds by Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012); *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, 2013 WL 57861, at *10 (N.D. Cal. Jan. 3, 2013) (holding that the advertising claims of "save money" and "simple, easy and flexible" were "non-actionable puffery since they are vague and highly subjective" in case involving GBL § 349 claims).

Yet the vast majority of statements that Albany identifies are these are exactly these anodyne statements or opinions that cannot support a fraud allegation:

- Express Scripts "works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes." Compl. ¶ 427; RICO Statement § 5(b–c).

- Express Scripts President Tim Wentworth said in 2016 that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary." Compl. ¶ 342.

- Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts represented in an interview with a national publication that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease" and that Express Scripts "broaden[s] insulin options for patients and

bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs." *Id.* ¶ 428 (alterations in original).

- Express Scripts' code of conduct states that it is "dedicated to keeping our promises to patients and clients." *Id.* ¶ 429.

- Amy Bricker testified: "I have no idea what the prices [for insulin] are so high, none of it is the fault of rebates." *Id.* ¶ 430.

- In a February 2017 earnings call, Express Scripts' CEO said: "Drugmakers set prices, and we exist to bring those prices down." *Id.* ¶ 430.

- Express Scripts' CEO said in 2017 CBS interview that PBMs "negotiate with drug companies to get the prices down." *Id.* ¶ 430.

### 2. *Express Scripts' statements supporting transparency*

Albany alleges that Express Scripts' CEO said in 2017 that "Express Scripts was 'absolutely transparent' about the Manufacturer Payments they receive and that payors 'know exactly how the dollars flow' with respect to these Manufacturer Payments." Compl. ¶ 435. What he actually said is that Express Scripts "*support[s]* absolute transparency with our clients and we support as well with patients," and that *clients* know "how the dollars flow" even if *patients* necessarily do not. Ex. 6 at 3 (emphasis added).[6]

Regardless, general promises of "transparency" are non-actionable statements of opinion. *See, e.g., Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 806 (S.D.N.Y. 2018) ("aspirational statements, such as that [a company] 'is committed, in principle and practice, to transparency consistent with good governance' . . . are merely generalizations regarding [the company's] business practices and are thus precisely the type of puffery that this and other circuits have consistently held to be inactionable" (quotations omitted)); *In re AT&T/DirecTV Now Sec. Litig.*,

---

[6] The Court can consider the complete transcript of the interview because Albany excerpted the interview in its complaint. *Cohen v. Cap. One Funding, LLC*, 489 F. Supp. 3d 33, 44 (E.D.N.Y. 2020) ("Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss.").

480 F. Supp. 3d 507, 524 (S.D.N.Y. 2020) (company's "'core set of values,' set forth in its 'Code of Business Conduct,' and its commitment to 'the highest standards' and 'operating with integrity, transparency, and honesty in everything' it does" are examples of "[n]on-actionable puffery"); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) ("statements touting [Defendant's] focus on compliance, building trust with various stakeholders, and transparency are examples of corporate optimism and puffery").   And even if the actual statements about transparency were actionable, the State's contracts with Albany show they are not false.  *See supra* § I;  *Manchester Equip. Co. v. Panasonic Indus. Co.*, 529 N.Y.S.2d 532, 534 (N.Y. App. Div. 1988) ("The provisions of the written contract which directly contradict the allegations of oral representations must be taken into account in evaluating a fraud claim." (quotation omitted)).

### 3. *Express Scripts' representations about the price of insulin for patients*

Albany fails to identify a single misrepresentation that the PBMs negotiate with Manufacturers to lower the costs of payors like Albany and "diabetic patients" as well.  Compl. ¶ 429 (emphasis removed).  Express Scripts' clients, like Albany, decide how to spend rebate dollars.  Many clients choose to retain the rebates to lower premiums or fund other priorities.  Clients' choices to retain rebates to lower premiums is consistent with Express Scripts' Senior Vice President's testimony before Congress that the lower prices Express Scripts negotiates from manufacturers are "*returned to patients in the form of lower premiums* and reduced out-of pocket costs." Compl. ¶ 429 (emphasis modified).

Albany itself has received at least 100% of the rebates that Express Scripts has received since 2010.  *See supra* § I.  Albany tellingly does not allege that it chooses to pass through those rebates directly to its members to reduce their out-of-pocket costs at the point of sale, as Albany is free to do.  *See generally* Ex. 4–5.  To the extent the rebates are not passed through to Albany's

beneficiaries at the pharmacy, that's Albany's choice.  But Albany cannot choose to retain those rebates and then blame Express Scripts for Albany being able to make that decision.

### 4.    Representations about Express Scripts' P&T Committee

Finally, Albany reaches to certain annual reports filed with the SEC to include Express Scripts' explanation of the role of its "Pharmacy & Therapeutics Committee" ("P&T Committee") in formulary development:

> [Express Scripts' P&T Committee] considers the drug's safety and efficacy, without any information on or consideration of the cost of the drug, including any discount or rebate arrangement that Express Scripts negotiates with the Manufacturer, and that Express Scripts fully complies with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy.

Compl. ¶ 427.  P&T Committees are standard in the industry.  For instance, the federal government requires a Medicare Part D sponsor to maintain a P&T Committee to develop and review the formularies.  *See* 42 C.F.R. § 423.120(b).

But the P&T Committee is not Express Scripts as a whole.  Albany tries to make hay out of conflating the P&T Committee—which focuses solely on clinical necessity in making formulary recommendations—and Express Scripts as a PBM—which absolutely considers the net cost to its clients for certain clinically interchangeable drugs, like insulin.  Albany knows this because its contract with Express Scripts expressly recognized that the formulary Albany selected could be modified from time to time based not only on "medical appropriateness," but on "manufacturer Rebate arrangements, and patent expirations" as well.  Ex. 4 § 1.12, p. 3.

Albany includes nothing to support an accusation that Express Scripts' independent P&T Committee considered anything but clinical effectiveness, and does not even mention the P&T Committee again elsewhere. Albany has not alleged facts sufficient to even suggest that Express Scripts' statements in its annual reports about its P&T Committee are misrepresentations.

**IV.**     **Albany's Contracts with Express Scripts Doom Its Unjust Enrichment Claim (Count IV).**

As an "alternative to any claim [the County] may have for legal relief," Albany claims Express Scripts "received a financial windfall from the Insulin Pricing Scheme at Plaintiff's expense." Compl. ¶¶ 589–90.  As a quasi-contract theory, unjust enrichment only contemplates an obligation "imposed by equity to prevent injustice, *in the absence of an actual agreement between the parties*."  *Ga. Malone & Co., Inc. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (emphasis added).  Where "a valid and enforceable written contract govern[s] a particular subject matter," the contract "ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987).  As Albany's contracts with Express Scripts directly address the amounts reimbursed for insulin, they govern the instant dispute and preclude recovery in unjust enrichment.

Albany's effort to avoid this bar by pleading unjust enrichment in the "alternative" to its claims for "legal relief," Compl. ¶ 589, may be a feint to invoke the principle that some courts permit a party to plead unjust enrichment in the alternative to a *breach of contract* claim.  *Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 430 (S.D.N.Y. 2020) (noting limitations of that principle).  But despite repeatedly invoking these contracts that are central to its dealings with Express Scripts, Albany does not bring a breach of contract claim.  Nor does Albany dispute the validity of the contracts themselves.

Unjust enrichment cannot be used in the alternative to other claims. "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim," nor is it "a catchall cause of action to be used when others fail."  *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012) (quotations omitted).  This equitable remedy is instead "available only in unusual situations when, though the defendant has not breached a contract nor

19

committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff"—such as when "the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *Id.* (citing *Markwica v. Davis*, 473 N.E.2d 750 (N.Y. 1984); *Kirby McInerney & Squire, LLP v. Hall Charne Burce & Olson, S.C.*, 790 N.Y.S.2d 84 (N.Y. App. Div. 2005)). Albany's entire case is premised on unsubstantiated allegations of wrongdoing; thus, its unjust enrichment claim is misplaced.

## V.   Albany's Section 1962(c) RICO Claim Fails for Additional Reasons (Count I).

"To state a civil RICO violation under 18 U.S.C. § 1962(c), 'a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Compton v. Pavone*, 2022 WL 1039966, at *1 (2d Cir. Apr. 7, 2022) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)). In addition, the plaintiff must allege facts showing that the challenged conduct was both the "but-for" and proximate cause of the plaintiff's claimed financial injury. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Albany's RICO claim under Section 1962(c) fails for the additional reasons that the County fails to plausibly allege the existence of an "enterprise" and its claims are barred by the indirect purchaser rule.

### A.   The County Failed to Plead a RICO Enterprise.

"The heart of any civil RICO claim is the enterprise. There can be no RICO violation without one." *D. Penguin Bros. Ltd. v. City Nat'l Bank*, 2014 WL 982859, at *4 (S.D.N.Y. Mar. 11, 2014), *aff'd* 587 F. App'x 663 (2d Cir. 2014). Because the County fails to plausibly allege that each PBM joined a separate criminal enterprise with each other or with an insulin Manufacturer, there can be no RICO violation. 18 U.S.C. § 1962(c).

An association-in-fact enterprise of the type that Albany attempts to allege requires "an ongoing organization, formal or informal, and . . . evidence that the various associates function as

a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981).  Such an enterprise must also have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).  Albany attempts to allege six association-in-fact enterprises—three of which include Express Scripts.  *See* Compl. ¶ 505.  But the County fails to allege specific facts about how Express Scripts or the other PBM Defendants have engaged in separate associations-in-fact, instead alleging the same facts as to "each PBM Defendant."  *See, e.g.*, Compl. ¶¶ 305, 320, 345, 349; RICO Statement § 6(b) ("[E]ach of the six association-in-fact enterprises described in the Complaint includes one of the collective PBM Defendants . . . and one Manufacturer Defendant . . . as well as each entity's director's employees, and agents.").  The County's decision to improperly lump together the PBMs as non-distinct participants in the so-called "enterprises" falls short of Rule 8's and Rule 9(b)'s requirements.  *See Gee Chan Choi v. Jeong-Wha Kim*, 2006 WL 3535931, at *7 (E.D.N.Y. Dec. 7, 2006) ("[A] plaintiff must plead specific facts, not mere conclusory allegations, which establish the existence of an enterprise." (quoting *Elliott v. Foufas*, 867 F.2d 877, 881 (E.D.N.Y. 2006))).

The County additionally, and fatally, fails to allege an enterprise "separate and apart from the pattern of racketeering activity." *Turkette*, 452 U.S. at 583.  The County frames the entirety of the Manufacturer-PBM relationship (based on rebate contracts) as the "Insulin Pricing Scheme." It does not allege a relationship, or even communications, outside of this "scheme."  Where the "enterprise" is the scheme itself, the separate existence requirement is not satisfied.  *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) ("The enterprise must be separate from the pattern of racketeering activity, and distinct from the person conducting the affairs of the enterprise." (citations omitted)).

**B.     The Indirect Purchaser Rule Bars Albany's Insulin Pricing Claims.**

Albany does not allege that it pays too much for PBM services; it alleges it pays too much for insulin.  *See, e.g.*, Compl. ¶ 472 ("Plaintiff has been unknowingly overpaying for the Manufacturer Defendants' diabetes medications by millions of dollars.").  But while Albany may be a direct purchaser of PBM services, it does not allege that Express Scripts distributed insulin directly to the County.  As only an indirect purchaser of insulin, Albany is barred by the "Indirect Purchaser Rule" from bringing RICO claims against Express Scripts and the other PBMs.

In *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that only direct purchasers could sue under the antitrust laws.  Indirect purchasers, whose resellers render them "two or more steps removed from the antitrust violator in a distribution chain," could not sue.  *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019).  The Second Circuit applies the Indirect Purchaser Rule to RICO claims.  *See, e.g.*, *Sperber v. Boesky*, 849 F.2d 60, 65 (2d Cir. 1988); *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1051 (E.D.N.Y. 2006) (recognizing the Indirect Purchaser Rule "equally applies to RICO actions for treble damages"), *rev'd on other grounds* by *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008).[7]  And courts have applied the bar at the pleading stage to dismiss RICO claims in cases involving nearly identical allegations.  *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, 2019 WL 1418129, at *14 (D.N.J. Mar. 29, 2019) (dismissing RICO claims under indirect-purchaser rule because plaintiffs were "not the first party to pay for the analog insulin at a purportedly inflated price"); *see also In re Insulin Pricing Litig.*, 2019 WL 643709, at *7–13 (D.N.J. Feb. 15, 2019) (same).

---

[7]     The Second Circuit is hardly alone in applying *Illinois Brick* to RICO claims.  *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004) ("indirect purchasers lack standing under RICO"); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996) ("The precepts taught by *Illinois Brick* . . . apply to RICO claims."); *Carter v. Berger*, 777 F.3d 1173, 1177 (7th Cir. 1985) (concluding that the indirect purchaser rule "applies to RICO, too").

Albany does not allege that Express Scripts distributed insulin to Albany directly. At most, Albany alleges that Plaintiff "paid Express Scripts" for the at-issue drugs. Compl. ¶ 409. But creating a distinct "payment chain" instead of "distribution chain" for purposes of the indirect purchaser rule defeats a key purpose of the indirect purchaser rule, which is to "avoid[] complicated damages calculations . . . [and] eliminat[e] duplicative damages against antitrust defendants." *Apple*, 139 S. Ct. at 1524.

Here, the County alleges that it paid unlawful overcharges for insulin passed down a distribution chain involving other purchasers upstream from the County. Compl. ¶ 281 (alleging insulin is distributed "(1) from manufacturer to wholesaler, wholesaler to pharmacy, and pharmacy to patient or (2) from manufacturer to mail-order pharmacy to patient"). Even if the County sent money to the PBMs, so long as there are intermediaries—such as wholesalers and pharmacies— that can allege an injury from the same purported overcharges, the PBMs would face the potential for duplicative damages and the Court would be faced with the precise apportionment concerns that *Illinois Brick* sought to eliminate. *See, e.g., Apple,* 139 S. Ct. at 1524; *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 208, 212 (1990).

## VI.   The County's RICO Conspiracy Claim Under Section 1962(d) Fails Because Its Section 1962(c) Claim Fails.

"[T]o adequately plead a RICO conspiracy under 18 U.S.C. § 1962(d), 'a plaintiff must allege the existence of an agreement to violate RICO's substantive provisions.'" *One World, LLC v. Onoufriadis*, 2021 WL 4452070, at *1 (2d Cir. Sept. 29, 2021) (quoting *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018)). Because Albany did not successfully plead the elements of a § 1962(c) claim, its conspiracy claim under 18 U.S.C. § 1962(d) also fails.

**VII.    The County's Civil Conspiracy Claim Fails Because It Is Not an Independent Cause of Action.**

"New York does not recognize civil conspiracy to commit a tort as an *independent* cause of action." *Puebla Palomo v. DeMaio*, 403 F. Supp. 3d 42, 60 n.18 (N.D.N.Y. 2019) (citing *Great Lakes Motor Corp. v. Johnson*, 68 N.Y.S.3d 614, 617 (N.Y. App. Div. 2017)).  Rather, "allegations of conspiracy" serve "only to connect the actions of separate defendants with an otherwise actionable tort."  *Id.; see also Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F. Supp. 709, 731 (S.D.N.Y. 1995) ("New York law does not provide a substantive tort of civil conspiracy.  Rather, a plaintiff must plead specific wrongful acts that constitute an independent tort.").

As set forth above, all the other claims upon which a civil conspiracy claim might have been predicated are defective.  Because all of the County's other claims against the PBMs must be dismissed, its civil conspiracy claim must be dismissed as well.

**VIII.    The County's Claims Against Evernorth Fail Because It Is Not Liable for the Actions of Its Subsidiaries.**

In contravention of the "general principle of corporate law 'deeply ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries," the County attempts to hold Evernorth liable for the alleged acts of the other PBM defendants.  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quotation omitted).  Even if Albany had valid claims against the PBMs (which it does not), its claims against their corporate parents, including Evernorth, would fail.

Although Albany alleges that "Evernorth, through its executives and employees, including its CEO and Vice Presidents, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme," Compl. ¶ 127, its allegations all boil down to accusations of influence

over its subsidiaries, the other Express Scripts defendants.  *See, e.g.*, Compl. ¶¶ 130 ("Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout New York, which engaged in the activities that gave rise to this Complaint."); 129 ("On a regular basis, Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.").  In New York, "complete domination of the corporation is the key to piercing the corporate veil."  *Morris v. N.Y. State Dep't of Tax. & Fin.*, 82 N.Y.2d 135, 141 (N.Y. 1993).  But even "domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required."  *Id.* at 141–42.  And as other courts reviewing similar allegations have held, generalized allegations of parental influence like those in Albany's complaint are insufficient to show the degree of control required to impose liability for a subsidiary's actions.  *See, e.g.*, *See Miss. ex rel. Fitch v. Eli Lilly & Co.*, No. 21-cv-674, slip op. at 14–16 (S.D. Miss. Aug. 15, 2022) (concluding plaintiff's "conclusory allegations that the parent companies exercise substantial control" over their subsidiaries was insufficient to pierce the corporate veil and hold parents liable for similar "Insulin Pricing Scheme").

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss Albany's complaint against Express Scripts with prejudice.[8]

---

[8]     Express Scripts also adopts the additional arguments for dismissal included in the memoranda of law submitted by its co-Defendants to the extent not included herein.

Dated:  December 14, 2022

Respectfully submitted,

/s/ *Jason R. Scherr*
Jason R. Scherr, Bar Roll No. 703952
Patrick A. Harvey (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave., NW
Washington, D.C. 20004-2541
Phone: (202) 739-3000
Fax: (202) 739-3001
Email: jr.scherr@morganlewis.com
         patrick.harvey@morganlewis.com

*Attorney for Defendants Evernorth Health
(formerly Express Scripts Holding Company),
Inc., Express Scripts, Inc., Express Scripts
Administrators, LLC, Medco Health
Solutions, Inc., ESI Mail Pharmacy Service
(sued as ESI Mail Pharmacy Services, Inc.),
and Express Scripts Pharmacy, Inc.*

26