**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**ALBANY DIVISION**

COUNTY OF ALBANY, NEW YORK,

                        Plaintiff,

          v.

ELI LILLY AND COMPANY, *et al.*,

                        Defendants.

Case No.: 1:22-cv-00981-DNH-CFH

**MEMORANDUM OF LAW IN SUPPORT OF EXPRESS SCRIPTS DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

ARGUMENT ........................................................................................................................ 5

    I.    Albany's Contracts with Express Scripts Fatally Contradict Albany's
        Allegations of Fraud, Deceptive Conduct, and Unjust Enrichment...................... 5

        A.    Express Scripts Passes Through Not Less Than 100% of Rebates to
                Albany and Discloses Any Other Manufacturer Revenue. ....................... 6

        B.    Albany Pays What Express Scripts Pays Network Pharmacies for
                Insulin. ...................................................................................................... 9

        C.    Albany Receives Greater Discounts for Mail-Order Pharmacy
                Orders When Manufacturers Raise the List Price of Insulin. .................. 11

    II.    Albany's RICO, GBL § 349, and Unjust Enrichment Claims Are Time-
        Barred.................................................................................................................... 11

    III.    Albany Failed to Plead Actionable Misrepresentations to Support Counts
        I–III. ..................................................................................................................... 13

        A.    Albany Failed to Plead Misrepresentations with Particularity to
                Support Its RICO Claims. ........................................................................ 13

        B.    The Specific Alleged Misrepresentations Are Not Actionable................ 14

                1.    Express Scripts' representations in its RFP Response ................. 15

                2.    Express Scripts' general commitments to its clients.................... 15

                 3.    Express Scripts' statements supporting transparency ................. 17

                 4.    Express Scripts' representations about the price of insulin
                      for patients ................................................................................... 18

                5.    Representations about Express Scripts' P&T Committee .......... 19

    IV.    Albany's Contracts with Express Scripts Doom Its Unjust Enrichment
        Claim..................................................................................................................... 20

    V.    The Indirect Purchaser Rule Bars Albany's Section 1962(c) RICO Claim......... 21

    VI.    The County's RICO Conspiracy Claim Under Section 1962(d) Fails
        Because Its Section 1962(c) Claim Fails. ............................................................. 23

    VII.    The County's Civil Conspiracy Claim Is Not an Independent Cause of
        Action................................................................................................................... 24

    VIII.    Defendant Evernorth Is Not Liable for the Actions of Its Subsidiaries............... 24

CONCLUSION.................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Berg Harmon Assocs.*,
    816 F. Supp. 919 (S.D.N.Y. 1993) ...................................................................14

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
    483 U.S. 143 (1987) ........................................................................................11

*Alpine Bank v. Hubbell*,
    555 F.3d 1097 (10th Cir. 2009) ......................................................................16

*Apple Inc. v. Pepper*,
    139 S. Ct. 1514 (2019) ...............................................................................21, 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................5, 6

*Aziz Zarif Shabazz v. Pico*,
    994 F. Supp. 460 (S.D.N.Y. 1998) .................................................................12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................................5

*Bologna v. Allstate Ins. Co.*,
    138 F. Supp. 2d 310 (E.D.N.Y. 2001) ............................................................15

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC*,
    2013 WL 57861 (N.D. Cal. Jan. 3, 2013) .......................................................16

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
    516 N.E.2d 190 (N.Y. 1987) ...........................................................................20

*Cohen v. Cap. One Funding, LLC*,
    489 F. Supp. 3d 33 (E.D.N.Y. 2020) ..............................................................17

*Corsello v. Verizon N.Y., Inc.*,
    967 N.E.2d 1177 (N.Y. 2012) .....................................................................20, 21

*Crawford v. Franklin Credit Mgmt. Corp.*,
    758 F.3d 473 (2d Cir. 2014) ............................................................................14

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) .............................................................17

*Duesler v. Cloverleaf Modular Homes Inc.*,
    2006 WL 8453637 (N.D.N.Y. Mar. 8, 2006) .................................................14

*Efron v. Embassy Suites (Puerto Rico), Inc.*,
    223 F.3d 12 (1st Cir. 2000)........................................................................14

*Endemann v. Liberty Ins. Corp.*,
    390 F. Supp. 3d 362 (N.D.N.Y. 2019).................................................6, 22

*Fetter v. Schink*,
    902 F. Supp. 2d 399 (S.D.N.Y. 2012)..........................................................8

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) ...................................................................16

*Friedman v. Nationwide Ins. Co. of Am.*,
    2017 WL 11635406 (C.D. Cal. Feb. 9, 2017)............................................15

*Gagliardi v. Ward*,
    967 F. Supp. 67 (N.D.N.Y. 1997)..............................................................14

*Gaidon v. Guardian Life Ins. Co. of Am.*,
    750 N.E.2d 1078 (N.Y. 2001).....................................................................11

*Georgia Malone & Co. v. Rieder*,
    973 N.E.2d 743 (N.Y. 2012)................................................................6, 20

*Gerschel v. Christensen*,
    40 N.Y.S.3d 41 (N.Y. App. Div. 2016) .....................................................12

*Great Lakes Motor Corp. v. Johnson*,
    68 N.Y.S.3d 614 (N.Y. App. Div. 2017) ...................................................24

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*,
    171 N.E.3d 1192 (N.Y. 2021).......................................................................6

*Illinois Brick v. Illinois*,
    431 U.S. 720 (1977)...............................................................................21, 22

*In re AT&T/DirecTV Now Sec. Litig.*,
    480 F. Supp. 3d 507 (S.D.N.Y. 2020)........................................................17

*In re Insulin Pricing Litig.*,
    2019 WL 643709 (D.N.J. Feb. 15, 2019) ..................................................21

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*,
    871 F. Supp. 709 (S.D.N.Y. 1995) ............................................................24

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995)..............................................................................3

iii

*Kansas v. UtiliCorp United, Inc.*,
 497 U.S. 199 (1990)..................................................................................22

*Kirby McInerney & Squire, LLP v. Hall Charne Burce & Olson, S.C.*,
 790 N.Y.S.2d 84 (N.Y. App. Div. 2005) ...................................................21

*Manchester Equip. Co. v. Panasonic Indus. Co.*,
 529 N.Y.S.2d 532 (N.Y. App. Div. 1988) .................................................18

*Markwica v. Davis*,
 473 N.E.2d 750 (N.Y. 1984).......................................................................21

*Marshall v. Hyundai Motor Am.*,
 334 F.R.D. 36 (S.D.N.Y. 2019) ..................................................................15

*Matana v. Merkin*,
 957 F. Supp. 2d 473 (S.D.N.Y. 2013)........................................................11

*Miss. ex rel. Fitch v. Eli Lilly & Co.*,
 No. 21-cv-674 (S.D. Miss. Aug. 15, 2022).................................................25

*Moody v. Ocwen Loan Servicing, LLC*,
 2016 WL 8814352 (C.D. Cal. Feb. 22, 2016).............................................15

*Morris v. N.Y. State Dep't of Tax. & Fin.*,
 82 N.Y.2d 135 (N.Y. 1993) .........................................................................25

*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*,
 2019 WL 1418129 (D.N.J. Mar. 29, 2019).................................................21

*Nelson v. Publishers Circulation Fulfillment, Inc.*,
 2012 WL 760335 (S.D.N.Y. Mar. 7, 2012) ................................................14

*One World, LLC v. Onoufriadis*,
 2021 WL 4452070 (2d Cir. Sept. 29, 2021) ...............................................23

*Puebla Palomo v. DeMaio*,
 403 F. Supp. 3d 42 (N.D.N.Y. 2019)..........................................................24

*Rotella v. Wood*,
 528 U.S. 549 (2000).....................................................................................12

*Sanchez v. ASA Coll., Inc.*,
 2015 WL 3540836 (S.D.N.Y. June 5, 2015) ..............................................14

*Schwab v. Philip Morris USA, Inc.*,
 449 F. Supp. 2d 992 (E.D.N.Y. 2006), ......................................................21

*Solutia Inc. v. FMC Corp.*,
  456 F. Supp. 2d 429 (S.D.N.Y. 2006) ..................................................................15

*Sperber v. Boesky*,
  849 F.2d 60 (2d Cir. 1988) ..............................................................................21

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) .............................................................................12

*Stanley v. Direct Energy Servs., LLC*,
  466 F. Supp. 3d 415 (S.D.N.Y. 2020) ...............................................................20

*Sulieman v. Igbara*,
  599 F. Supp. 3d 113 (E.D.N.Y. 2022) ...............................................................13

*United States v. Bestfoods*,
  524 U.S. 51 (1998) ...........................................................................................24

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ...............................................................18

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
  127 F. Supp. 3d 156 (S.D.N.Y. 2015) .................................................................4

*Wender v. Gilberg Agency*,
  716 N.Y.S.2d 40 (N.Y. App. Div. 2000) ............................................................12

*Williams v. Affinion Grp., LLC*,
  889 F.3d 116 (2d Cir. 2018) .......................................................................13, 23

**Statutes**

15 U.S.C. § 15b ...................................................................................................11

18 U.S.C. § 1341 .................................................................................................13

18 U.S.C. § 1343 .................................................................................................13

18 U.S.C. § 1961 ...................................................................................................6

18 U.S.C. § 1962 ........................................................................................... passim

New York Civil Practice Law and Rules § 214 ...................................................11

New York General Business Law § 349 ...................................................... passim

**Rules**

Fed. R. Civ. P. 8 ....................................................................................................5

Fed. R. Civ. P. 9 ............................................................................................13, 14

Fed. R. Civ. P. 12 ................................................................................................12

**Regulations**

42 C.F.R. § 423.120(b) .........................................................................................19

## INTRODUCTION

The County of Albany, New York ("Albany" or "the County") complains about manufacturers increasing their insulin list prices by amounts that are largely offset by manufacturer-paid revenues passed back to Albany on terms that it negotiated, at times in amounts more than the rebates themselves.   Despite attempting to remove embarrassing admissions, Albany's First Amended Complaint (ECF No. 137) ("FAC") does not change these fundamental truths raised in Express Scripts'[1] motion to dismiss Albany's original complaint, and remain fatal to the County's tweaked claims.

The County speculates that the reason insulin prices have risen over the last decade is that certain Pharmacy Benefit Managers—Express Scripts, CVS Caremark, OptumRx ("PBMs")—conspired with the three largest insulin manufacturers—Eli Lilly, Novo Nordisk, and Sanofi-Aventis ("Manufacturers")—to drive up insulin prices in exchange for rebates paid by Manufacturers to PBMs.  Albany's complaint paints an incomplete, distorted picture of the market for insulin—a lifesaving drug necessary for millions of Americans.  For brief moments, Albany identifies what it describes as the key drivers of rising insulin prices.  Albany asserts that most of the insulin products have remained under patent until recently, and that Manufacturers use patent "evergreening" and other techniques to make "new competition more costly and risky."  FAC ¶ 235.  This makes the market for insulin "unique" because there are "no true generics[,] few biosimilar options," and few manufacturers.  *Id.* ¶ 311.  Albany recognizes that each Manufacturer alone has the power to set the list price for its insulin products, and the prices Manufacturers set impact what everyone in the distribution chain pays for such products.  *See id.* ¶ 265.

---

[1] Evernorth Health, Inc. (formerly Express Scripts Holding Company), Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc. are referred to collectively as "Express Scripts."

With a lack of biosimilar competition and sky-high demand for an essential product, Manufacturers have repeatedly and "dramatically" raised their list prices over the years.  *See id.* ¶¶ 254–62.  Yet, just as they were free to raise prices, Manufacturers recently *decreased* the list prices for certain insulin products substantially.  *See* ECF No. 146 at 3–5 ("Am. RICO Statement"). In short, Manufacturers have the pricing power to set the price they believe the market will bear.

PBMs serve to counter that pricing power.  In such a concentrated market with patented drugs, absent price restraints imposed by competition from generic and biosimilar alternatives, PBMs' influence to resist "exponential" price increases is more limited.  *See* FAC ¶ 261.  But by leveraging the purchasing behavior of its collective clients, Express Scripts can negotiate discounts—frequently paid as rebates—to blunt Manufacturers' price increases.  Albany originally acknowledged that these rebates have generated material client savings by noting that list prices "have increased exponentially" while "the net price has not."  Compl. ¶ 278.  This inconvenient concession was omitted in the amended pleading.  But its strategic omission makes it no less true; Albany still alleges the "list price" is a "false price" because the "net prices that the Manufacturers ultimately realize" are much lower than the list prices.  FAC ¶ 21.

Clients like Albany are free to apply the savings generated by their contracts with Express Scripts in whatever way they determine—to reduce members' retail prices for particular drugs at the point of sale, to offset premium increases, to invest in wellness or education programs, or to address costs borne elsewhere in the health plans they sponsor.  Clients' decisions to retain the rebates instead of passing them on to beneficiaries can lead to higher out-of-pocket costs for diabetics, even if other plan participants (or all participants collectively) benefit from those savings in other ways.  If Albany believes that diabetics are bearing a disproportionate share of Manufacturers' increasing drug prices, then Albany need look only to itself to determine why.

Albany's contracts with Express Scripts reveal that Albany benefits immensely from Express Scripts' efforts to reduce the County's cost of insulin, even if the County chooses not to share that savings with its members. For more than twelve years, Albany has contracted for PBM services with Express Scripts, Inc. ("ESI") or its predecessor, Medco Health Solutions ("Medco"), and those contracts have clear and unambiguous terms. Those terms show the hollowness of claims premised on a supposed "Insulin Pricing Scheme" involving a complex, multi-party conspiracy between PBMs and Manufacturers. For this and other reasons discussed below, the Court should dismiss Albany's amended complaint for failure to state a claim.

## BACKGROUND

The "unifying factor" in drug pricing "is that the price that each entity in the pharmaceutical chain pays for a drug is inexorably tied to the price set by the manufacturer." FAC ¶ 265. One reported price of a drug is its Average Wholesale Price ("AWP"). *Id.* ¶ 266.

At least until very recently, Manufacturers have raised the reported price of insulin "exponentially." *See id.* ¶¶ 254–62. PBMs have no control over the reported price, but PBMs have been able to negotiate substantial rebates to lower net prices, which directly benefits clients like Albany. *See id.* ¶¶ 354–55. Albany alleges that PBMs historically have retained "substantial" portions of rebates or other Manufacturer payments. *Id.* p. 80. For that reason, Albany's 2017 Request for Proposals ("RFP") required any PBM to pass through 100% of the rebates received from Manufacturers—in some circumstances passing through *more than* 100% of the revenue received—and utilize a "transparent pricing model" for its bid. *Id.* ¶ 466; Ex. 1, p. 8 & 44. [2]

---

[2] Numbered exhibits are attached to the Declaration of Jason R. Scherr. Pin cites refer to the page number of the PDF rather than any internal pagination. The Court may consider integral documents referenced in the complaint, like Exhibits 1 and 2, without converting the motion to one for summary judgment. *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

3

While all PBMs bid on the RFP, ESI's proposal won.  FAC ¶¶ 467, 469; *see also* Ex. 2.
Albany engaged benefits consultant Locey & Cahill, LLC to analyze the competing proposals.  Ex.
3 (July 13, 2018 Mem.).[3]  The consultant noted that "actual drug pricing models" were "very
competitive," which was "not surprising in this very competitive marketplace."  *Id.* at 12.  The
consultant also emphasized that under Albany's "transparent pricing" requirement, the selected
PBM "will not have the ability to retain any portion of the negotiated price relative to the ingredient
cost nor will [it] be able to retain any portion of the prescription drug rebates."  *Id.* at 14.  The
parties entered into a contract with a February 1, 2019 effective date memorializing the pricing
ESI offered in response to Albany's RFP.  FAC ¶ 469; *id.* Ex. C.

ESI had served as Albany's long-term PBM (through ESI's predecessor, Medco) since
2010.  *Id.* ¶ 462; *id.* Ex. B.  Both ESI and Medco delivered "transparent pricing" that Albany
specified.  And both contracts also explicitly state that Express Scripts does *not* serve as a fiduciary
of Albany for the services at issue here.  *Id.* Ex. C § 5.2, p. 8 ("Sponsor [i.e. Albany] acknowledges
and agrees that . . . neither it nor the Plan intends for ESI to be a fiduciary (as defined under ERISA
or state law) of the Plan . . . ."); *id.* Ex. B § 14.8, p. 14 ("SPONSOR will not name or represent
that Medco is, and Medco will not be, a Plan Administrator or, except as specifically set forth in
this section, a fiduciary of any prescription drug benefit plan . . . .").

Albany alleges it has paid too much for insulin by self-funding health care coverage for its
employees and by purchasing insulin for county-run facilities like prisons.  *See id.* ¶¶ 35–39.

Express Scripts and other Defendants moved to dismiss Albany's complaint in December
2022.  Without seeking leave or requesting the other parties' consent, Albany filed an amended

---

[3] The analysis is publicly available.  *See* Scherr Decl. ¶ 6.  The Court may take judicial notice of
government records "retrieved from official government websites."  *Wells Fargo Bank, N.A. v.
Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (collecting cases).

pleading on February 24, 2023 in lieu of responding to the motions to dismiss.  In the First

Amended Complaint, like in the original pleading, Albany bases five causes of action on what it

terms an "Insulin Pricing Scheme": (1) violation of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (2) violation of RICO, 18 U.S.C. § 1962(d);

(3) violation of New York General Business Law § 349 ("GBL § 349"), (4) unjust enrichment,

and (5) civil conspiracy.  *Id.* ¶¶ 508–606.  After the Amended Complaint was filed, the County

filed an amended RICO statement required under Local Rule 9.2.

**ARGUMENT**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The

allegations "must be enough to raise a right to relief above the speculative level."  *Twombly*, 550

U.S. at 555.  "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  If alleging conspiracy, the "need

at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement

reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft

'to show that the pleader is entitled to relief.'"  *Twombly*, 550 U.S. at 557 (quoting Rule 8).

**I.**     **Albany's Contracts with Express Scripts Fatally Contradict Albany's Allegations of Fraud, Deceptive Conduct, and Unjust Enrichment.**

Albany's alleged "Insulin Pricing Scheme" involves Manufacturers raising the list prices

of insulin to "artificially" high levels and then using the higher prices to fund rebates and other

payments to PBMs.  FAC ¶ 317.  Albany repeatedly criticizes the supposed secrecy of PBMs

negotiating with pharmacies and Manufacturers to lower the price of insulin.  In particular, Albany

claims Express Scripts and other PBMs profit by "(1) retaining a significant, yet undisclosed,

5

percentage of the Manufacturers Payments, (2) using the inflated reported price to generate profits from pharmacies, and (3) relying on the inflated list price to drive up the PBMs' margins through their own mail-order pharmacies." *Id.* ¶ 351.

The crux of Albany's complaint is that these practices are "fraudulent," "unfair and deceptive," and "unjust" in contravention of the various standards for each theory. *See* 18 U.S.C. §§ 1961(1), 1962(a) (using mail or wires to obtain money by "false or fraudulent pretenses"); *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 171 N.E.3d 1192, 1197 (N.Y. 2021) (GBL § 349 requiring "deceptive or misleading" practices); *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (unjust enrichment when retention of benefit is "against equity and good conscience").

Albany must plead facts to make its allegations plausible. *See Iqbal*, 556 U.S. at 678. But Albany's allegations, and the terms of the contracts Albany alleged it negotiated, show that Express Scripts did not engage in fraudulent, unfair, deceptive, or unjust conduct. These publicly available contracts, attached to the pleading, "control" over any contrary allegations in the complaint. *Endemann v. Liberty Ins. Corp.*, 390 F. Supp. 3d 362, 370 (N.D.N.Y. 2019) ("When documents attached to the complaint as exhibits or incorporated by reference in the complaint contain statements that contradict the allegations in the complaint, the documents control and the Court need not accept the allegations as true.").

## A.    Express Scripts Passes Through Not Less Than 100% of Rebates to Albany and Discloses Any Other Manufacturer Revenue.

Albany's own contracts refute its theory that Express Scripts unlawfully retains Manufacturer rebates and fails to disclose non-rebate Manufacturer revenues. *See* FAC ¶¶ 352–97. Regarding rebates, Albany received *the greater of* 100% of what ESI received or certain guaranteed amounts, enabling Albany to potentially receive more than ESI did. Ex. 2 at Ex. A-3.

This identical pass-through was included in the 2019 contract memorializing the agreement.  FAC Ex. C at Ex. A-3.  In its earlier contract, Medco also guaranteed a similar pass-through for Albany. *Id.* Ex. B § 6.2, p. 8 (providing "the greater of (i) 100% of the Total Rebates received by Medco based on the dispensing of each manufacturer's formulary drugs under SPONSOR'S Program or (ii) the Guaranteed Rebates (as defined [later in contract])").

Express Scripts never "hid the ball" about other retained Manufacturer payments, as demonstrated by Albany's contracts plainly defining rebates as directly attributable to members' utilization of rebate-driving drugs.  *Compare id.* ¶ 357, *with id.* Ex. C § 1.25, p. 3.  Rebates do not include, among other things, Manufacturer Administrative Fees ("MAFs")—which are both identified and defined in plain language as fees paid by Manufacturers not for drug utilization driven by formulary design, but for separate services provided by ESI to Manufacturers "in connection with ESI's invoicing, allocating and collecting the Rebates under the Rebate program." *Id.* Ex. C § 1.15, p. 3.  The maximum MAF that ESI can receive is expressly disclosed.  *Id.* Ex. D, p. 40.  Express Scripts also disclosed in both the RFP response and in the contract that it may have other sources of revenue from Manufacturers.  *See* Ex. 2 at 4; FAC Ex. C at Ex. D pp. 40–41.  And Albany negotiated for the right to audit rebate payments and other pass-through arrangements.  *See* FAC Ex. C at Ex. B, pp. 34–35.

Albany alleges that "[h]istorically," PBMs contracted to "keep most or all of the rebates they received."  *Id.* ¶ 354.  But Albany's 2010 contract with Medco showed that, even back then, Albany received not just formulary rebates but also other amounts paid by Manufacturers.  Medco disclosed that it received "Additional Rebates and Fees" that include amounts "which may take into account various factors, including the utilization of certain drugs."  *Id.* Ex. B § 6.2, p. 7. Albany negotiated for those to be passed through to Albany *in addition to* the "Formulary Rebates"

that Medco received "as a result of the inclusion of those manufacturers' branded products" on Medco's formulary.  *See id.*  Albany also fully knew which Manufacturer payments it contracted for Medco to retain, namely: "payments [for] services rendered by Medco on behalf of or to pharmaceutical manufacturers."  *Id.*[4]  There is nothing secret about these terms; neither is there anything "unfair" or "deceptive" about abiding by the contract that Albany negotiated for retention or pass-through of Manufacturer payments.

Albany's response now is to challenge the terms within the contracts it negotiated—alleging that the term "rebates" is too narrowly defined in the PBM-payor contracts, *id.* ¶¶ 355, 360; that PBMs prevent the County from auditing rebates by excluding various fees from their definition, *id.* ¶ 358; and that Manufacturers play an improper role in selecting PBM-payor contract terms*, id.* ¶ 356.  But these complaints sound in contract, not fraud.  *See Fetter v. Schink*, 902 F. Supp. 2d 399, 404 (S.D.N.Y. 2012) ("Under New York law, 'a cause of action sounding in fraud is not viable when the only fraud charged relates to a breach of contract.'").  Albany does not bring a breach of contract claim or seek rescission of its contract with Express Scripts.  And these new allegations only highlight the purely contractual nature of the County's claims.

Albany also implies something mischievous about Manufacturer inflation payments—which Manufacturers agree to pay if they raise their list prices above a set amount—and the protections ESI offers its clients.  *See* FAC ¶¶ 363–67.  But Albany itself negotiated to participate in ESI's Inflation Protection Program, under which ESI is willing to assume the risk of Manufacturers increasing the list price of drugs *irrespective of Express Scripts' ability to negotiate*

---

[4] These services include, for example, "adherence, compliance, nursing, and other patient support services; patient referral and assistance services; product launch and other support services; equipment replacement services; clinical and research studies, data and analytics; and services related to high-risk biopharmaceuticals."  FAC Ex. B § 6.2, p. 8.

*discounts from Manufacturers*. Indeed, the agreement provides that ESI's "Inflation Protection Program, and the underlying economics[,] is separate and apart from, any Rebates/Total Rebates paid to Sponsor [Albany] and the amounts described above will be paid to Sponsor in addition to any Rebate/Total Rebate payments to which Sponsor is entitled." *Id.* Ex. C at Ex. A-5, p. 31.

Without further explanation, Albany alleges "Defendants were supplying a vital service of a quasi-public nature." *Id.* ¶ 472. But the County is the real public entity, which could pass along rebates to its diabetic citizens had it chosen to do so. Express Scripts is a private company that is neither a charity nor a fiduciary or guarantor for the County. There is nothing wrong with Express Scripts making a profit, or suffering a loss, based on the allocation of risk for which it contracts with sponsors like Albany. If Manufacturers unilaterally raise the list price of their drugs enough to trigger an "inflation fee," but less than the client' price protection guarantee as Albany suggests, *see id.* ¶¶ 365–67, then Express Scripts benefits only as the contract contemplates. This lawful possibility is fully disclosed: "ESI contracts for inflation payments from manufacturers for its own account and ESI may realize positive margin between amounts paid to Sponsors and amounts received from pharmaceutical manufacturers." *Id.* Ex. C at Ex. A-5, p. 33. What Albany ignores is that ESI can lose money if it negotiates inflation fees from Manufacturers less than payments due Albany. *See id.* The protection to which Albany is entitled is precisely what it negotiated.

### B.    Albany Pays What Express Scripts Pays Network Pharmacies for Insulin.

Albany alleges that the so-called pricing scheme allows Express Scripts "to derive profit from the pharmacies with whom they contract, including those in Albany County." *Id.* ¶ 382. Albany asserts that PBMs "pocket the spread between the amount that the PBMs are paid by their clients for the at-issue drugs . . . and the amount the PBM reimburses the pharmacy." *Id.* ¶ 385. And that "PBMs often disclose the concept of spread pricing to payors, but only in vague terms that require no accountability . . . because the revenue is not defined as a 'rebate' in the PBM

contracts with payors." *Id.* ¶ 388. While there is nothing unlawful about Express Scripts earning revenue in this disclosed manner, Albany's own requirements refute the implication that Express Scripts earned any revenue under the Albany contracts through "spread pricing."

This was by Albany's design. Albany specified a pricing proposal in which the PBM would "not retain . . . any money associated with the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies." *Id.* ¶ 466; Ex. 1 at 8. In its cost proposal responding to Albany's RFP, Express Scripts incorporated that specification:

> The retail program offered is a "transparent pricing" model. **This means that Express Scripts will not retain any money associated with the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies.**

Ex. 2 at 5 (emphasis added). The reimbursement rates Albany would pay are also described in detail in Exhibit A-2 of the cost proposal. *See id.* at 18. For in-network pharmacies, the reimbursements are a "pass-through" with a backstop guarantee of a certain percentage off the AWP for drugs. *See id.* The pass-through nature of the pricing, which continued forward in the final contract with Express Scripts, prevented Albany from feeling any impact from spread pricing terms the County now alleges to be vague. FAC Ex. C at Ex. A-2, p. 16; *see id.* ¶ 388.

Albany also negotiated pass-through pricing to avoid any "pharmacy spread" in its prior contract with Medco. For drugs dispensed in Medco's retail pharmacy network, Albany agreed to reimburse Medco "*the lowest of* (i) the pharmacy's usual and customary price, as submitted ('U&C') plus applicable taxes, (ii) the maximum allowable cost ('MAC'), where applicable, plus the Dispensing Fee *contracted with the pharmacy* plus applicable taxes, or (iii) AWP less the AWP discount and Dispensing Fee *contracted with the pharmacy* plus applicable taxes." *Id.* Ex. B at Sched. A § 1, p. 17 (emphases added). Albany's allegations claiming any fraud, deception, or inequity regarding spread pricing do not square with the documents incorporated by the complaint.

C.      **Albany Receives Greater Discounts for Mail-Order Pharmacy Orders When Manufacturers Raise the List Price of Insulin.**

Albany asserts that "the more the Manufacturers inflate their prices, the more money the PBMs make" through mail-order pharmacies. *Id.* ¶ 399. Once again, there would be nothing unlawful about Express Scripts making money in this way, had it happened. But it didn't. Albany receives a *percentage* discount off the AWP set by the insulin Manufacturers. *Id.* Ex. C at Ex. A-2 § 2.2, p. 17; *id.* Ex. B at Sched. A § 2 & Chart A, pp. 17, 22–23. Thus, if Manufacturers raise their list prices, Albany receives a *larger* discount—that's how percentages work.

Albany also speculates that Express Scripts may engage in "arbitrage" by stocking up on insulin—which usually needs to be refrigerated for long-term storage—when supposedly receiving advance notice when Manufacturers are going to raise insulin prices. *See id.* ¶ 399. But even if this allegation were sufficiently plausible to be credible, such arbitrage only shows a potential revenue stream for Express Scripts. It does not show deception, fraud, unfairness, or inequity.

II.     **Albany's RICO, GBL § 349, and Unjust Enrichment Claims Are Time-Barred.**

Albany's demand for "transparent pricing" shows that Albany knew, or at least should have known, of its alleged injuries from the so-called "Insulin Pricing Scheme" before the statute of limitations expired. As a result, the Court should dismiss Albany's objections as barred by the applicable statute of limitations.

The RICO statute of limitations, borrowed from the Clayton Act, is four years. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 152, 156 (1987); 15 U.S.C. § 15b. GBL claims are governed by a three-year limitations period that similarly bars actions that were not commenced in that window. *Gaidon v. Guardian Life Ins. Co. of Am.*, 750 N.E.2d 1078, 1081–83 (N.Y. 2001); N.Y. C.P.L.R. § 214. And where, as here, a plaintiff seeks damages, the statute of limitations applicable to an unjust enrichment claim is three years under New York law. *Matana*

*v. Merkin*, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013).  The RICO limitations period begins to run when the plaintiff knew, or should have known, of its *injuries*—not when it discovers the last predicate act to support a RICO claim.  *Rotella v. Wood*, 528 U.S. 549, 555 (2000).  Similarly, the GBL and unjust enrichment limitations periods cannot be extended based on the discovery rule. *Gerschel v. Christensen*, 40 N.Y.S.3d 41, 43 (N.Y. App. Div. 2016); *Wender v. Gilberg Agency*, 716 N.Y.S.2d 40, 41–42 (N.Y. App. Div. 2000).

Although the statute of limitations is an affirmative defense, a court may dismiss claims on limitations grounds on a Rule 12(b)(6) motion when "the defense appears on the face of the complaint."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  Such is the case here.  Albany asks the Court to toll the statute of limitations by alleging that it did not "beg[in] to learn about the Insulin Pricing Scheme" until "April 2021."  FAC ¶ 492.  But the Court should disregard this self-serving allegation, which is belied by the rest of Albany's pleading.  *See Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 470 (S.D.N.Y. 1998) (courts can "properly disregard[]" a party's argument "based on his inconsistent and contradictory statements").

Albany cites articles dating back to 2016, in which media outlets claimed that PBMs were "incentivized to inflate drug prices," leading to "[r]apdily escalating profits for PBMs and high drug prices for the consumer."  FAC ¶ 341 n.38; *see also id.* ¶ 429 n.67.  Albany alleges that by 2017—June 19, 2017, to be precise (Ex. 1 at p. 5)—it demanded proposals with "a 'transparent pricing' model," meaning the PBM must propose pricing in which it "will not retain any money associated with prescription drug rebates or any money associated with the margin between guaranteed reimbursement rates and the actual amount paid to the pharmacies."  *Id.* ¶ 466; *accord* Ex. 1 at 8.  The existence of such a condition in the RFP demonstrates Albany's awareness of the practices referenced in the articles it cites.  Thus, even if Albany did not read the articles in 2016,

the statute of limitations began accruing no later than June 19, 2017, when it issued the RFP.

Albany filed its complaint more than five years later, on September 16, 2022. *See generally* FAC.

Because the RICO claims and the GBL § 349 and unjust enrichment claims are subject to four-

and three-year limitations periods, respectively, those claims are time-barred. The Court should

dismiss with prejudice Counts I through IV of Albany's Complaint on limitations grounds.

## III.   Albany Failed to Plead Actionable Misrepresentations to Support Counts I–III.

Albany's RICO and GBL § 349 claims sound in fraud. The sole predicate acts supporting

Albany's RICO claims are mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. *See* FAC

¶ 548. And Albany's alleged violations of GBL § 349 turn on supposed "false and misleading

misrepresentations of fact." *Id.* ¶ 584. Yet, Albany fails to plead facts to show Express Scripts

made any actionable representations that could support these claims sounding in fraud.

### A.   Albany Failed to Plead Misrepresentations with Particularity to Support Its RICO Claims.

The County predicates its RICO claims on mail and wire fraud but fails to plead

particularized facts supporting its fraud allegations. Rule 9(b) requires the County to "set forth the

who, what, when, where and how of the alleged fraud." *Sulieman v. Igbara*, 599 F. Supp. 3d 113,

120 (E.D.N.Y. 2022) (quotation omitted). That means the County's "complaint must detail the

specific statements that are false or fraudulent, identify the speaker, state when and where the

statements were made, and explain why the statements were fraudulent." *Williams v. Affinion Grp.,*

*LLC*, 889 F.3d 116, 124 (2d Cir. 2018).

In this circuit, the obligation to plead with particularity is doubly important for RICO

claims. "Given the routine use of mail and wire communications in business operations . . . 'RICO

claims premised on mail or wire fraud,'" like those the County raises here, "'must be particularly

scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from

allegations that, upon closer scrutiny, do not support it.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)).

In its 33-page RICO Statement, the only statements Albany challenges by Express Scripts are two representations in Express Scripts' publicly available annual reports and three statements Express Scripts made in response to the County's RFP. *See* Am. RICO Statement § 5(b–c). And despite its prolixity, the FAC still pleads few specific representations made by Express Scripts or its officers. Those it does include, *see infra*, are untethered to a single County official who allegedly heard or read the representations.

Even without digging into the content of representations themselves, the Court can dismiss Albany's RICO claims for failing to comply with Rule 9(b). Albany fails to identify whom at Albany ever heard or saw any of the alleged misrepresentations, even though the RICO Statement specifically requires disclosure of that information. *See* Am. RICO Statement § 5(c). That alone requires dismissal. *See Duesler v. Cloverleaf Modular Homes Inc.*, 2006 WL 8453637, at *2 (N.D.N.Y. Mar. 8, 2006) (dismissing Plaintiffs' RICO claims for failing to comply with general order requiring RICO Statement); *Gagliardi v. Ward*, 967 F. Supp. 67, 69 (N.D.N.Y. 1997) (same)*; Adler v. Berg Harmon Assocs.*, 816 F. Supp. 919, 925 (S.D.N.Y. 1993) (allegation that does not state "when, where, how, or to whom" statements were made does not satisfy Rule 9(b)).

### B.   The Specific Alleged Misrepresentations Are Not Actionable.

In addition to a lack of particularity, Albany fails to identify actionable misrepresentations. "[O]pinions and puffery or ultimately unfulfilled promises" do not state a violation of the mail or wire fraud statutes supporting a RICO claim. *Nelson v. Publishers Circulation Fulfillment, Inc.*, 2012 WL 760335, at *4 (S.D.N.Y. Mar. 7, 2012). A plaintiff cannot base a fraud claim on "subjective claims about products, which cannot be proven either true or false." *Sanchez v. ASA*

*Coll., Inc.*, 2015 WL 3540836, at *9 (S.D.N.Y. June 5, 2015).  The same requirement to plead statements of facts that can be proven false, rather than opinions, also applies to Albany's GBL § 349 claim.  *See, e.g.*, *Marshall v. Hyundai Motor Am.*, 334 F.R.D. 36, 52 n.14 (S.D.N.Y. 2019) (noting that puffery is "not actionable under . . . New York's consumer protection statutes").  The particular misrepresentations Albany details in its complaint fail to state a viable claim.

### 1.    *Express Scripts' representations in its RFP Response*

Albany cries foul at Express Scripts' alleged failure to "reveal in its 2017 RFP response or elsewhere that it had coordinated with the Manufacturers" to determine PBM-payor contract terms, create formularies, or set prices.  FAC ¶ 434.  But as two parties "participating in an arms'-length transaction," neither Albany nor Express Scripts served as the other's fiduciary.  *See Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 447 (S.D.N.Y. 2006).  Therefore, neither party owed the other a duty to disclose its dealing with other parties.  *See id.*  Regardless of how the parties reached the terms to which they agreed, what is important is that Express Scripts fulfilled its contractual promise to "pay the County 100% of the non-specialty formulary rebates it receives based on the County's specific utilization."  FAC ¶ 433.  Even drawing all reasonable inferences in the County's favor, its pleading—which conspicuously fails to address Express Scripts' satisfaction of its contractual obligations—does not even suggest otherwise.

### 2.    *Express Scripts' general commitments to its clients.*

Statements that an entity will be on a client's "side" or advocate for them "constitute puffery and are therefore not actionable."  *See Friedman v. Nationwide Ins. Co. of Am.*, 2017 WL 11635406, at *3 (C.D. Cal. Feb. 9, 2017) ("Nationwide's advertisements that it is on the insured's side and will act as the insured's advocate . . . constitute puffery and are therefore not actionable."); *see also Bologna v. Allstate Ins. Co.*, 138 F. Supp. 2d 310, 323 (E.D.N.Y. 2001) ("'You're in good hands with Allstate,' is general, subjective, and cannot be proven true or false."); *Moody v. Ocwen*

*Loan Servicing, LLC*, 2016 WL 8814352, at *4–5 (C.D. Cal. Feb. 22, 2016) (loan servicer's slogan that "Helping Homeowners Is What We Do!" was "a quintessential example of non-actionable puffery" under state false-advertising law); *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106–07, 1112–13 (10th Cir. 2009) (bank's slogan that "You concentrate on your dream. We'll take care of everything else." was puffery and nonactionable under state consumer-protection act).  The same is true for statements that a defendant will lower costs.  *See*, *e.g., Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir. 1997) (concluding that statements that defendant could "control costs" and save money were "too general" to support fraud claim), *overruled on other grounds by Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012); *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, 2013 WL 57861, at *10 (N.D. Cal. Jan. 3, 2013) (holding that the advertising claims of "save money" and "simple, easy and flexible" were "non-actionable puffery since they are vague and highly subjective" in case involving GBL § 349 claims).

Yet the vast majority of statements that Albany identifies are these are exactly these anodyne statements or opinions that cannot support a fraud allegation:

- Express Scripts "works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain, and to improve members' health outcomes." FAC ¶ 428; RICO Statement § 5(b–c).

- Express Scripts President Tim Wentworth said in 2016 that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary." FAC ¶ 324.

- Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts represented in an interview with a national publication that "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease" and that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs." *Id.* ¶ 429 (alterations in original).

- Express Scripts' code of conduct states that it is "dedicated to keeping our promises to patients and clients." *Id.* ¶ 430.

- Amy Bricker testified: "I have no idea what the prices [for insulin] are so high, none of it is the fault of rebates." *Id.* ¶ 431 (alteration in original).

- In a February 2017 earnings call, Express Scripts' CEO said: "Drugmakers set prices, and we exist to bring those prices down." *Id.*

- Express Scripts' CEO said in 2017 CBS interview that PBMs "negotiate with drug companies to get the prices down." *Id.*

### 3.    *Express Scripts' statements supporting transparency*

Albany alleges that Express Scripts' CEO said in 2017 that "Express Scripts was 'absolutely transparent' about the Manufacturer Payments they receive and that payors 'know exactly how the dollars flow' with respect to these Manufacturer Payments." *Id.* ¶ 439.  What he actually said is that Express Scripts "*support[s]* absolute transparency with our *clients* and we support as well with patients," and that *clients* know "how the dollars flow" even if *patients* necessarily do not.  Ex. 4 at 3 (emphasis added).[5]

Regardless, general promises of "transparency" are non-actionable statements of opinion. *See, e.g., Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 806 (S.D.N.Y. 2018) ("aspirational statements, such as that [a company] 'is committed, in principle and practice, to transparency consistent with good governance' . . . are merely generalizations regarding [the company's] business practices and are thus precisely the type of puffery that this and other circuits have consistently held to be inactionable" (quotations omitted)); *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 524 (S.D.N.Y. 2020) (company's "'core set of values,' set forth in its 'Code of Business Conduct,' and its commitment to 'the highest standards' and 'operating with integrity, transparency, and honesty in everything' it does" are examples of "[n]on-actionable puffery");

---

[5] The Court can consider the complete transcript of the interview because Albany excerpted the interview in its complaint.  *Cohen v. Cap. One Funding, LLC*, 489 F. Supp. 3d 33, 44 (E.D.N.Y. 2020) ("Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss.").

*Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) ("statements touting [Defendant's] focus on compliance, building trust with various stakeholders, and transparency are examples of corporate optimism and puffery").   And even if the actual statements about transparency were actionable, the State's contracts with Albany show they are not false.  *See supra* § I;  *Manchester Equip. Co. v. Panasonic Indus. Co.*, 529 N.Y.S.2d 532, 534 (N.Y. App. Div. 1988) ("The provisions of the written contract which directly contradict the allegations of oral representations must be taken into account in evaluating a fraud claim." (quotation omitted)).

4.     *Express Scripts' representations about the price of insulin for patients*

Albany fails to identify any misrepresentation about PBM-negotiated savings lowering patient costs.  *See* FAC ¶ 430.  Express Scripts' clients, like Albany, decide how to spend rebate dollars.  Many clients choose to retain the rebates to lower premiums or fund other priorities. Clients' choices to retain rebates to lower premiums are consistent with Express Scripts' Senior Vice President's cited testimony before Congress that the lower prices Express Scripts negotiates from manufacturers are "returned to patients *in the form of lower premiums* and reduced out-of-pocket costs." *Id.* (emphasis altered).

Albany itself has received at least 100% of the rebates that Express Scripts has received since 2010.  *See supra* § I.  Albany tellingly does not allege that it chooses to pass through those rebates directly to its members to reduce their out-of-pocket costs at the point of sale, as Albany is free to do.  *See generally* FAC Exs. B–C.  To the extent the rebates are not passed through to Albany's beneficiaries at the pharmacy, that's Albany's choice.  But Albany cannot choose to retain those rebates and then blame Express Scripts for Albany being able to make that decision.

5.       *Representations about Express Scripts' P&T Committee*

Finally, Albany reaches to certain annual reports filed with the SEC to include Express Scripts' explanation of the role of its "Pharmacy & Therapeutics Committee" ("P&T Committee") in formulary development:

> Express Scripts' [P&T Committee] considers the drug's safety and efficacy, without any information on or consideration of the cost of the drug, including any discount or rebate arrangement that Express Scripts negotiates with the Manufacturer, and that Express Scripts fully complies with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of safety and efficacy.

*Id.* ¶ 428.  P&T Committees are standard in the industry.  For instance, the federal government requires a Medicare Part D sponsor to maintain a P&T Committee to develop and review the formularies.  *See* 42 C.F.R. § 423.120(b).

But the P&T Committee is not Express Scripts as a whole.  Albany tries to make hay out of conflating the P&T Committee—which focuses solely on clinical necessity in making formulary recommendations—and Express Scripts as a PBM—which absolutely considers the net cost to its clients for certain clinically interchangeable drugs, like insulin.  Albany knows this because its contract with Express Scripts expressly recognized that the formulary Albany selected could be modified from time to time based not only on "medical appropriateness," but on "manufacturer Rebate arrangements, and patent expirations" as well.  FAC Ex. C § 1.12, p. 3.

Albany includes nothing to support an accusation that Express Scripts' independent P&T Committee considered anything but clinical effectiveness, and does not even mention the P&T Committee again elsewhere. Albany has not alleged facts sufficient to even suggest that Express Scripts' statements in its annual reports about its P&T Committee are misrepresentations.

19

**IV.**   **Albany's Contracts with Express Scripts Doom Its Unjust Enrichment Claim.**

As an "alternative to any claim [the County] may have for legal relief," Albany claims

Express Scripts "received a financial windfall from the Insulin Pricing Scheme at Plaintiff's

expense."  FAC ¶¶ 594–95.  As a quasi-contract theory, unjust enrichment only contemplates an

obligation "imposed by equity to prevent injustice, *in the absence of an actual agreement between*

*the parties*."  *Ga. Malone & Co., Inc. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (emphasis

added).  Where "a valid and enforceable written contract govern[s] a particular subject matter,"

the contract "ordinarily precludes recovery in quasi contract for events arising out of the same

subject matter."  *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987).

As Albany's contracts with Express Scripts directly address the amounts reimbursed for insulin,

they govern the instant dispute and preclude recovery in unjust enrichment.

Albany's effort to avoid this bar by pleading unjust enrichment in the "alternative" to its

claims for "legal relief," FAC ¶ 594, may be a feint to invoke the principle that some courts permit

a party to plead unjust enrichment in the alternative to a *breach of contract* claim.  *Stanley v. Direct*

*Energy Servs., LLC*, 466 F. Supp. 3d 415, 430 (S.D.N.Y. 2020) (noting limitations of that

principle).  But despite repeatedly invoking these contracts that are central to its dealings with

Express Scripts, Albany does not bring a breach of contract claim.  Nor does Albany dispute the

validity of the contracts themselves.

Unjust enrichment cannot be used in the alternative to other claims. "An unjust enrichment

claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim,"

nor is it "a catchall cause of action to be used when others fail."  *Corsello v. Verizon N.Y., Inc.*,

967 N.E.2d 1177, 1185 (N.Y. 2012) (quotations omitted).  This equitable remedy is instead

"available only in unusual situations when, though the defendant has not breached a contract nor

committed a recognized tort, circumstances create an equitable obligation running from the

defendant to the plaintiff"—such as when "the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *Id.* (citing *Markwica v. Davis*, 473 N.E.2d 750 (N.Y. 1984); *Kirby McInerney & Squire, LLP v. Hall Charne Burce & Olson, S.C.*, 790 N.Y.S.2d 84 (N.Y. App. Div. 2005)).  Albany's entire case is premised on unsubstantiated allegations of wrongdoing; thus, its unjust enrichment claim is misplaced.

## V.   <u>The Indirect Purchaser Rule Bars Albany's Section 1962(c) RICO Claim.</u>

Albany does not allege that it pays too much for PBM services; it alleges it pays too much for insulin.  *See, e.g.*, FAC ¶ 470–71 ("Defendants' Insulin Pricing Scheme has cost Plaintiff millions of dollars in overcharges . . . more than $5.4 million on the at-issue diabetes medications.").  Only direct purchasers of a product may bring RICO claims, and the County alleges it's a direct purchaser of insulin only for certain "county-run facilities." *Id.* ¶ 405.

In *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that only direct purchasers could sue under the antitrust laws.  Indirect purchasers, whose resellers render them "two or more steps removed from the antitrust violator in a distribution chain," could not sue. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019).  The Second Circuit applies the Indirect Purchaser Rule to RICO claims.  *See, e.g.*, *Sperber v. Boesky*, 849 F.2d 60, 65 (2d Cir. 1988); *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1051 (E.D.N.Y. 2006), *rev'd on other grounds* by *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008).  And courts have applied the bar at the pleading stage to dismiss RICO claims in cases involving nearly identical allegations. *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, 2019 WL 1418129, at *14 (D.N.J. Mar. 29, 2019) (dismissing RICO claims under indirect-purchaser rule because plaintiffs were "not the first party to pay for the analog insulin at a purportedly inflated price"); *see also In re Insulin Pricing Litig.*, 2019 WL 643709, at *7–13 (D.N.J. Feb. 15, 2019) (same).

Outside of county-run facilities, Albany does not, and cannot, allege that Express Scripts distributed insulin to Albany directly.  At most, Albany alleges that Plaintiff "paid Express Scripts" for the at-issue drugs.  FAC ¶ 409.  But creating a distinct "payment chain" instead of "distribution chain" for purposes of the indirect purchaser rule defeats a key purpose of the indirect purchaser rule, which is to "avoid[] complicated damages calculations . . . [and] eliminat[e] duplicative damages against antitrust defendants."  *Apple*, 139 S. Ct. at 1524.

Here, the County alleges that it paid unlawful overcharges for insulin passed down a distribution chain involving other purchasers upstream from the County.  FAC ¶ 264 (alleging insulin is distributed "(1) from manufacturer to wholesaler (distributor), wholesaler to pharmacy, and pharmacy to patient; (2) from manufacturer to mail-order pharmacy to patient; and (3) from manufacturer to mail-order pharmacy, mail-order pharmacy to self-insured payor, and then self-insured payor to patient").  Even if the County sent money to the PBMs, so long as there are intermediaries—such as wholesalers and pharmacies—that can allege an injury from the same purported overcharges, the PBMs would face the potential for duplicative damages and the Court would be faced with the precise apportionment concerns that *Illinois Brick* sought to eliminate. *See, e.g., Apple,* 139 S. Ct. at 1524; *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 208, 212 (1990).  Accordingly, Albany's RICO claims relating to insulin purchased by members—instead of the County directly—should be dismissed.

As to the remaining portion of the County's claim, related to insulin acquired for use in county-run facilities, Albany's allegations of direct purchase are unsupported by the contract—attached to the FAC—pursuant to which the County alleges that it made such purchases.  FAC ¶¶ 405–06.  When the allegations of a pleading depart from the terms of a contract incorporated by reference, the terms of the contract control.  *Endemann*, 390 F. Supp. 3d at 370.  Albany says

its purchases of insulin were governed by agreements with Express Scripts entities dated November 2010 (FAC Ex. B) and February 2019 (FAC Ex. C).[6]  Neither agreement provides for wholesale supply purchases to stock in-house pharmacies at correctional facilities and county-run nursing homes, as Albany posits.  This is not surprising, as the County's RFP does not even request bids for such services.  *See generally* Ex. 1.  Rather, the agreements provide for claims adjudication and other PBM services.  Albany contracted for the actual supply of drugs to be handled by third-party retail pharmacies or by mail-order pharmacies that may or may not be affiliated with the PBM.  *See* FAC Ex. B §§ 3, 4; *id.* Ex. C § 2.2.  But even as to affiliated mail-order pharmacies, the 2010 agreement contemplates dispensing prescription drugs only to named "Eligible Persons"—natural persons; the 2019 agreement likewise provides only for mail-order delivery to "Members."  *Id.*  Neither provides for plan sponsors like Albany to directly purchase drugs as inventory for in-house pharmacies or to further dispense to patients or wards under their care. Because the County's implausible purchasing allegations depart from the contracts on which it relies, they should be disregarded.  Absent plausible allegations that the County directly purchased insulin products from Express Scripts under these contracts, the County cannot avoid the Indirect Purchaser Rule, and the balance of its § 1962(c) claim must be dismissed.

## VI.   **The County's RICO Conspiracy Claim Under Section 1962(d) Fails Because Its Section 1962(c) Claim Fails.**

"[T]o adequately plead a RICO conspiracy under 18 U.S.C. § 1962(d), 'a plaintiff must allege the existence of an agreement to violate RICO's substantive provisions.'"  *One World, LLC v. Onoufriadis*, 2021 WL 4452070, at *1 (2d Cir. Sept. 29, 2021) (quoting *Williams v. Affinion*

---

[6] Albany renewed its agreement with Express Scripts effective October 1, 2022, after it filed the complaint in this action.  Excerpts of the renewed agreement are attached as Exhibit 5, excluding portions that would be duplicative or unnecessarily disclose sensitive information.

*Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018)).  Because Albany did not successfully plead the elements of a § 1962(c) claim, its conspiracy claim under 18 U.S.C. § 1962(d) also fails.

## VII.    The County's Civil Conspiracy Claim Is Not an Independent Cause of Action.

"New York does not recognize civil conspiracy to commit a tort as an *independent* cause of action." *Puebla Palomo v. DeMaio*, 403 F. Supp. 3d 42, 60 n.18 (N.D.N.Y. 2019) (citing *Great Lakes Motor Corp. v. Johnson*, 68 N.Y.S.3d 614, 617 (N.Y. App. Div. 2017)).  Rather, "allegations of conspiracy" serve "only to connect the actions of separate defendants with an otherwise actionable tort." *Id.; see also Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F. Supp. 709, 731 (S.D.N.Y. 1995) (under New York law, "a plaintiff must plead specific wrongful acts that constitute an independent tort").

As set forth above, all the other claims upon which a civil conspiracy claim might have been predicated are defective.  Because all of the County's other claims against the PBMs must be dismissed, its civil conspiracy claim must be dismissed as well.

## VIII.   Defendant Evernorth Is Not Liable for the Actions of Its Subsidiaries.

In contravention of the "general principle of corporate law 'deeply ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries," the County attempts to hold Evernorth liable for the alleged acts of the other PBM defendants. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quotation omitted).  Even if Albany had valid claims against the PBMs, its claims against Evernorth should fail.

Although Albany alleges that "Evernorth, through its executives and employees, including its CEO and Vice Presidents, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme," FAC ¶ 123, its allegations all boil down to accusations of influence over its subsidiaries, the other Express Scripts defendants. *See, e.g.*, *id.* ¶¶ 126 ("Evernorth is the

immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout New York, which engaged in the activities that gave rise to this Complaint."); *id.* ¶ 125 ("On a regular basis, Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.").  In New York, "complete domination of the corporation is the key to piercing the corporate veil." *Morris v. N.Y. State Dep't of Tax. & Fin.*, 82 N.Y.2d 135, 141 (N.Y. 1993).  But even "domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required." *Id.* at 141–42.  And as other courts reviewing similar allegations have held, generalized allegations of parental influence like those in Albany's complaint are insufficient to show the degree of control required to impose liability for a subsidiary's actions. *See, e.g.*, *See Miss. ex rel. Fitch v. Eli Lilly & Co.*, No. 21-cv-674, slip op. at 14–16 (S.D. Miss. Aug. 15, 2022) (concluding plaintiff's "conclusory allegations that the parent companies exercise substantial control" over their subsidiaries was insufficient to pierce the corporate veil and hold parents liable for similar "Insulin Pricing Scheme").

## CONCLUSION

For the foregoing reasons, the Court should dismiss Albany's First Amended Complaint against Express Scripts with prejudice.[7]

\*     \*     \*

---

[7] Express Scripts also adopts the additional arguments for dismissal included in the memoranda of law submitted by its co-Defendants to the extent not included herein.

Dated:  April 14, 2023

Respectfully submitted,

/s/ *Jason R. Scherr*
Jason R. Scherr, Bar Roll No. 703952
Patrick A. Harvey (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave., NW
Washington, D.C. 20004-2541
Phone: (202) 739-3000
Fax: (202) 739-3001
Email: jr.scherr@morganlewis.com
        patrick.harvey@morganlewis.com

*Attorneys for Defendants Evernorth Health*
*(formerly Express Scripts Holding Company),*
*Inc., Express Scripts, Inc., Express Scripts*
*Administrators, LLC, Medco Health*
*Solutions, Inc., ESI Mail Pharmacy Service*
*(sued as ESI Mail Pharmacy Services, Inc.),*
*and Express Scripts Pharmacy, Inc.*